IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | |
|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., DETYENS SHIPYARDS, INC., and HIGHTRAK STAFFING, INC. d/b/a HITRAK STAFFING, INC.<br><br>Defendants. | CASE NO. 2:21-cv-965-RMG<br><br>PLAINTIFF'S RESPONSE IN OPPOSITION TO CROWLEY MARITIME CORPORATION AND CROWLEY GOVERNMENT SERVICES' MOTION FOR SUMMARY JUDMENT |

Plaintiff Tiffany N. Provence, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez ("Plaintiff"), by and through her undersigned counsel, submits this response in opposition to the Motion for Summary Judgment (ECF No. 44, Mot. for Summary Judgment) filed by Defendants Crowley Maritime Corporation ("CMC") and Crowley Government Services ("Crowley").

## INTRODUCTION

After months of discovery in which Crowley takes the position that its contract with the United States did not require it to ensure safe working conditions on the USNS 1st Lieutenant Jack Lummus ("the Lummus") while the ship was undergoing repairs at Detyens Shipyards, Crowley now argues that it cannot be held liable in this case because it was acting as an agent of the United States and is therefore

covered by the exclusive remedy provision of the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, as applied to this matter through the Public Vessels Act, 46 U.S.C. §§ 31101-31113.

The source of any agency relationship between Crowley and the United States is undisputedly Crowley's contract with the Navy's Military Sealift Command ("MSC") to operate the Lummus. As an initial matter, this contract does not establish that the acts and omissions that give rise to Plaintiff's claims—Crowley's negligent oversight and implementation of safety measures aboard the Lummus—were subject to the level of control needed to establish an agency relationship. Moreover, in an apparent effort to argue that it owed no duties in this case, Crowley has repeatedly offered testimony that it was not required by its contract with MSC to engage in oversight or implementation of safety measures on the Lummus. Crowley's own testimony and other evidence in this case creates a dispute of material fact as to whether Crowley's acts and omissions fell within the scope of its agency relationship with the United States.

Crowley should not be allowed to have it both ways. It is inconsistent for Crowley to argue that its actions fell outside of the scope of its contract with the United States while simultaneously arguing that it was acting as an agent of the United States. Therefore, the court should deny Crowley's Motion for Summary Judgment.

## BACKGROUND

Juan Antonio Villalobos Hernandez ("Hernandez") was employed by Southern Skill Trades, Inc. and hired through HiTrak Staffing, Inc. to perform work for Detyens Shipyards, Inc. ("DSI") at the Detyens Shipyard in North Charleston, South Carolina. On the morning of April 3, 2019, Hernandez was assigned to perform repairs to lifeboat davit number 5 aboard the Lummus. A lifeboat davit is a crane-like mechanism designed to secure the lifeboat in a raised position and facilitate the lowering of the lifeboat over the side of a ship when needed. (Exhibit 1, Report of Gerry Nielsen at 4.) The

mechanism works through the controlled release of gravitational energy. In normal operations, the davit arm, and by extension the lifeboat, is locked in place in the upright position by a mechanical restraint known as a "stopper bar." Secondarily, the lifeboat and davit arm are restrained in place by a braided wire rope, known as a "stay," that is attached to a winch at one end and the lifeboat at the other end. Once the stopper bar is removed, and the winch is loosened, the force of gravity carries the davit arm down a track, thereby positioning the lifeboat over the ship's rail where the winch can let out the system's wire "stays" to lower the lifeboat into the water.

While the Lummus was held in dry dock at Detyens Shipyard, the lifeboats and "stays" were removed from the davits, but the davit arms were not. The davit arms were rigged into their upright position using a temporary but fixed wire rope, installed only for the purpose of the repairs. On the morning of April 3, 2019, while Hernandez was preparing to work on lifeboat davit number 5, the temporary wire rope holding the davit arm in place failed, releasing the 3,640-pound steel davit arm, which slid down its track and pinned Hernandez's neck against the ship's equipment under the weight of the davit arm. (Exhibit 2, Vessel Defs. 990, 994.) Hernandez survived for some period of time until after the davit arm was removed and attempts to save his life were suspended. (Exhibit 3, Report of Dr. Kim Collins at 2 ("Mr. Hernandez would have been conscious and aware of his injuries and would have experienced extreme pain and suffering.").)

The lifeboat davit arm was improperly rigged using only a single temporary wire rope to hold the davit arm in the upright position for repairs. Not only was this wire rope installed negligently—improperly utilizing wire clips and wrapping the wire around sharp corners, (Report of Gerry Nielsen at 19-23)—but the davit arm was rigged without any primary form of restraint, i.e. the stopper bar. The failure to use a primary restraint is particularly egregious given the fact that the built-in nature of the

3

stopper bar is "100 percent effective" in preventing the davit arm from moving down the track. (Exhibit 4, Fisher Dep. 76:11-77:5.) Of note, the lock-out, tag-out system in Crowley's Safety Management System[1] for the Lummus provides that "[a]ll potential hazardous energy sources shall be isolated from the equipment or system that will be serviced. Two-level isolation may be possible in some instances and shall be used when possible." (Exhibit 5, Vessel Defs. 1708-11 (emphasis added).)

The Lummus is a United States ship that is operated by Crowley, pursuant to a contract with MSC ("the MSC Contract"). (Exhibit 6, MSC Contract.)[2] By contract, Crowley agreed to operate six ships in the MSC's Maritime Prepositioning Force, including the Lummus. (MSC Contract § 1.1.1.) The MSC Contract imposes numerous obligations on Crowley in connection with the operation and maintenance of the Lummus. (Id. § 2.1.) Crowley testified that the terms of the contract outline the scope of Crowley's obligations to the United States:

> Q. And this ship management contract sets forth the rights and responsibilities of both the United States and Crowley. Is that right?
>
> A. That's correct.
>
> Q. This is the master controlling document between the United States and what it expects of Crowley and what Crowley's responsibilities are and what it expects from the United States. Is that right?
>
> A. That is correct. If anything changes there will be an amendment provided.

(Exhibit 7, Varghese Dep. Vol. II at 27:13-23). Crowley also testified that it has no responsibility for safety under the MSC Contract while repairs are underway and the ship is not in operation:

---

[1] As detailed below, Crowley utilized this lock out, tag out system on the lifeboats—albeit, negligently—while the Lummus was in dry dock at Detyens Shipyard. Nevertheless, Crowley claims that the Safety Management System only applies when the Lummus is "in operation."

[2] Plaintiff has included only the excerpted sections of the MSC Contract submitted in connection with Crowley's Motion.

4

> Q. Okay. Well, while the vessel is in a RAV status[3] does Crowley have any responsibility for safety or not?
>
> A. No.

(Id. at 119:15-18.) Crowley also contends that its safety management policies are not applicable while the ship is in dry dock.

> A. Yes. When the vessel is under the master's command and operating there will be procedures and forms and all the policies that applies to the vessel.
>
> Q. Okay. And would those safety management policies include policies that were pertinent to the lifeboat systems on the vessel? On the Lummus.
>
> A. Yes, while in operation.
>
> Q. While it's in operation?
>
> A. Yes.
>
> Q. And then when it's -- when it's in dry dock those policies are suspended but the policies don't change or anything? They just don't have to be –
>
> A. I –
>
> Q. -- in place if it's not safe?
>
> A. I --
>
> Q. Is that right?
>
> A. Yes. I would say it is dormant, not suspended. It is dormant and when the ship come back -- come back to, you know, certified status after the repairs that will become active.

(Id. at 23:11-24:8.) More generally, when discussing working conditions on the Lummus, Crowley testified that it is not involved in DSI's administration of its safety management system.

> Q. [. . .] I can't tell whether Crowley is actively involved in reviewing whether Detyens are doing it or whether Crowley just defers completely to Detyens and has no involvement in that process.

---

[3] RAV refers to "Repair Availability" status: i.e. in the shipyard. Crowley confirmed the Lummus was in RAV at the time of Hernandez's death. (Varghese Dep. Vol II at 3:7-18.)

> A. Crowley allows Detyens to do their job. Crowley will monitor whatever they can and then they will do the final testing and acceptance to make sure that the specification work item is complete and in accordance with the spec.

(Id. at 145:8-17; see also Varghese Dep. Vol. II at 230:2-11 ("Q. Okay. And does Crowley Government Services feel entitled to rely on the trained safety officers at Detyens Shipyard? A. That is the custody and control of the Detyens Shipyard. Then we have to go by the Detyens Shipyard safety management system. Under the impression and also based on -- based on the information they provided Detyens had fully – you know, fully implemented their safety management system in place.").)  Indeed, Crowley testified that it has been specifically directed by the United States that it cannot tell the shipyard how to do its job.

> Q. Okay. So I think I followed you there. The government has a requirement that prevents you from telling Detyens how to do its job?
>
> A. Yes.

(Id. at 180:8-11.)

Despite Crowley's testimony that it was not obligated to supervise or assist in safety management while the Lummus was undergoing repairs, there is evidence that Crowley did participate in such efforts in several ways.  DSI Safety Officer Justin Lyles testified that Crowley crew members participated in daily safety walk-through inspections:

> Q. So on the Lummus when you would do your safety walks, you would meet with the chief mate?
>
> A. Get with somebody from the ship's crew to see if they have any issues. That's the first thing you do when you get on board.
>
> Q. Okay. Every time you get on board, the first thing you do is communicate with somebody from the ship's crew. Is that accurate?
>
> A. If -- if they're available.

(Exhibit 8, Lyles Dep. at 39:6-14; see also Exhibit 9, Vessel Defs. 2904 (comments to SITREP 16 from Capt. David Hagner, stating that he "[t]ook a topside walkabout" and commenting on

6

observed safety issues).) Crowley has even testified that it was actively involved in locking and tagging out the lifeboat system.

> Q. All right. And the two locations for the tag out of lifeboat system, was that done by Crowley personnel, that procedure?
>
> A. Yes. That is requested and then done by Crowley. Yes.

(Exhibit 10, Varghese Dep. Vol. III at 60:21-25;[4] see also Exhibit 11, Vessel Defs. 1243-44 (report for "week ending 2018-12-07," indicating that "Crew is assisting DSI with services, safety tag outs and identification of work items.").) Moreover, Crowley's contract with DSI required DSI to "use its best efforts to prevent injury or damage to all employees, persons, and property" while completing the repairs, (Exhibit 12, DSI 000024), and Crowley confirmed that it would monitor DSI's compliance with that provision:

> Q. Okay. So a Crowley person is actively involved in making sure that the job is being done properly and in a safe manner?
>
> A. Crowley works in -- you know, they are there to verify that, but they are not the person in any of those items. That is why the shipyard has to employ the property quality of the work -- for work and then also to hire the workers who can do the job.

(Varghese Vol. II at 143:11-22; see also Vessel Defs. 1243-44 (indicating that "Shipyard has been responsive to RFPS, COS, and safety concerns.").) When viewed in the light most favorable to the Plaintiff, this evidence demonstrates that Crowley was involved in various safety-related activities that were outside of its contract with the United States.

---

[4] The parties have yet to receive an official transcript for the June 16, 2022, deposition of Crowley's 30(b)(6) witness, Paul Varghese. Plaintiff will supplement this memorandum with relevant portions of the transcript when it becomes available.

**ARGUMENT**

I.  **Summary judgment should be denied because evidence shows that Crowley regularly engaged in activities that were not subject to the United States' direction and control, and thus, Crowley was not acting as an agent of the United States.**

Crowley argues that the MSC Contract conclusively establishes that it was acting as an agent of the United States at all times relevant to this action, and therefore, any claims based on Crowley's acts or omission must be brought exclusively against the United States. (ECF No. 44, Mot. for Summary Judgment at 7-9.) However, Crowley has failed to carry its burden to prove that this agency relationship extended to all of the acts and omissions at issue in this case.[5]

The Public Vessels Act ("PVA") waives sovereign immunity for actions brought against the United States for "damages caused by a public vessel of the United States." 46 U.S.C.A. § 31102. Actions brought under the PVA are subject to the exclusivity provision of the Suits in Admiralty Act ("SIAA"), which provides:

> If a remedy is provided by this chapter, it shall be exclusive of any other action arising out of the same subject matter against the officer, employee, or agent of the United States or the federally-owned corporation whose act or omission gave rise to the claim.

46 U.S.C. § 30904.

Courts draw on common law agency principles to determine whether a defendant is considered an "agent of the United States" within the meaning of the Public Vessels Act. See Servis v. Hiller Sys. Inc., 54 F.3d 203, 207 (4th Cir. 1995) (referring to the Restatement (Second) of Agency § 1(1) in outlining what constitutes an "agency relationship"); see also Dearborn v. Mar Ship Operations, Inc., 113 F.3d 995, 997 (9th Cir. 1997) (joining "other courts" in using "the common law definition of agent when analyzing relationships between the United States and private entities for purposes of admiralty law").

---

[5] Plaintiff does not take the position that no agency relationship existed at all. However, genuine issues of fact remain regarding the extent of that agency relationship and whether all of the acts and omissions which give rise to Plaintiff's claims against Crowley were committed as an agent of the United States.

8

"[A]n agency relationship is 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" Servis, 54 F.3d at 207 (quoting Restatement (Second) of Agency § 1(1)).

Crowley's agency argument is entirely premised on the MSC Contract. In making this argument, Crowley focuses on contractual provisions governing its "operation" of the Lummus. (Mot. for Summary Judgment at 2.) Crowley highlights Section 1.1.2, which provides that "Operational Control will be exercised by the Operational Commander," and that "[e]ach operational mission will be the subject of a classified Operational Order (OPORD) or Sailing Order (SAILORD) that specifies exactly how the mission will be accomplished." (MSC Contract § 1.1.2.) Crowley also notes that, pursuant to Section 1.1.13.1, "[e]ach ship Master shall comply with MSC sailing orders and operational orders promulgated by the ship's Operational Commander." Finally, Crowley's claim that the MSC Contract "stressed the sovereign nature of the covered vessels" is based on a citation to MSC Contract Section 1.1.3, which provides that "[t]he Master, while performing ship operations, shall advise foreign authorities that each USNS vessel under this contract is a sovereign immune vessel of the United States."

However, Crowley has consistently maintained that, for all times relevant to this action, the Lummus was not in "operational status." (E.g., Varghese Dep. Vol. II at 23:2-6 ("Q. Okay. The safety management system still existed? It just didn't comply because the vessel wasn't in operational status. Is that right? A. That is accurate.").) Indeed, Crowley contends that it was not even in control of the Lummus while it was in dry dock. (Id. at 119:10-14 (explaining that "[t]he master does not have command" and "Crowley doesn't have control of the vessel" while in RAV status).) These provisions fail to demonstrate that the United States consented to allow Crowley to act on its behalf, much less subject to its control, while the Lummus was in dry dock and not in operation.

The only contractual provision cited in Crowley's motion that addresses repairs on the Lummus is Section 2.1, which provides that:

> [Crowley] shall maintain the material condition of all ships under this contract in accordance with the requirements outlined in Section 06.6 of the Technical Manual and all other applicable instructions, rules and regulations. This maintenance includes scheduling, managing, and documenting various preventive, predictive, and corrective maintenance actions in accordance with applicable ABS, U.S. Coast Guard, and MSC rules and policy.

(MSC Contract § 2.1.) As an initial matter, it is unclear what significance this provision has in demonstrating an agency relationship, given Crowley's testimony that it did not need to comply with the Technical Manual while the Lummus was in dry dock and not "in operation." (Varghese Dep. Vol. II at 37:9-15.) Though this provision at least imposes some repair-related obligations on Crowley, it does not demonstrate "the degree of operational control" necessary to establish an agency relationship under the Public Vessels Act. See Servis, 54 F.3d at 208 (recognizing that "a primary factor in determining agency status is the degree of operational control exercised by the United States" and finding no agency-relationship existed where "the United States exercised no operational control over appellees' day-to-day performance of their contractual duties").

Even if some agency relationship exists between Crowley and the United States, and even if that relationship extends to some aspects of the Lummus's repairs, Crowley's own testimony precludes summary judgment on this issue. As outlined in greater detail above, there is evidence that Crowley took numerous actions that it now claims were not required under the MSC Contract, including participating in routine safety inspections with DSI safety officers, locking out and tagging out the lifeboat system, and monitoring DSI's compliance with its own safety management system. (Supra at 6-7.) Courts have recognized that, even where an agency relationship exists under the Suits in Admiralty Act and Public Vessels Act, a defendant may nevertheless be held liable for acts and omission that fall outside the scope of that relationship. In Shaw v. United States, for instance, the court refused to dismiss claims brought

10

against contractual operators of a public vessel, where the plaintiff alleged that the operators "were acting outside the scope of their agency relationship when the plaintiff was injured." 2019 WL 268648, at *3 (N.D. Cal. Jan. 18, 2019). Similarly, in Matter of Pac. Adventures, Inc., the court found that genuine issues of fact precluded summary judgment where the defendant undertook some duties as an agent and others as a non-agent independent contractor, and the injury arose from "the point at which these two areas of responsibility [met]." 5 F. Supp. 2d 874, 881 (D. Haw. 1998).[6]

A review of the cases Crowley cites in support of its position quickly reveals that Crowley fails to address other factors relied on by these courts to support the finding of an agency relationship.[7] For instance, the contract at issue in Smith v. United States "expressly empowered the Government to terminate the employment of the master or any member of the crew whose continued retention was considered prejudicial to the interest of the United States." 346 F.2d 449, 452 (4th Cir. 1965). Here, in contrast, the MSC Contract only allows the United States to contact Crowley if it is dissatisfied with the "qualifications, conduct or performance of any person assigned to [the] contract," at which point Crowley will "independently investigate and take corrective action, as appropriate." (MSC Contract § 3.4.2.) The Fourth Circuit has also recognized that the parties' characterization of their relationship, while not dispositive, is nevertheless relevant to the analysis. See Servis, 54 F.3d at 207-08 (explaining that "none of the documents refer to any appellee as an

---

[6] Though Pacific Adventures dealt with a somewhat tangled issue of whether a release form could be enforced under 46 U.S.C. § 183c, the application of that provision turned on the defendant's status as an "agent" of a "vessel transporting passengers between ports of the United States" and the agency analysis was explicitly borrowed from cases applying the exclusivity provision of the Suits in Admiralty Act.

[7] Crowley concedes that "most of the cases on this issue deals with seamen's claims," not § 905(b) claims. Mot. for Summary Judgment at 9 n. 10. Crowley cites to no binding precedent in its arguments applying the Public Vessels Act's exclusivity provision to a longshoreman or harbor worker's § 905(b) claims. But see LeBlanc v. United States, 732 F. Supp. 709, 713 (E.D. Tex. 1990) (applying exclusivity under a different set of facts relating to an independent contractor "once-removed" from an agent of the U.S).

'agent' of the United States," while in contrast, the ship's operator, "was expressly engaged to serve as the United States' general or operating agent for the CAPE DIAMOND and was in fact the only party to consent to agency status with the United States in the Ship Manager's Agreement"). Here, the MSC Contract does not refer to Crowley as an "agent."

In this case, there is evidence that Crowley participated in safety walk-throughs with DSI safety officers, (Lyles Dep. at 39:6-14), applied lock-out, tag-out procedures to the lifeboats, (Varghese Dep. Vol. III at 60:21-25), and monitored DSI's compliance with its shipyard safety management system. (Varghese Vol. II at 143:11-22.) Crowley has simultaneously testified that it had no responsibility for safety under the MSC Contract, (Id. at 119:15-18), and cannot demonstrate that its participation in these activities and monitoring of DSI's safety procedures were subject to the United States' direction and control. Because Plaintiff's claims are based, at least in part, on these actions, there are genuine issues of material facts regarding whether such claims may be jointly directed against Crowley or the United States.

**II.     The potential for recovery under § 905(b) does not require dismissal of alternative avenues of relief, particularly where evidence exists that Crowley was not acting as an agent of the United States and was not acting as an operator of the Lummus.**

Crowley also argues that Plaintiff's negligence claim must be dismissed pursuant to 33 U.S.C. § 905(b) of the Longshore Harbor Workers Compensation Act ("LHWCA"), which provides the exclusive remedy against "operators" and "agents" of the vessel. This argument fails for many of the same reasons outlined above—Crowley has testified that it was not acting as an "operator" of the vessel in any meaningful sense while the Lummus was in dry dock and issues of fact remain regarding the extent to which Crowley was acting as an "agent" of the United States. Moreover, Crowley misunderstands the effect of § 905(b)'s exclusivity language. While recovery under § 905(b) may

eventually preclude recovery under other claims, Plaintiff is not required to forfeit alternative claims simply because a § 905(b) claim may be available.

Plaintiff does not dispute that Hernandez was a covered employee under the LHWCA, nor does she dispute that § 905(b) is the exclusive remedy for actions against Crowley based on its status as a vessel. Section 905(b) permits actions for negligence to be brought against "vessels" for injuries to covered employees under the LHWCA but states that "[t]he remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." 33 U.S.C. § 905(b). "Vessel" is defined in 33 U.S.C. § 902(21) to include "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."

Crowley argues that it falls within this definition because "it operated the [Lummus] under a contract with the United States." (Mot. for Summary Judgment at 6.) Presumably, Crowley is arguing that it is either the "operator" of the Lummus or an "agent" of the Lummus. For certain purposes, Crowley is likely both, but that does not end the inquiry. The Fifth Circuit has held that the exclusive remedy against "vessel owners" provided by § 905(b) does not preclude the availability of other claims, if the vessel owner breaches duties owed to the plaintiff in some other capacity. As the court explained in McLaurin v. Noble Drilling (US) Inc.:

> [U]nlike employers, . . . a maritime worker may attempt to recover against a vessel owner for vessel negligence under § 905(b), against a vessel owner as a third-party tortfeasor under § 933, or even against a vessel owner as a "borrowing employer" under § 904. It is not a vessel owner's status as a vessel owner that dictates which LHWCA provision a maritime worker may use; it is the type of negligence that the worker alleges and the duty that is owed by the vessel owner that is controlling.[8]

---

[8] Though the McLaurin court spoke in terms of the "vessel owner," this reasoning would extend to any party falling within the definition of a "vessel" under the LHWCA.

13

529 F.3d 285, 292 (5th Cir. 2008). It is true that, if a plaintiff is able to recover under § 905(b), he or she may not also recover under any other claims. Id. at 293 ("'If a maritime worker recovers against a vessel under § 905(b), then he may not also sue the vessel in tort.'"); Holder v. Fraser Shipyards, Inc., 288 F. Supp. 3d 911, 934 (W.D. Wis. 2018) ("Importantly, plaintiff is only able to assert his state claims if § 905(b) does not apply."). But this potential for recovery under § 905(b) does not preclude a plaintiff's ability to bring alternative claims. See McLaurin, 529 F.3d at 293 ("The plain language of § 933 clearly contemplates and preserves a maritime worker's ability to pursue separate claims against third parties, including vessel owners allegedly responsible for the injury."); see also Holder, 288 F. Supp. 3d at 932-37 (allowing plaintiff to bring § 905(b) claims and state law claims, where claims "[arose] from the same facts and [relied] on the same evidence"). In effect, Crowley is asking the Court to elect the Plaintiff's remedy before the case has been presented and before disputed evidence can be resolved by the fact finder at trial.

Here, there are material issues of fact regarding Crowley's status as an "agent" or "operator" of the Lummus at the time of the incident. As set forth above, there is evidence that Crowley was engaged in activities that, according to Crowley's own testimony, fell outside of its obligations to the United States. Crowley has also repeatedly testified that it was not "operating" the Lummus while the Lummus was in dry dock at Detyens Shipyard. Again, Crowley claims that it was not even in control of the Lummus at the time. (Varghese Dep. Vol. II at 119:10-14.) To the extent Plaintiff's claims are based on acts or omissions falling outside of the scope of Crowley's status as vessel, Plaintiff's claims are permitted under 33 U.S.C. § 933, which allows for a general maritime negligence claim against third-parties. Because there are genuine issues of fact regarding Crowley's status as a "vessel" under § 905(b), Plaintiff's alternative claims should not be dismissed.

## CONCLUSION

Because there are genuine issues of material fact regarding Crowley's status as an agent of the United States and Crowley's status as a vessel under § 905(b), the Court should deny Crowley's Motion for Summary Judgment.

s/ Robert L. Wehrman<br>
J. Rutledge Young, III (Fed. Bar No. 7260)<br>
Julie L. Moore (Fed. Bar No. 11138)<br>
Robert L. Wehrman (Fed. Bar No. 13426)<br>
DUFFY &YOUNG,LLC<br>
96 Broad Street<br>
Charleston, SC 29401<br>
(843) 720-2044<br>
ryoung@duffyandyoung.com<br>
jmoore@duffyandyoung.com<br>
rwehrman@duffyandyoung.com<br>
*Attorneys for Plaintiff*

June 24, 2022
Charleston, South Carolina