IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | |
|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative for the Estate of Juan Antonio Villalobos Hernandez, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES OF AMERICA, CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., DETYENS SHIPYARDS, INC., and HIGHTRAK STAFFING, INC. d/b/a HITRAK STAFFING, INC. <br><br> Defendants. | Civil Action No.: 2:21-CV-965-RMG <br><br><br><br><br> **REPLY TO OPPOSITION TO SUMMARY JUDGMENT MOTION OF CROWLEY MARITIME CORPORATION AND CROWLEY GOVERNMENT SERVICES, INC.** |

Defendants Crowley Maritime Corporation ("CMC") and Crowley Government Services, Inc. ("Crowley")[1] submit the following Reply to the Plaintiff's Response in Opposition to its Motion for Summary Judgment.

In her opposition, the Plaintiff concedes that Crowley acted as an agent of the United States, for purposes of the Suits in Admiralty Act ("SIAA")[2], in at least some capacity. She attempts, however, to argue that certain of Crowley's actions, insofar as they relate to repairs aboard the

---

[1] The Plaintiff offers no argument or evidence in opposition to the pending summary judgment motion insofar as it relates to CMC. For simplicity, Crowley Government Services, Inc., the only entity against whom the Plaintiff offers any opposition, will be referred to as "Crowley." "DSI" continues to refer to Detyens Shipyards, Inc.

[2] 46 U.S.C. §§ 30901-30918.

1

public vessel *Lummus*, somehow exceeded Crowley's agency status. These arguments are unavailing.[3]

I.  CROWLEY ACTED AS THE AGENT OF THE UNITED STATES IN MANAGING REPAIRS TO THE *LUMMUS*

As noted above, the Plaintiff concedes that Crowley served as the agent of the United States for at least some purposes—presumably the active operation of a public vessel in support of Government-directed missions. In her Response to Crowley's summary judgment motion, however, the Plaintiff suggests that Crowley's agent status somehow lapsed during the shipyard repair operations aboard the *Lummus*. The Plaintiff appears to make two basic contentions in this regard: first, that the repair-related provisions in the MSC Contract[4] do not demonstrate the required degree of operational control by the Government; and second, that Crowley was involved in safety-related activities that were, according to the Plaintiff, "outside of its contract with the United States." Neither argument stands in the way of summary judgment.

A.  THE MSC CONTRACT DEMONSTRATES THE REQUISITE DEGREE OF CONTROL DURING REPAIR OPERATIONS

From the Plaintiff's perspective, repair activities aboard the *Lummus* represent something like "frolic and detour," in which Crowley departs from its ordinary operational role and behaves like a volunteer, involving itself in the shipyard's repairs for its own amusement rather than on behalf of the United States. This argument, while creative, ignores the clear language of the MSC Contract.

---

[3] Much of the Plaintiff's opposition consists of the Plaintiff's assertion that the lifeboat davits on the *Lummus* were improperly secured by the shipyard hired to repair them, for which Crowley was somehow negligent. Needless to say, Crowley rejects that assertion. The shipyard's rigging of lifeboat davits, however, is irrelevant to the question of whether the SIAA excludes any remedy against Crowley.

[4] "MSC Contract" is as defined in Crowley's original motion. *See* Entry No. 44 at p. 2.

To begin with, the MSC Contract clearly contemplates various levels of vessel operational status. Granted, "Full Operating Status," or "FOS," is the norm. (MSC Contract ¶¶ 1.1.3, 1.1.3.1, Entry No. 44-1 at 3). But the MSC Contract also defines "Reduced Operating Status" ("ROS") and states that "the ships may spend a portion of the time in ROS status with reduced manning during the contract performance period." (*Id.* at ¶¶ 1.1.3, 1.1.3.2). Pursuant to Section 1.7.1.3 of the MSC Contract (Entry No. 44-1 at 22), "the Government reserves the right to put any ship into [ROS] at any time." ROS status "includes time spent in shipyard availabilities in ROS/RAV status" (*Id.* at ¶ 1.1.3.2, Entry No. 44-1 at 3), with "RAV" referring to "repair availability" in a shipyard. (*Id.* at ¶ 1.7.1.2, Entry No. 44-1 at 22). ROS/RAV status does not absolve Crowley of its duty to operate the ship for the United States. On the contrary, "[i]f the ship is required to get underway, an activation notice may be issued by the Contracting Officer [a representative of the Government] and the ship may be required to transition to FOS status." (*Id.* at ¶ 1.1.3.2, Entry No. 44-1 at 3). Crowley must still man ships in ROS and RAV (*See id.* at ¶ 1.7.1.3, Entry No. 44-1 at 22) and must be prepared to get them underway should the United States so direct.

Vessel repair and maintenance, moreover, is clearly an essential feature of the MSC Contract. In addition to the passage already cited in Crowley's pending motion, the MSC Contract provides that:

> [Crowley] shall procure and manage shipyard services to comply with the provisions of this contract, conduct repairs as necessary during scheduled and unscheduled availabilities to maintain the ships within the required standards of material condition, to satisfy regulatory body and classification society requirements, and to accomplish Government directed work.

3

(MSC Contract ¶ 2.7, Entry No. 44-1 at 39).[5] Repair "availabilities" are subject an elaborate planning process. (*See id.* at ¶ 2.7.3, Entry No. 44-1 at 41). That process begins with a "planning letter," about a year before the contemplated repair availability, in which the Government's Contracting Officer sets out the availability dates, the operational status of the ship during the availability, and the geographical area in which repair bids may be solicited by Crowley (*Id.* at ¶ 2.7.3.1). The Government's planning letter even specifies the liquidated damages to be included in the repair contract.[6] Crowley is then to prepare a "Plan of Action and Milestones" for procurement of the necessary repairs within the Government's specified timeframe. The Government must approve this plan. (*Id.* at ¶ 2.7.3.2). Crowley then arranges a "pre-availability inspection" attended by the Government. Crowley must also develop a "work package" in coordination with the Government. This work package cannot be released for bid until the Government has reviewed the package and consented to its release. (*Id.* at ¶ 2.7.3.5, Entry No. 44-1 at 43).[7] Crowley must submit the results of the bidding process to the Government's contracting officer, who "may consent to the placement of the [repair] subcontract." (*Id.* at ¶ 2.7.3.7). Repair contracts must include particular clauses dictated by the Government. (*Id.* at ¶ 2.6.5.1, Entry No. 44-1 at 38).

---

[5] The MSC Contract provisions referenced in this Reply are already of record, having been filed in support of Crowley's original motion.

[6] Any liquidated damages assessed against a subcontractor are to be reflected in Crowley's final availability invoice to the Government. (MSC Contract at ¶ 2.7.3.4.5, Entry No. 44-1 at 43).

[7] This was confirmed by testimony from an MSC program manager in a deposition taken by the Plaintiff, the rough transcript for which only became available on the date this filing was due. *See* excerpt from Deposition of the United States through its Corporate Designee, Juanita Broennimann, attached as Exhibit "A," at p. 53, lines 11-16. The United States' representative confirmed that, "once the [MSC Contract] is in place, "Crowley is directed to do all of the things in the contract on behalf of the Government." (*Id.* 54, lines 10-13). She further testified that, while the *Lummus* is under Crowley's control, "the United States expects Crowley to be acting in the best interest of the United States." (*Id.* at 55, lines 3-7).

Crowley's management of the repair availability period is also the subject of another section of the MSC Contract. (*See id.* at ¶ 2.7.4, Entry No. 44-1 at 44). During repair availability status, Crowley must provide shipboard personnel to "monitor repairs and alterations" and "provide for required in-port security." (*Id.* at ¶ 2.7.4.1; see also *id.* at ¶ 1.7.1.2, Entry No. 44-1 at 22). Any change in RAV vessel manning requires government approval. (*Id.* at ¶ 1.7.1.2). Crowley must provide one port engineer for shipyard work in excess of $500,000. Two fulltime Crowley port engineers and an administrative assistant must be present for all work requiring more than 14 days to complete. (*Id.* at ¶ 2.7.2.1, 44-1 at p. 39). Crowley must use a government-provided software program with respect to any such availability. (*Id.* at ¶ 2.7.2.3, Entry No. 44-1 at 40). The Government has the right to have a representative present onsite during repairs. (*Id.* at ¶ 2.7.2.8).

Crowley's port engineers are charged with "manag[ing] execution of the work" in accordance with the MSC Contract. (*Id.* at ¶ 2.7.4.2, Entry No. 44-1 at 44). Crowley must "ensure that all work is completed within the time frame established in the solicitation." (*Id.* at ¶ 2.7.4.5). Extension requests are subject to the Contracting Officer's approval. (*Id.*)[8] Crowley must submit a weekly status report to the Government where work exceeds 14 days. (*Id.* at ¶ 2.7.2.6, Entry No. 44-1 at 40). Crowley must inform the Government's contracting officer "[i]n the event the shipyard or repair subcontractor files a claim or formal complaint" against Crowley. (*Id.* at ¶ 2.6.5, 44-1 at 38).

In sum, the MSC Contract clearly establishes that Crowley acts on the direct behalf of the United States in arranging for repair work to be performed on the public vessels covered by that Contract. Crowley is responsible for planning shipyard repairs well in advance as directed by the

---

[8] Partial or total cancellation of work is subject to a similar approval requirement. (MSC Contract at ¶ 2.7.2.5).

5

Government, developing the scope of work for such repairs, putting that work out for bid, briefing the United States on the bidding results, awarding repair contracts with the Government's consent, and requiring the shipyard's timely performance of the repair contract. All of Crowley's activities aboard the *Lummus* while the ship was at DSI were in furtherance of its contractual obligations to the United States, either with respect to manning and operating the ship during RAV status or making sure repair work was completed in accordance with the ship repair specification.

The Plaintiff ignores nearly all this evidence of record, focusing exclusively on the contract excerpt actually quoted in Crowley's memorandum—which she claims does not demonstrate the required level of operational control. (Entry No. 49 at 10). Again, the Plaintiff concedes that the MSC Contract created at least some agency between the Crowley and the Government. There is no meaningful distinction between Crowley's duties with respect to vessels on full operational status and its duties with respect to vessels undergoing repair. In each case, Crowley was engaged to "manage and conduct the business of a government vessel." *See Servis v. Hiller Sys.*, 54 F.3d 203, 209 (4th Cir. 1995). While the Government may not have directed Crowley's every action, it clearly exercised overall control over the repair process that it hired Crowley to manage. *C.f. Shaw v. United States*, 436 F. Supp. 3d 1315, 1324 (N.D. Cal. 2020) ("The United States must exercise significant control over the charterer's activities—either day to day control or *overall control and direction of the mission*.") (emphasis added).

      B.    CROWLEY WAS NOT ACTING OUTSIDE THE SCOPE OF ITS AGENCY DURING REPAIRS TO THE *LUMMUS*

The Plaintiff also argues that Crowley acted beyond the scope of its government agency with respect to the circumstances of this case. This argument is based in part on a misreading of testimony. The Plaintiff argues that Crowley was not acting on behalf of the Government because, although the MSC Contract states that vessels are to be maintained in accordance with a technical

6

manual, a Crowley witness supposedly denied that the technical manual applied. That is not what the witness said. Crowley's representative was asked, "so while Crowley is administering the repairs to a vessel like the *Lummus* Crowley is required to comply with the technical manual. Is that correct?" He answered "[w]hile in operation, while in repairs, Crowley write the specification to get the repairs done to bring it to that status." (Entry No. 49-7 at dep. page 37, lines 9-15). This testimony is entirely consistent with the contract provisions discussed above. Counsel continued, "[i]n other words, the technical manual sets forth the requirements that the vessel has to meet to be in operational and certified status. Is that true?," to which the witness answered "[t]hat is correct." (*Id.* at lines 16-20). Again, there is nothing inconsistent between this testimony and the MSC Contract. These testimonial excerpts come nowhere near supporting the Plaintiff's assertion that Crowley somehow denied any obligation to comply with the applicable technical manual during repairs.

Elsewhere the Plaintiff claims that Crowley was acting beyond the scope of the MSC Contract because, according to the Plaintiff, Crowley's representative disclaimed various safety-related obligations, whereas there was evidence that Crowley involved itself in certain safety-related activities.[9] But the question is not whether Crowley participated in safety activities; it is whether the activities exceeded the scope of the MSC Contract. They did not.

---

[9] The Plaintiff spends a lot of time discussing Crowley's Safety Management System, or SMS. Commercial vessel operators are required by law to comply with the "ISM Code." See 46 U.S.C. §§ 3201-3205. Coast Guard regulations implementing the ISM Code require vessel operators to develop an SMS. *See* 33 C.F.R. Part 96. The MSC Contract requires Crowley to develop and maintain an SMS for the *Lummus*, (MSC Contract at ¶ 3.18, 44-1 p. 56), which it obviously did.

However, the SMS is immaterial to Crowley's motion, as courts have held that ISM Code requirements do not affect a vessel operator's negligence liability. *See, e.g.*, *Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 797 (11th Cir. 2015); *Jones v. Sanko S.S. Co.*, 148 F. Supp. 3d 374, 391 n.39 (D.N.J. 2015); *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1396 (S.D. Fla. 2014) ("the [ISM] Code does not create any duties and thus cannot be the basis for a negligence

The activities in question consisted of the following, according to the Plaintiff's opposing submission: A shipyard safety officer testified that he would occasionally meet with the ship's chief mate or another member of the crew and "see if they have any issues" (Entry No. 49 at 6); the ship's captain commented on "safety issues" observed during a "topside walkabout" in a situation report submitted to the Government[10] (*Id.* at 6-7); at the request of DSI, ship personnel performed a lockout/tagout procedure for the overall lifeboat system as part of the turnover to the shipyard (*Id.* at 7); and the repair contract imposed safety requirements on DSI, compliance with which was monitored by Crowley (*Id.*).

The Plaintiff fails, however, to demonstrate how any of these actions were outside the scope of the MSC Contract. Crowley was, after all, required to operate the *Lummus* even in ROS/RAV status (as noted above, the Government was free to order the ship back to full operational status at any time). There is nothing untoward about a ship's captain commenting on safety during rounds of the vessel, or a member of the ship's crew comparing notes with a shipyard representative.

---

claim against a cruise line."); *Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237, 1243 (S.D. Fla. 2010); *Calderon v. Offen*, No. 07-61022, 2009 U.S. Dist. LEXIS 97565, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009) ("Congress merely desired to participate with other maritime nations in achieving safety goals [of the ISM Code], but did not intend to change long-established rules of law which govern liability and its allocation in general maritime law"); *Johnson v. Horizon Lines*, LLC, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) (ISM regulations were "cast in general terms which restate principles already well established by American case law"). Thus, the Plaintiff's preoccupation over whether Crowley's SMS continued to apply after the vessel was turned over to the shipyard is beside the point insofar as the ultimate merits of her claim are concerned. With respect to the issue presented by Crowley's pending summary judgment motion, the precise limits of Crowley's SMS are completely irrelevant—the salient fact is that Crowley developed an SMS for the *Lummus* because, as an agent of the United States, because it was responsible for operating and managing the vessel.

[10] A curious activity if Crowley was, as insisted by the Plaintiff, no longer operating the vessel.

Similarly, Crowley was required by contract to monitor the progress of repairs on behalf the Government, and to provide in-port security while the repairs were ongoing. It is hardly surprising that ship's crew had some degree of safety-related interface with shipyard personnel. Locking and tagging out the overall lifeboat system as part of the ship's turnover to the shipyard seems part and parcel of Crowley's general obligation to maintain the *Lummus* in the condition required by the MSC Contract. In short, the activities cited by the Plaintiff are, if anything, supported by the requirements of the MSC Contract. The Plaintiff fails to cite any provisions of the MSC Contract which prohibit, or which are inconsistent with, the activities she lists in her opposition.

In sum, the Plaintiff fails to show that Crowley's operation of the *Lummus* during repair availability, and management of the repairs themselves, were outside the scope of the MSC Contract. Nor does the Plaintiff cite a single case in which a contractual operator akin to Crowley was held not to be an agent of the United States.[11] The case on which the Plaintiff principally relies, *Servis v. Hiller Systems, Inc.*, *supra*, is inapposite. In *Servis*, the plaintiff sued a shipyard, Norfolk Shipbuilding and Drydock Co., and various of its subcontractors in connection with an injury aboard the public vessel *Cape Diamond*. 54 F.3d at 206. She did not, however, sue the United States or Marine Transport Lines ("MTL"), the ship's contract operator. *Id.* The Fourth Circuit held that, unlike MTL, Norfolk Shipbuilding and its subcontractors, *etc.*, had not acted as agents for the United States. *Id.* at 208.

---

[11] The closest the Plaintiff comes is *Shaw v. United States*, 2019 WL 278468 (N.D. Cal. 2019). In *Shaw*, the court refused to dismiss a complaint at the pleadings stage, where the plaintiff alleged that the contract operator of a public vessel had acted outside the scope of its government agency. After an opportunity for discovery, the court granted summary judgment in favor of the operator. *Shaw v. United States*, 436 F. Supp. 3d 1315 (N.D. Cal. 2020).

*Servis* would be on point if DSI was claiming agent status for purposes of the SIAA. But DSI makes no such claim. Rather, Crowley is acting in the same capacity as MTL, namely the contract operator of the public vessel.[12] "The relevant jurisprudence provides overwhelming support for the proposition that a contract operator of a public vessel is, *by definition*, an agent for the purposes of the exclusivity provision." *Gibson v. Ocean Shipholdings, Inc.*, No. 15-662, 2015 U.S. Dist. LEXIS 146806, at *8 (E.D. La. 2015) (emphasis added).

II.     PLAINTIFF'S EXCLUSIVE REMEDY IS SECTION 5(b) OF THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT

In opposing Crowley's argument that Section 5(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA")[13] provides the exclusive remedy against the vessel operator for the fatality at issue in this case, the Plaintiff advances the novel argument that Crowley was not the "operator" of the *Lummus* for purposes of § 905(b), because Crowley was "not even in control of the Lummus at the time." The theory seems to be that, if a vessel operator relinquishes control of the vessel to a shipyard, it forfeits its status as an operator for purposes the "vessel" definition in 33 U.S.C. § 902(21).[14] The argument proves too much. The case law specifically recognizes that a vessel owner will "turn the vessel over to a ship repair company." *Laulusa v. Foss Mar.*

---

[12] The MARAD contract at issue in *Servis* did expressly name MTL as agent for the Government. 54 F.3d at 208. The Fourth Circuit noted, however, that the contract "authorized MTL, and MTL alone, to manage and conduct the business of the *Cape Diamond*." The Court also cited with approval *Buck Kreihs Co. v. International Marine Carriers, Inc.*, 741 F. Supp. 1249, 1251 (E.D. La. 1990), for the proposition that "[g]enerally, a contract operator of a naval vessel is an agent of the United States for purposes of" the SIAA. *See also River & Offshore Servs. Co. v. United States*, 651 F. Supp. 276, 278 (E.D. La. 1986) ("While no specific clause in the contract identifies MTL as an 'agent' (the term 'contractor' is used throughout), the contract establishes an agency relationship.").

[13] Codified at 33 U.S.C. § 905(b).

[14] This section of the LHWCA includes the operator of a vessel within the definition of "vessel." As the Plaintiff points out in her opposition, the "agent" of the vessel is also included in the definition. Both terms apply to Crowley's role with respect to the *Lummus*.

*Corp.*, 1998 U.S. Dist. LEXIS 22493, at *5 (N.D. Cal. 1998); *see West v. United States*, 361 U.S. 118, 123, 80 S. Ct. 189, 193 (1959) (vessel owner had "no control over the ship or the repairs" performed by a contractor). Indeed, the "turnover duty," recognized by the Section 905(b) jurisprudence, obviously envisions the vessel operator turning over the vessel to a contractor such as a stevedore or shipyard. *See Price v. Mos Shipping Co.*, 740 F. App'x 781, 783 (4th Cir. 2018) (quoting *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997)) ("a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor"); *Deyerle v. United States*, 149 F.3d 314, 316 (4th Cir. 1998) (vessel owner has "completely surrendered control of the computer room to Xeno for repairs and did not supervise or control the repairs"). The Plaintiff fails to cite any case for the unlikely proposition that a party is no longer the "operator," for purposes of Section 905(b), merely because it hands over control of the vessel, or an area of the vessel, to a repair contractor.[15] This inventive interpretation would do considerable violence to the LHWCA's remedial scheme and should be rejected.

The Plaintiff also cites *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 287 (5th Cir. 2008), for the proposition that state law negligence claims may be brought independently of Section 905(b) of the LHWCA. In contrast to this case, plaintiff McLaurin was not working aboard a vessel at the time of his injury. Instead, he was working in a shipyard on land, "approximately 200 feet from the vessel," fabricating pontoons for use in a conversion of the vessel (a drilling unit) for deep-water use. 529 F.3d at 287. The gist of McLaurin's claim was that the vessel owner,

---

[15] The Plaintiff's own evidence also shows that, despite the turnover of the *Lummus* to DSI, Crowley continued to maintain a crew presence aboard the vessel, conduct security rounds, and send periodic reports to the Government. This conduct certainly seems like "operation" of the vessel, even if it was in repair availability status with areas of the ship turned over to DSI to conduct repairs.

Noble Drilling, had assumed control over the shipyard's work and was responsible for its safe performance. *Id.* The court held that Section 905(b)'s exclusivity provision did not apply because the plaintiff's injury had not occurred on navigable waters and was therefore not within admiralty jurisdiction. *Id.* at 293.

*McLaurin* was distinguished in *In re Complaint of Donjon Marine Co.*, 2008 AMC 2045, 2008 U.S. Dist. LEXIS 59102 (S.D.N.Y. 2008). There, the plaintiff was injured aboard a vessel in dry dock. "[W]hereas the *McLaurin* plaintiff's injury took place in a shipyard, *i.e.* on dry land," wrote the court, in the case at bar the "injury took place in a floating dry dock, and injuries that occur in a dry dock have long been considered to occur on navigable water." 2008 U.S. Dist. LEXIS 59102, at *10-11. The court read *McLaurin* to hold that "if an injured employee's tort claims against a vessel owner fall under the federal courts' admiralty jurisdiction, section 905(b) preempts state claims against the vessel owner." *Id.*

Here, the Plaintiff herself alleges a fatality aboard a vessel in navigable waters (in drydock or alongside a pier), and has brought this case under the Court's admiralty jurisdiction. *McLaurin* is therefore inapposite. As the Plaintiff's claim sounds in admiralty for a repair worker's death aboard a vessel on navigable waters, her exclusive remedy is under Section 5(b) of the LHWCA.

## Conclusion

The MSC Contract makes it clear that, regardless of whether Crowley was actively navigating the *Lummus*, operating the vessel during repair availability status, or managing contractual repairs to the vessel, it was acting as the agent of the United States for purposes of the Suits in Admiralty Act. Nothing Crowley did in connection with those repairs was in any way outside the scope of that agency. The Plaintiff's exclusive remedy is under Section 5(b) of the

LHWCA, and her claim is against the United States, not its contractual agent. Crowley's motion for summary judgment motion should therefore be granted.

                          Respectfully Submitted,

                          By: /s/ Ryan Gilsenan
                          Ryan Gilsenan, Fed I.D. No. 9837
                          Julius H. Hines, Fed. I.D. No. 5807
                          Edward N. Smith, Fed I.D. No. 13429
                          1535 Hobby Street, Suite 203-D
                          Charleston Navy Yard
                          North Charleston, SC 29405
                          T: 843.266.7577
                          gilsenan@hinesandgilsenan.com
                          hines@hinesandgilsenan.com
                          smith@hinesandgilsenan.com

North Charleston, South Carolina     *Counsel for the Defendants Crowley*
July 1, 2022                                      *Maritime Corporation, and Crowley*
                                                     *Government Services, Inc.*