IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | | |
|---|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative for the Estate of Juan Antonio Villalobos Hernandez, | ) ) ) | Civil Action No.: 2:21-CV-965-RMG |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **MOTION FOR SUMMARY JUDGMENT OF CROWLEY** |
| UNITED STATES OF AMERICA, CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., DETYENS SHIPYARDS, INC., and HIGHTRAK STAFFING, INC. d/b/a HITRAK STAFFING, INC. | ) ) ) ) ) ) ) | **MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., AND THE UNITED STATES OF AMERICA** |
| | ) | |
| Defendants. | ) | |

Defendants Crowley Maritime Corporation ("CMC"), Crowley Government Services, Inc. ("CGS") and the United States of America ("United States") (collectively the "Vessel Defendants") hereby move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the grounds that there is no genuine issue of material fact that they breached no duty of care to the Plaintiff's decedent ("Plaintiff").[1] This motion is supported by the within Memorandum of Law,[2] the pleadings on file, by the sworn Declaration of Capt. David Hagner (Ex. A), and by excerpts of the deposition transcripts and other documents attached hereto as Exhibits.

---

[1] The separate motion for summary judgement of CMC and CGS, on statutory grounds, is currently pending. (D.E. 44).

[2] This filing contains a full explanation of the motion for purposes of Local Rule 7.04, DSC.

## I.    Factual Background

This case arises from a fatal accident that occurred in the course of a shipyard's performance of contract work on the lifeboat davits of the *USNS 1ˢᵗ LT Jack Lummus* (the "vessel" or "*Lummus*"), a public vessel of the United States.  (Complaint, D.E. 1, at ¶¶ 13, 16-19, 23).

### A.    The Parties and the Contracts

Pursuant to a government contract (the "MSC Contract"),[3] the *Lummus* and four other *Bobo*-class vessels[4] are operated by Crowley Government Services, Inc. With respect to vessel maintenance, the MSC[5] Contract required CGS to:

> maintain the material condition of all ships under this contract in accordance with the requirements outlined in Section 06.6 of the Technical Manual and all other applicable instructions, rules, and regulations. This maintenance includes scheduling, managing, and documenting various preventive, predictive, and corrective maintenance actions in accordance with applicable ABS, U.S. Coast Guard, and MSC rules and policy.

(Ex. B, MSC Contract § 2.1).  CGS developed a "work package" in coordination with the government and released the work package for bid to several shipyards.  (*Id.* at ¶ 2.7.3.5).[6]  CGS submitted the shipyard bids to MSC, and MSC approved the award of the repair contract to DSI.

---

[3] The cover page and sections C-1, C-2 and C-3 of the MSC Contract were attached to the Declaration of Paul Varghese filed previously (ECF 44-1) and are attached herewith as Exhibit B. The entire MSC Contract runs over 600 pages and contains classified information which was redacted for purposes of production to the other parties in this action.

[4] The *Lummus* is one of five *Bobo*-class vessels outfitted to carry military cargo.  The *Bobo*-class vessels are 950-feet in length and carry containers on deck and rolling stock below decks, accessed via a stern ramp.  The ships are manned by civilian merchant mariners.
*See* https://www.msc.usff.navy.mil/Ships/Ship-Inventory/Maritime-Prepositioning-Force/

[5] MSC is the abbreviation of Military Sealift Command, a division of the United States Navy.

[6] This was confirmed by testimony of MSC Program Manager Juanita Broennimann. *See* excerpt of Deposition of the United States through its Corporate Designee, Juanita Broennimann, attached as Exhibit C, at p. 53, lines 11-16.

(Ex. C, Deposition of MSC Program Manager Juanita Broennimann, at p. 25:15-24).  As part of the repair contracting process, DSI submitted an Exceptions and Clarifications letter to CGS on August 1, 2018.  (*See* Exhibit D).  The letter provided DSI with an opportunity to take exception to any aspect of the ship repair specification or to ask questions and request further detail about any aspect of the ship repair specification.  (*See* Ex. E, First Deposition of CGS, through its Corporate Designee, Paul Varghese, at p. 226:9-229:9).   DSI raised no questions about Repair Item 601, entitled "Lifeboat Davit Repairs and Falls Renewal."  (Ex. D).  CGS understood this to mean that DSI was satisfied it could perform the davit repairs and had no questions as to how to do so.  (Ex. E, First Varghese Depo., at p. 228:13-229:9).  "Our understanding is that…Detyens fully understood the [lifeboat davit repair] spec. They priced it and they will be – they are ready to do the job." (*Id*. at p. 229:6-9).

The following month, on September 5, 2018, DSI and CGS entered in a ship repair contract called the "BIMCO Ship Repair Contract, Code Name: REPAIRCON" (the "Repair Contract"). The Repair Contract defined DSI as the "Contractor".  (Ex. F, Repair Contract, at p. 2, Box 3). The Repair Contract defined the "Specification Works" as "the work to be carried out under this Contract described in the Specification attached as Annex 'A' hereto." (*Id.* at p. 9, ¶ 1, Definitions). Although the repair Specification runs many hundreds of pages, relevant excerpts, Bates labeled Vessel Defendants 955-979, are attached hereto as Exhibit G.

Specification Item No. 0001, Definition and General Requirements, Section 4.1 provides:

> Within the scope of this work package, each work item will be accomplished in accordance with all appropriate General Technical Requirements (GTR), whether stated or not in the individual work items, which form an integral part of this contract.  In addition, any changes thereto will be accomplished in accordance with the General Technical Requirements.

(Ex. G at p. Vessel Defendants 960, ¶ 4.1).

MSC prepared the GTR and required CGS and contracting shipyards to follow them. (Ex. E, First Varghese Depo. at p. 225:9-17). It is incorporated into the ship repair specification. (Ex. G at p. Vessel Defendants 960, ¶ 4.1). The GTR provides guidance to CGS on, among other things, how to draft ship repair specifications. In relevant part, the GTR instructs that, "[w]ork items are performance oriented; **the shipyard determines how to do the work**." (Ex. H, GTR Excerpt, at p. Vessel Defendants 1164, ¶ 3.6) (emphasis added). MSC's Program Manager, Juanita Broennimann confirmed this in her deposition:

Q: Okay. Let's focus on shipyard guidance. Under the GTR, what is the government's policy on who determines how to do the work?

A: Under the GTR, it's guidance level work items, which means the Government or Crowley would tell the shipyard, via the [repair] spec, what it is we're trying to accomplish; *but how to do it is left up to the shipyard*.

Q: So you don't expect Crowley to tell the shipyard how to do the work?

A: No.

Q: Or how to perform the rigging?

A: No.

(Ex. C, Broennimann Depo., at p. 153:17-154:3) (emphasis added).

With respect to rigging, Specification Item No. 0001, Definition and General Requirements, Section 3.3 provides:

The Contractor will provide all labor and materials necessary to accomplish all items in the work package. *The Contractor will rig*, unrig, connect and disconnect, stage, un-stage, and remove and replace any interference as required to accomplish each item of the work package.

(Ex. G at p. Vessel Defendants 960, ¶ 3.3) (emphasis added). In this regard, MSC's Program Manager Juanita Broennimann testified:

Q: Does the MSC contract with Crowley for the operation of the *Lummus* require Crowley to supply a rigging expert to the shipyard?

A: No, specifically, it assigns rigging responsibilities to the shipyard because they are the subject matter experts.

(Ex. C, Broennimann Depo., at p. 152:20-25).  Accordingly, DSI was responsible for all rigging necessary for the work it was hired to perform.

The vessel arrived at DSI and repairs commenced on or about November 15, 2018 and concluded on July 1, 2019. Among the hundreds of repair specifications for the *Lummus* was Work Item 601, "Lifeboat Davit Repairs and Falls Renewal." (*See* Ex. G, at pp. 967-970).

## B.     The Lifeboat Davit Repairs

The Lummus is equipped with a total of six lifeboats, three on each side of the vessel. Each lifeboat is launched and retrieved by means of a davit. Davits 1, 3 and 5 are on the starboard side, and davits 2, 4 and 6 are to port.  Each davit has two steel arms from which a lifeboat is suspended using a 230-foot length of wire rope called the "falls." The falls run through the sheeves of the davit arms and tackle of the lifeboat.  (*See* Ex. I, Report of Vessel Defendant's expert witness, Dr. Ken Fisher, Ph.D. (the "Fisher Report") at ¶¶ 14-17).   Ordinarily, the falls restrain the davit arms in the upright position.  (*Id.* at ¶ 17). If a lifeboat is launched, the falls pay out from an electric winch, allowing the davit arms to slide down a pair inclined rails, or tracks, to deploy the lifeboat. (*Id.*).

[*Illustration Follows*]



**Figure 1: Profile of a roller gravity davit. (Ex. I at p. 5).**

Item 601 required the shipyard to remove the vessel's six lifeboats and repair the davits. (Ex. G, p. Vessel Defendants 968, ¶ 7.1).  With the lifeboats removed, DSI requested CGS to "lock out" and "tag out" the lifeboat davit systems.  As CGS's Paul Varghese testified, "[t]he first tag out would normally [be] at the [engine] control room, where the main [electrical circuit] breaker is."  (Ex. J, Second Deposition of CGS, through its corporate representative Paul Varghese, at p. 118:13-20).  The second tag out of the lifeboat system "is at the operating station where the lifeboats are operated, lower and raise," thereby providing "two…methods of isolation."  (*Id.* at p. 118:21 – 119:5).  Although lock-out/tag-out disabled the normal operation of the lifeboat systems, DSI could still rig individual component parts of the davit system with its own cranes and equipment.  "The davit system…was tagged out," explained Paul Varghese.  "The davit arm is only part of that.  So, when the shipyard lifts that off or the shipyard [is] working on [the davit arm], the shipyard could use their rigging procedures or their safety procedures to do that work."

(*Id.* at 120:17-23). "Crowley will not tell you [how to] lift it off or how you tie it or how you do that work." (*Id.* at p. 120:24-25).

After removing the lifeboats and falls, personnel from DSI's rigging department restrained each of the twelve lifeboat davit arms with a length of 7 x 19 stainless steel wire rope, fixed with large fasteners known as "Crosby" clamps. (Ex. I at ¶ 20; *see also* Ex. K, OSHA Salt Lake Technical Center Report).



**Figure 2: Wire rope with Crosby clamps. (Ex. I at p. 6).**

Item 601 called for, among other things, replacement of the falls and blasting and painting of the davit structures, arms, and appurtenances. (Ex. G, Repair Specification, at pp. Vessel Defendants 968-970). DSI was also to have a service engineer from Palfinger USA ("Palfinger"), the original equipment manufacturer's ("OEM") representative, to examine the davits to determine the full scope of necessary repairs. (*Id.* at pp. 967-969, ¶¶ 5.2, 7.9). Palfinger's inspection revealed, among other things, numerous areas of corrosion that need to be removed with flame cutters or grinding discs, followed by "clad welding" to replace metal in the corroded areas. (Ex. I, Fisher Report, at ¶ 5).

### C.    DSI's History of Rigging Gravity Davit Arms with Wire Ropes

This davit arm restraining method was a longstanding and standard procedure at DSI. The restraint of the davit arms on the *Lummus* in 2018 was "the way we've been restraining davits for years." (Ex. L, Deposition of DSI's Project Manager, Dallas Verble, at p. 70:8-9). Verble added, DSI's "riggers have the experience and the skill, and they've always done it." (*Id.* at p. 72:17-18). Mr. Verble's examination continued:

Q:  All right.  And then are you aware that the davit arm was restrained and rigged into place by some Detyens folks?

A:  Yes, sir.

Q:  And what do you know about that?  How did you find that out?

A:  How did I find out that Detyens folks [did the rigging]?

Q:  Yeah.

A:  Because we've always restrained the davit arms.

Q:  Okay.  That's part of what the rigging folks do at Detyens?

A:  Yes, sir.

Q:  Every ship that comes in?

A:  Yes, sir.

(*Id.* at pp. 45:21 – 46:10). The procedure was so commonplace that Mr. Verble could rely on DSI's rigging shop to rig the davits without his supervision or instruction: "I tell my son to go out and mow the grass, okay, he's done it 15 times, I don't have to tell him to go back and forth to make each pass every time I need you to go out and mow the grass." (*Id.* at p. 64:23-65:2).

Mr. Verble testified that it is "common" in his experience for lifeboat davit repair specifications from shipyard customers to contain no instructions as to how the davit arms should be restrained during repair work. (*Id.* at p. 128:9-14).  Asked whether he found the *Lummus* repair

specifications deficient because they did not specify how to restrain the davit arms, Mr. Verble answered, "I did not." (*Id.* at p. 128:15-21). Mr. Verble's examination continued:

> Q:   And do you expect the customer to tell the shipyard how to restrain the davit arm?
>
> A:   I don't expect [that], no.
>
> Q:   Okay. And that's handled by the rigging shop?
>
> A:   Handled by the rigging shop and customary, the standard way we've done it for all along.
>
> Q:   Okay. Do you have any idea how long Detyens has prior to this incident restrained davit arms with this wire rope and Crosby clamps method?
>
> A:   I don't know for how long. I can tell you I have been here for 23 years and it's the way that it's been done since I've been here.
>
> Q:   …And has any customer in your 23 years in the past ever objected to the way it was done?
>
> A:   No, sir.

(*Id.* at p. 130:3-20). Even after the accident, DSI continues to receive specifications that leave the davit arm restraining method up to the shipyard. (*Id.* at p. 129:2-10) ("I'm working on a job right now where I have a davit job like that. I have not seen one [ship repair specification] yet that specifies how to" rig the davit arms. (*Id.* at p. 129:12-14)).

Moreover, the repair specification required the shipyard to provide an OEM specialist for the lifeboat davits—in this case Palfinger. Mr. Verble testified that, as the davit OEM representative, Palfinger would "possess a level of expertise regarding these davits." (*Id.* at p. 134:14-17). A Palfinger representative is, he added, frequently in the shipyard on other davit jobs, as well. (*Id.* at p. 134:7-10). Mr. Verble testified that, in his 23 years at the shipyard, he knew of no instance in which Palfinger objected to DSI's method of restraining the davit arms. (*Id.* at p. 134:18-135:2). MSC's Program Manager Juanita Broennimann testified that in her 31 years as an

engineer at MSC, she had "customarily seen [the davits] rigged in this manner." (Ex. C, Broennimann Depo., at p. 147:19-22). "I wouldn't take any particular notice of it," she continued, "because this is what I have always seen." (*Id.* at p. 147:25-148:1). Ms. Broennimann added, "I believe that the shipyard rigged it in the way they had determined was a safe manner." (*Id.* at p. 157:17-18).

David Hagner was the master aboard the *Lummus* during the repairs in question. Until his retirement in the spring of 2019, Capt. Hagner had worked aboard ships for 35 years. (Ex. A, Capt. Hagner Decl., at ¶¶ 2-3). He had been Master of the *Lummus* for 20 years and attended shipyard repairs at DSI in 2006, 2010 and 2013, in addition to the period at issue in this case (November 2018 to April 2019). (*Id.* at ¶¶ 5-6). Capt. Hagner agreed that the ship's officers and crew rely on the shipyard's expertise and do not "tell the shipyard workers how to perform their work." (*Id.* at ¶ 7). Neither did any ship's crew or CGS personnel participate in the davit repairs, all of which had been turned over to DSI. (*Id.*). The davits had been serviced during each of Capt. Hagner's four prior visits to the shipyard; each time, "DSI's rigging department restrained the davit arms the same way, namely with wire rope and Crosby clamps." (Capt. Hagner Decl. at ¶ 8). "As the method of restraint had been used without incident on past occasions and appeared safe and sufficient," Capt. Hagner states in his Declaration, "I never had any reason to question its use by the shipyard." (*Id.*).

Capt. Hagner also recounted the following from around two months before the accident:

Because I believed that the davit arms were safely secured, I trusted my own life to the wire restraints that DSI employed. During one routine round of the main deck earlier in the repair availability (I recollect cold weather apparel and would guess it to have been at least two months prior to the accident), I saw a welder breaking from work on the No. 2 davit on the ship's port side. After he vacated the trackway, I climbed into his workspace and stood between the tracks of the forward arm of the No. 2 davit *with my back to the davit arm* and my attention turned outboard and down, to see what the welder had been welding. Had that davit arm's wire rope parted, I would have been killed in the same

10

manner as the decedent in this case. However, I stood between the trackways because I believed that my safety was assured by years of proven success with this method of davit arm restraint.

(*Id.* at ¶ 9) (emphasis in original).

No ship's officer, crew, or other CGS personnel participated in the repairs of the davits, all of which were under DSI's control. (*Id.* at ¶ 7). MSC's Program Manager Juanita Broennimann described the shipyard's custody and control of the vessel succinctly: "the industry standard is that, once [the shipyard] has taken custody…of the ship, they are responsible for the ship until they turn it back over" to the owner. (Ex. C, Broennimann Depo. at p. 156:2-4).[7] She described "two indicators that are commonly used [for the shipyard's] taking custody of the ship." (*Id.* at p. 156:8-9). One is the ship's "crossing the sill of the dry dock, if the ship is going directly into dry docking," and the other is the ship's "being tied up alongside the pier if they're not going directly to dry dock." (*Id.* at p. 156:9-12). Crowley, Broennimann explained, "is expected to manage the contract that they enter into with the shipyard, but…the repairs are being done by the shipyard." (*Id.* at p. 62:8-10). In this regard, DSI's Project Manager Dallas Verble testified that as the shipyard's work is completed in "stages," the vessel's "chief mate and the Crowley rep accept the [work] as finished" at various "checkpoints." (Ex. L, Verble Depo., at pp. 131:7-132:15). The Crowley representatives do not supervise the work "as it's going on day-to-day." (*Id.* at p. 132:12-15).

---

[7] Plaintiff's counsel acknowledged that Ms. Broennimann, a 31-year engineer at MSC, is "an expert in this field." (Ex. C, Broennimann Depo. at p. 60:21-22).

### D.    The Accident

As of April 3, 2019, Plaintiff's decedent, Juan Antonio Villalobos Hernandez ("Mr. Hernandez") was employed by Southern Skill Trades, a temporary staffing agency. Southern Skill Trades lent Hernandez to another staffing agency, HighTrack Staffing, Inc., who in turn lent him to DSI.[8] (Complaint, D.E. 1, at ¶¶ 14-16).  Mr. Hernandez started work that morning either by grinding or welding on the aft arm or trackway of the No. 5 lifeboat davit, on the ship's starboard side aft.  (Complaint, D.E. 1, at ¶¶ 17, 19; Ex. M, Deposition of Plaintiff's Metallurgical Expert Thomas Wenzel at p. 52:14-22).  While working that morning, Mr. Hernandez stood between the rails of the trackway for the aft davit arm, and the wire rope restraining the davit arm parted. (Complaint, D.E. 1, at ¶ 23). The davit arm rolled down the trackway and struck Mr. Hernandez, fatally injuring him.  (*Id.*).

When Mr. Hernandez was found, he was wearing a welding helmet, and had arc welding rods and electrical welding leads within reach. (Ex. M, Wenzel Depo., at pp. 46:9-14, 42:19, and 39:14-16).

### E.    Causation

The federal Occupational Safety and Health Agency ("OSHA") responded the same day and led the investigation into the cause of the accident.[9]  The OSHA investigator collected the wire rope and sent it to the OSHA Salt Lake Technical Center ("SLTC") in Utah for metallurgical analysis.  The SLTC reported evidence of electrical damage, carbon deposits, and melting on the

---

[8] Mr. Hernandez was identified in his employment papers, by his Texas photo identification card, and by his Social Security card as "Jose Pena."  The Charleston County Coroner later identified him through fingerprint analysis as Mr. Hernandez.

[9] OSHA investigated pursuant to its authority under 29 CFR Part 1915, "Occupational Safety and Health Standards for Shipyard Employment."  This Part applies to shipyards only and expressly exempts shipboard personnel from OSHA's purview.  29 CFR § 1915.2(b).

frayed ends of the wire rope where it parted. (Ex. K, OSHA SLTC Report, at p. 4). "The presence of carbon deposits," the report stated, "are evidence that the failure was the result of an electrical event." (*Id.* at p. 5). The report concluded that "[t]he wire rope failed due to an electrical arc." (*Id.*).

Plaintiff's metallurgical expert, Thomas C. Wenzel, testified he was "generally in agreement with OSHA." (Ex. M, Wenzel Depo., at p. 12:16-17). Mr. Wenzel characterized the mechanism of failure as a "thermal damage" in the wire and agreed that "the electrical arc is the best possibility at this time." (*Id.* at pp. 54:13-14; 55:4-5). As possible sources for the electrical arc, Mr. Wenzel cited as ungrounded welding "on the davit arm or in the vicinity of the davit arm" or else a lightning strike.[10] (*Id.* at p. 25:5-22). He ruled out corrosion and sheering force of the wire as causes of failure. (*Id.* at p. 53:15-21). He also conceded that DSI had not overloaded the wire rope. (*Id.* at p. 55:15-18). "We definitely have a thermal event that has melted individual wires," Wenzel testified; "they're resolidified on the free end, and we definitely have thermal damage that ultimately compromised the strength of the wire rope." (Wenzel Depo. at p. 55:20-24).[11]

### F.     Procedural History

Mr. Hernandez' estate filed a workers' compensation action against his employer, Southern Skill Trades, under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et. seq.* (the "LHWCA"). The estate collected death benefits for Mr. Hernandez's widow and sons,

---

[10] The weather was clear and sunny on the morning of the accident.

[11] Plaintiff's liability expert, Gerald Nielsen agreed. It was his "understanding" that the source of the electrical current that melted the wire rope was "ungrounded welding." (Ex. N, Nielsen Depo., at p. 185:14-18).

then aged 17 and 15.  Plaintiff filed the within action against the Vessel Defendants, DSI, and HighTrack Staffing, Inc. on April 1, 2021.  (D.E. 1).  Against the Vessel Defendants, Plaintiff asserted a claim of negligence under 33 U.S.C. § 905(b), and state law claims for wrongful death and survival.

Vessel Defendants Crowley Maritime Corporation and Crowley Government Services, Inc. have already moved for summary judgment on the grounds that Plaintiff's exclusive remedy is an action against the United States under the Public Vessels Act and Suits in Admiralty Act. That motion remains pending.  (D.E. 44).  The United States, as owner of the public vessel *Lummus*, now moves for summary judgment on the merits of the case on the grounds that the there is no issue of fact as to whether it breached any duty of care to the Plaintiff's decedent. Although they are entitled to judgment for the reasons already briefed to the Court, the Crowley defendants join in the United States' motion as additional grounds for summary judgment in their favor.

## II.    Argument

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322. The nonmovant "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a

genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, (1968)). Evidence should be viewed in the light most favorable to the nonmoving party and all inferences drawn in its favor. *Anderson*, 477 U.S. at 255. However, a mere "scintilla" of evidence will not preclude summary judgment. *Id.* at 252.

### A.    Plaintiff's Exclusive Remedy Is Provided by the LHWCA

An injured shipyard employee's rights against a vessel are determined by the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. §§ 901, *et. seq.* ("LHWCA").[12] Enacted in 1927, the LHWCA provides harbor workers like Mr. Hernandez with a broad federal compensation remedy from the stevedore or shipyard employer. Before 1972, harbor workers could sue vessels and their owners for injuries caused by an unseaworthy condition — a form of strict liability claim traditionally available only to seamen.  In 1972, Congress amended the LHWCA to increase the scheduled benefits paid to harbor workers from the employer, while striking the harbor workers' third-party recovery against the vessel on grounds of unseaworthiness and requiring proof of actual negligence by the vessel and its crew. 33 U.S.C. § 905(b). See generally *Slaughter v. S/S RONDE*, 390 F. Supp. 637, 639-41 (S.D. Ga. 1974), *aff'd* 509 F.2d 973 (5th Cir. 1975). Thus, the 1972 Amendments eliminated the longshoreman's strict liability remedy against the vessel, allowing instead that a harbor worker injured "by the negligence of a vessel . . . [to] bring an action against such vessel as a third party," but stipulating that the vessel's liability "shall not be based on the warranty of seaworthiness." 33 U.S.C. § 905(b). The 905(b) remedy is *exclusive of all other*

---

[12] Under the LHWCA, "[t]he term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker **including a ship repairman**, shipbuilder, and ship-breaker…." 33 U.S.C. § 902(3)(emphasis added).  The term "vessel" includes "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." *Id.* at § 902(21).

*remedies against the vessel*." (*Id.*) (emphasis added). "Vessel," for purposes of Section 905(b), includes the vessel's "owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. 902(21). Thus, state law claims for wrongful death and survival are barred by § 5(b) of the LHWCA.

In consideration for the elimination of strict liability as an avenue of recovery against the vessel, the 1972 Amendments substantially increased the workers' compensation payments that injured harbor workers that workers such as Mr. Hernandez (or his estate) could recover from their employers and eliminated the vessel's right to indemnity from the employer. *Howlett v. Birkdale Shipping Co*., 512 U.S. 92, 96 (1994); *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 261-62 (1977). Under this regime, Mr. Hernandez's estate received compensation for his tragic death from his employer, Southern Skill Trades, and the Vessel Defendants would be barred from seeking contractual or equitable indemnity from his employer assuming they were held liable to the estate.

### B.    A Vessel's LHWCA Duties Are Defined by Controlling Case Law

The United States Supreme Court considered the nature of a longshoreman's claim for vessel negligence in the landmark case of *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981). As further explained in *Howlett v. Birkdale Shipping*, 512 U.S. 92, *Scindia* established three distinct, but limited, duties owed by the shipowner to a harbor worker:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. *See* 451 U.S. at 167. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Ibid.* The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore. See 451 U.S. at 167-178.

*Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. 156). In *Howlett,* the plaintiff argued that the shipowner had a duty to inspect for hazards that arose in the course of the contractor's work aboard the ship. *Id.* at 100. In rejecting that theory, the Court observed, "a vessel has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id*. at 101 (internal quotation marks omitted).

While *Scindia* and *Howlett* both involved injuries sustained during a stevedore's cargo operations, the narrow duties of the shipowner apply equally to ship repair contractors. As noted in *Deyerle v. United States*, 149 F.3d 314, 316 (4th Cir. 1998), "[a]lthough *Scindia* only addressed the vessel owner's duty to a longshoreman, subsequent decisions have held that its principles generally apply to all independent contractors and their employees." *See also Bates v. Merritt Seafood, Inc*., 663 F. Supp. 915, 926 (D.S.C. 1987) (citing *Hill v. Texaco, Inc*., 674 F.2d 447 (5th Cir. 1982)).

### 1. The Turnover Duty

As stated above, the "turnover duty" focuses on the shipowner's obligation before or at the commencement of the repairman's operations. *Howlett*, 512 U.S. at 98; *Kirksey v. Tonhai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008). In the context of a ship repair worker's injury, the Fourth Circuit Court of Appeals summarized the duty as follows:

> This "turnover duty" thus requires that the shipowner exercise due care to ensure that the ship is safe enough when turned over to the stevedore to allow the stevedore, exercising reasonable care, to perform cargo operations safely, and that the stevedore be warned of any hidden defects that are known or should be known to the shipowner. [The] shipowner is negligent "if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care."

*Deyerle*, 149 F.3d at 316 (quoting *Scindia*, 451 U.S. 156). The "turnover duty" has two components:

> This duty extends at least to (1) exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to (2) warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Scindia*, 451 U.S. at 166-67 (emphasis added). "It bears repeating that the duty [to warn] attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99. "Given the *Howlett* Court's clear language strictly limiting the vessel's turnover duty to warn to *latent* defects and dangers, it makes no sense to say that the vessel is nevertheless liable to the longshoremen for breach of the duty to turnover a safe ship based on an *obvious* defect against which it had no duty to warn." *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 395 (5th Cir. 2008) (emphasis in original).

Although *Scindia* and *Howlett* were decided after the 1972 Amendments to the LHWCA, which abrogated the shipowner's strict liability warranty of seaworthiness, neither decision disturbed the holding of *West v. United States*, 361 U.S. 118 (1959), a case which arose from the injury of a shipyard worker. In *West*, the plaintiff sued the United States under the Public Vessels Act for injuries suffered in the course of repairing a government ship. *Id.* A repair contractor "was to have complete responsibility and control of the making of the repairs, with the right in the United States to inspect the work and materials to insure compliance with the contract." Although the United States placed six officers and crew aboard the ship, they "had no 'control of the ship in the ordinarily accepted context,' their sole function being to serve as inspectors for the United States." *Id.* at 119-120. The plaintiff was injured while working on the ship's main engine and sought

recovery from the United States on the then-available strict liability doctrine of unseaworthiness. *Id.* at 120.  However, the Court found:

> The [vessel], as anyone could see, was not in maritime service. She was undergoing major repairs and complete renovation, as the petitioner knew.  Furthermore, he took his orders from the contractor, not the shipowner.  He knew who was in control.

*West*, 361 U.S. at 122-123.  For this reason, the Court rejected the unseaworthiness claim.  *Id.* at 123.

The *West* Court also rejected a negligence claim for the shipowner's alleged failure to provide the plaintiff a safe place to work.  *Id.*  "[H]ere the owner had no control of the ship; it had been turned over to a repair contractor for extensive overhaul, which was not performed under the direction of the shipowner," but of the shipyard.  *Id.* at 124.  "*It appears manifestly unfair* to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and *the work of repair in effect creates the danger* which makes the place unsafe."  *Id.* at 123 (affirming defense verdict) (emphasis added).

The Fourth Circuit Court of Appeals considered the vitality of *West* in the post-*Scindia* era in *Deyerle v. United States*, 149 F.3d 314, 316 (4th Cir. 1998).  As in *West* and the case at bar, the *Deyerle* plaintiff was injured during repairs to a public vessel and sued the United States under the Public Vessels Act.  *Id.* The injury occurred while the plaintiff was removing power cables from the ceiling in a ship's computer room turned over to the contractor for repair.  *Id.* at 315. In affirming summary judgment for the United States, the Fourth Circuit found no breach of the *Scindia* duties as plaintiff's employer was "a repair contractor hired specifically to replace and repair the very equipment on which [plaintiff] was injured."  *Id.* at 316.  The *Deyerle* Court continued:

> To hold a shipowner liable to repairmen for injuries resulting from the very equipment they have been hired to repair would, in many cases, effectively render the shipowner an insurer

of all repair operations, a result that Congress clearly did not intend by its 1972 Amendments to the LHWCA, which were designed to eliminate the essentially strict liability regime of "seaworthiness" and to establish a negligence regime.

*Id.* Quoting *West*, the *Deyerle* Court observed that it would be "manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, *and the work of repair in effect creates the danger which makes the place unsafe.*" *Id.* (quoting *West*, 361 U.S. at 123) (emphasis added);[13] *see also Stass v. American Commercial Lines, inc.*, 720 F.2d 879, 1984 AMC 2808 (5th Cir. 1983)(affirming summary judgment for vessel where repair worker was injured in course of barge repairs contractor was hired to perform); *Kirby v. OMI Corp.*, 1989 AMC 1079 (Fl. Cir. Ct. 1989)(finding no breach of duty by vessel owner to plaintiff's decedent in shipyard accident); *Peters v. Titan Van. Co.*, 857 F.2d 1342, 1989 AMC 1598 (9th Cir. 1988)(finding, in § 905(b) actions, shipowner has no negligence liability when repair worker is injured by very condition he was hired to repair); *Rose v. Cargill, Inc.*, 2015 AMC 2020 (E.D. La. 2015) (no duty to warn worker injured by slipping hazard contractor was hired to clean); *Velez v. Laredo Offshore Services, Inc.*, 2010 U.S. Dist. Lexis 70125, 2010 WL2757489 (S.D. Tx. 2010)(finding no breach of turnover duty where repair contractor's work created danger that made vessel unsafe).

It is clear that this case does not implicate the turnover duty. There has been no suggestion that the lifeboat davits aboard the *Lummus* were in anything other than normal condition, apart from the required repairs, when the vessel was turned over to the shipyard. DSI obviously knew that the davits needed to be restrained in the upright position after the falls were removed — as

---

[13] The United States District Court for the District of South Carolina, Charleston Division, observed that "*West* has continued vitality." *Bates*, 663 F. Supp. at 926 (citing, *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir. 1982); *Stass v. American Commercial Lines, Inc.*, 1984 AMC 2808, 2812, 720 F.2d 879, 882, (5th Cir. 1983); *Duplantis v. Zigler Shipyards, Inc.*, 692 F.2d 372 (5th Cir. 1982)).

plainly evidenced by the fact that DSI did in fact restrain them. The length of wire rope that failed was furnished by DSI; it was not part of the vessel's equipment when the ship was turned over.

The davits were, moreover, the very things DSI was to repair pursuant to Work Item 601. Under *West*, *Deyerle* and similar authorities, the plaintiff cannot recover based on risks inherent in the very repair task the shipyard was hired to perform. Thus, the turnover duty can be eliminated as a possible source of liability.

### 2.     The Active Control Duty

The second duty is known as the "active control duty." Once the stevedore's or repairer's operations have commenced, the shipowner's duties narrow considerably. *See Spence v. Mariehamns R/S*, 766 F.2d 1504, 1507 (11th Cir. 1985).     The Fourth Circuit Court of Appeals summarized the active control duty as follows:

> Under the active control duty, a vessel owner is liable if it either actively involves itself in the cargo operations and negligently injures a longshoreman or fails to exercise due care to avoid exposing longshoremen to harm from hazards that they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Price v. Mos Shipping Co*., 740 F. App'x 781, 783 (4th Cir. 2018) (internal citations and quotations omitted). The *Price* Court also found that "*the mere presence of an officer of the ship's crew does not constitute active involvement* in discharge operations within the meaning of *Scindia*." *Id.* at 783 (emphasis added); *See also Bonds v. Mortensen & Lange*, 717 F.2d 123, 124 (4th Cir. 1983) (in a case arising from Port of Georgetown, South Carolina, mere fact "that an officer of the ship's crew observed *and oversaw* [cargo] operations at all times" did not constitute "active control" of contractor's operation) (emphasis added).

In this case, the Plaintiff has elicited no evidence whatsoever that the lifeboat davits, all decommissioned and under repair for five months, remained under the "active control" or "operational control" of the Vessel Defendants. *Price*, 740 F. App'x at 783. Further, "the mere

presence of an officer of the ship's crew" patrolling the deck from time to time does not restore active control of the work area to the vessel. *Id.* Crowley's work was limited to inspection of completed repairs. (Ex. A, Capt. Hagner Decl. at ¶ 7; Ex. L, Verble Depo., at pp. 131:7-132:15).

Thus, neither is the active control duty implicated in this case. There is no evidence that Crowley actively involved itself in the davit repairs. Those repairs were performed entirely by the shipyard long after the vessel had crossed the sill of the drydock. There is no evidence that the davits remained under the ship's active control. Their normal shipboard controls had been disabled and their component parts had been restrained by the shipyard under its contract to perform the repairs. The davits were clearly included among the portions of the vessel that had been turned over to the shipyard for repair. Although crewmembers may have occasionally been present in the vicinity of the davits for various purposes, this does not implicate the active control duty under the authorities cited above.

### 3.  The Intervention Duty

"The third and final duty, referred to as the 'duty to intervene,' concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." *Howlett*, 512 U.S. at 98.  In considering the duty to intervene, the Court held, "a vessel has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the … operations that are assigned to the stevedore." *Id.* at 101.  In *Price*, 740 F. App'x at 783-84, the plaintiff was injured when a forklift operated by another longshoreman fell through an unprotected hatch opening and struck him.  As noted above, the court disposed of the active control duty by finding that the mere presence of a ship's officer who operated the cargo elevator during stevedore operations when the forklift fell

nearby was insufficient to constitute active control of the stevedoring operation. *Id.* at 784. With respect to the intervention duty, the court noted that:

> a vessel owner generally owes no duty to the longshoremen to inspect or supervise the cargo operations and may rely on the judgement of the stevedore to avoid exposing longshore workers to unreasonable risks of harm.

*Id.* Intervention is required, however, "when the vessel owner knows that the stevedore's judgment in carrying out his tasks is *obviously improvident* under the circumstances." *Id.* (emphasis added). The emphasized words are important because the courts under *Scindia* distinguish working safely in the presence of danger (common enough in industrial settings) with obvious recklessness. In this regard, the vessel owner violates the intervention duty if it:

> fails to intervene in the stevedore's operations when he has *actual knowledge* that both: (1) a hazardous condition exists; and (2) the stevedore, in the exercise of *obviously improvident* judgment means to work on in the face of it and therefore cannot be relied on to remedy it.

*Id.* at 783 (emphasis added). Thus, the vessel's officers and crew must have actual knowledge of a specific danger and that the contractor's continued work is obviously improvident:

> If the shipowner may reasonably believe, *despite its own knowledge of the danger*, that the stevedore will act to avoid the dangerous conditions, *the owner cannot be said to have been negligent*, as the decision whether a condition imposes an unreasonable risk of harm to longshoremen is a matter of judgment committed to the stevedore in the first instance.

*Id.* at 783-84 (internal citations and quotation marks omitted) (emphasis added); see also *Scindia*, 451 U.S. at 172. Whether a condition imposes an unreasonable risk of harm to employees is a "matter of judgment" committed to the contractor in the first instance. *Price*, at 783. In *Price*, a ship's officer observed longshoremen operating a forklift near an unprotected hatch opening in the deck. While it was obviously hazardous to do so, the Fourth Circuit Court of Appeals held there was no duty to intervene because the ship's officer "was entitled to rely on the longshore workers' judgment as to whether cargo operations could be conducted safely." *Id.* at 784 (affirming summary judgment for the shipowner).

The intervention cases uniformly require (1) the shipowner's "actual knowledge" of a hazardous condition and (2) the shipyard's or stevedore's "obviously improvident" judgment in continuing the hazardous work. *Id.* Here, Plaintiff's claim fails on both points. Plaintiff has elicited no evidence that any vessel personnel had "actual knowledge" of the hazard that ultimately killed the Plaintiff's decedent. There is no evidence that anyone knew that an errant electrical current might weaken an otherwise sturdy length of wire rope to the point that it might fail. Nor did any crewmembers or other Crowley personnel have reason to anticipate that after decades of safe use, the shipyard's standard method of restraining davit arms should suddenly fail. Indeed, Capt. Hagner did not hesitate to trust his life to DSI's retraining method. (*See* Ex. A at ¶ 9). The evidence is all to the effect that the shipyard had used the same rigging method on untold numbers of davit arms for at least the 23 years of DSI Project Manager Dallas Verble's tenure. Thus, it cannot be said that DSI's work on the *Lummus* davits was "obviously improvident." In fact, no one testified to anticipating the melting of a wire rope by an invisible electrical current. The other eleven davit arms on the *Lummus* – not subjected to electrical current – all held fast as designed. "Nothing in my 35 years of sailing on ships gave me any reason to anticipate this accident." (Ex. A, Capt. Hagner Decl., at ¶ 13).

In an effort to prove the shipowner's "actual knowledge" of the unlikely danger that caused the accident, Plaintiff will undoubtedly cite a technical manual for the lifeboats and davits, prepared by the OEM and kept, along with numerous other technical manuals, aboard the vessel. The manual recommends the use of chain or wire rope (as DSI used) to restrain the davit arms when the falls are removed, as they were here by DSI. The manual also mentions the use of a "stopper bar" across the trackway, although it is unclear as to whether the bar is used in normal operation to relieve strain on the falls or as a backup restraint when the falls are removed. Whatever

the case, the davit stopper bars would have required removal at some point to clear the davit arms for blasting and painting of the davit structure. Even so, the Plaintiff seizes on the technical manual as evidence the davit arms should have restrained by a bar in addition to wire rope.

Even assuming the Plaintiff reads this manual correctly, it does not constitute evidence of a breach of the intervention duty. As noted above, that duty requires the shipowner's "actual knowledge" of the allegedly improvident practice. *C.f.* RESTATEMENT (SECOND) OF AGENCY § 9, comment c (1958) ("For legal purposes, in contrast with 'reason to know' and 'should know', knowledge requires awareness of a fact or condition.").    On any ship of the size and complexity of the *Lummus*, there are hundreds, if not thousands, of technical manuals.  (Ex. C, Broennimann Depo. at p. 169:5-8). No person can be expected to know the entire contents of each and every manual aboard the ship. There is no evidence that any of the ship's officers, crew, or other Crowley personnel were in fact aware of the provisions relating to davit arm restraint in the applicable technical manual. The ship had, as previously noted, been turned over to a shipyard for repair, and it did not fall to any representative of the United States to memorize any of the technical manuals that might pertain in some way to the shipyard's work. The existence of ambiguous instructions on the page of a single book in a technical library of hundreds or thousands of volumes is a far cry from "actual knowledge" of a potential danger.

Moreover, even if a representative of the United States had actual knowledge of the manual, that would still not implicate the intervention duty. The vessel is under a duty to intervene only if the contractor's actions are "obviously improvident." The fact that additional precautions might be available does not make the contractor's actions improvident. Here, even someone who had memorized the technical manual would know only that, whatever the manual might recommend, the shipyard had chosen to employ its standard procedure for restraining lifeboat davits. There is

no evidence that the use of heavy wire rope restraints, without some secondary means, was so extremely hazardous as to make the method obviously improvident. On the contrary, the evidence is all to the effect that Capt. Hagner and other ship personnel had every reason to believe the wire ropes were quite safe on their own. Capt. Hagner had witnessed the same methods used successfully during past visits the same shipyard, and the davits had all remained secure over the months between the ship's arrival at DSI and the unfortunate accident in this case.

A decision from the Eastern District of Louisiana is very much on point. In *Aguilar v. Bollinger Shipyards, Inc*., 833 F. Supp. 2d 582 (E.D. La. 2011), the plaintiff was injured when he was struck by a falling I-beam aboard a ship in drydock for repair. The I-beam had been furnished by the vessel owner at the request from a repair contractor, who needed it to lift some heavy gears for work on main engine gearboxes. The I-beam fell because it came loose in the course of a series of a lifts. Everyone involved in the operation believed the I-beam was completely safe for the required lifting operations. Indeed, the plaintiff's supervisor claimed to be "100 percent satisfied with the beam and its placement and its securing before [he] and Mr. Aguilar began lifting that gear." *Id.* at 586. The I-beam could, however, have been *additionally* secured by welding, drilling and bolting, clamping, or other means. *Id.* at 586-87. Moreover, the *Aguilar* Court found that the I-beam had been safely used as a lifting point for "nearly 20 lifts" before it fell on the Plaintiff. *Id.* at 593.

On these facts, the court refused to find a violation of the intervention duty. The court emphasized that the intervention duty is "narrow" and requires "something more than a dangerous condition." *Id*. at 592, (quoting *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)). "Obviously improvident judgment," for purposes of the intervention duty, requires proof that the contractor "follow[ed] a procedure that is so hazardous that anyone can tell that its

continued use creates an unreasonable risk of harm." *Id.* at 593 (quoting *Clay v. Daiichi Shipping*, 74 F.Supp.2d 665, 673 (E.D. La. 1999), *aff'd* 237 F.3d 631 (5th Cir. 2000)). There was, according to the court, no credible proof that the shipowner had actual knowledge of the "hazardous condition posed by the use of the I-beam as a lifting point." *Id.* at 593. Although the I-beam could have been welded or bolted in place, it was still "capable of being safely used without welding" by the repair contractor and had been so used nearly 20 times. *Id.* at 593-594. The gist of the plaintiff's claims, the court noted, was that the vessel owner should have supervised the contractor's operations to ensure that the contractor's employees "did not act in a manner in which they could harm themselves." *Id.* at 594. Such a duty of supervision, the court concluded, "runs contrary to the underpinnings of *Scindia*." *Id.* The court instead applied the limited duties imposed by *Scindia* and its progeny, none of which had been breached by the vessel owner.

The Plaintiff here advances much the same argument as the plaintiff in *Aguilar*, namely that the lifeboat davits on the *Lummus* could have been made safer by the use of a secondary restraint such as a stopper bar welded onto to the davit tracks. The relevant inquiry for purposes of the intervention duty, however, is whether DSI's standard method of restraining lifeboat davits was "capable of being used safely." The answer is obvious—of course the restraining method can be used safely, because DSI had done so on countless prior occasions for more than two decades, far more than the "nearly 20 lifts" over the course of one month in *Aguilar*. *Id.* at 593. Here, the only reason the method failed was the presence of an errant electrical current—something no one had any reason to anticipate. "That's the entire meaning of 'errant,'" MSC's Program Manager testified, "[i]t's unintended." (Ex. C, Broennimann Depo., at p. 173:23-24). "And the electricity can't be seen, so it's not obvious to a safety observer." (*Id.* at p. 173:24-25).

The accident was unspeakably tragic. But the Vessel Defendants were not at fault. In sum, it would be "manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe." *Deyerle v. United States*, 149 F.3d 314, 316 (4th Cir. 1998)(quoting *West*, 361 U.S. at 123). To hold that "the vessel owner…should have supervised the [DSI's] operations to ensure that…[DSI's] employees did not act in a manner in which they could harm themselves…runs contrary to the underpinnings of *Scindia* and would virtually require the provision of a supervisor for every [repair worker] in the yard." *Aguilar*, 833 F. Supp. 2d at 593.

## Conclusion

The United States, joined by Crowley Maritime Corporation, Crowley Government Services, Inc., should be granted summary judgment because they breached no duty of care to the Plaintiff's decedent and because it would be "manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, [where] the work of repair in effect creates the danger which makes the place unsafe." *Deyerle*, 149 F.3d at 316 (quoting *West*, 361 U.S. at 123). Additionally, Plaintiff's state law claims for wrongful death and survival are barred by the exclusivity provision of § 5(b) of the LHWCA.

Respectfully submitted this 29th day of July 2022.

By: /s/ Ryan Gilsenan
Ryan Gilsenan, Fed I.D. No. 9837
Julius H. Hines, Fed. I.D. No. 5807
Edward N. Smith, Fed I.D. No. 13429
1535 Hobby Street, Suite 203-D
Charleston Navy Yard
North Charleston, SC 29405
T: 843.266.7577
gilsenan@hinesandgilsenan.com
hines@hinesandgilsenan.com
smith@hinesandgilsenan.com
*Counsel for the Defendants United States of America, Crowley Maritime Corporation, and Crowley Government Services, Inc.*

## <u>LIST OF EXHIBITS</u>

A. Declaration of the Master of the *Lummus*, Capt. David Hagner

B. MSC Contract

C. Deposition of MSC Program Manager Juanita Broennimann, pp. 25, 53, 60-62, 147-157, 169, 173

D. DSI Exceptions & Clarifications Letter

E. First Deposition of CGS General Manager, Paul Varghese, pp. 225-229

F. Shipyard Repair Contract, "BIMCO REPAIRCON"

G. Repair Specification Excerpt, Vessel Defendants 955-979

H. GTR, pp. 1026, 1164

I. Report of Vessel Defendants' Expert Witness Dr. Ken Fisher, Ph.D.

J. Second Deposition of CGS General Manager Paul Varghese, pp. 118-120

K. OSHA Salt Lake City Technical Center Report

L. Deposition of DSI Project Manager Dallas Verble, pp. 45-46, 64-65, 70-72, 128-135

M. Deposition of Plaintiff's Metallurgical Expert, Thomas Wenzel, pp. 12, 25, 52-55

N. Deposition of Plaintiff's Liability Expert, Gerald Nielsen, p. 185