IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | | |
|---|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative for the Estate of Juan Antonio Villalobos Hernandez, | ) ) ) | Civil Action No.: 2:21-CV-965-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DECLARATION** |
| | ) | **OF** |
| UNITED STATES OF AMERICA, | ) | **CAPTAIN DAVID HAGNER** |
| CROWLEY MARITIME CORPORATION, | ) | |
| CROWLEY GOVERNMENT SERVICES, | ) | |
| INC., DETYENS SHIPYARDS, INC., and | ) | |
| HIGHTRAK STAFFING, INC. d/b/a | ) | |
| HITRAK STAFFING, INC. | ) | |
| | ) | |
| Defendants. | ) | |

I, David Hagner, give the following declaration:

1.      In April 2019, I was employed by Crowley Government Services, Inc. as the Master of the USNS *1st Lt. Jack Lummus* when the accident occurred from which this litigation arises. I was scheduled to retire from the industry three days later and did so.

2.      My career began upon graduation from the U.S. Merchant Marine Academy at Kings Point, New York in June 1984. I received a commission in the United States Navy and served for three years as a Surface Warfare Officer.

3.      In 1987, my Naval obligation complete, I began my career sailing as a deck officer in the Merchant Marine. I joined the *Bobo*-class vessels, of which the *Lummus* is one, sailing as a Mate. I sailed as Chief Mate aboard *Bobo* class vessels during Operation Desert Storm in 1991.

4.      In 1995, I received my first command on a *Bobo* class vessel as a Relief Captain.

5.      I received command of the *Lummus* in January 1999 and, apart from vacation time, sailed as Master of the vessel for 20 years until retiring in April 2019.

6.      I served as Master of the *Lummus* during prior shipyard repair availabilities at Detyens Shipyards, Inc. ("DSI") at the following times:



# Exhibit A



a. December 9 – December 30, 2006 (21 days).

b. April 4 – April 15, 2010 (11 days).

c. October 1 – November 19, 2013 (50 days).

d. December 8, 2018 – April 7, 2019 (120 days).[1]

7.      As ship's crew, we rely on the shipyard's expertise, and, consistent with industry custom and practice and with the policies of the Military Sealift Command and Crowley Government Services, Inc., neither I, nor the ships other officers and crew, tell the shipyard workers how to perform their work. Neither did any ship's officer, crew, or other Crowley personnel participate in any aspect of the davit repairs, all of which was under the control of DSI.

8.      DSI worked on the lifeboat davits on all of the above occasions. Each time, DSI's rigging department restrained the davit arms the same way, namely with wire rope and Crosby clamps. As the method of restraint had been used without incident on past occasions and appeared safe and sufficient, I never had any reason to question its use by the shipyard.

9.      Because I believed that the davit arms were safely secured, I trusted my own life to the wire restraints that DSI employed. During one routine round of the main deck earlier in the repair availability (I recollect cold weather apparel and would guess it to have been at least two months prior to the accident), I saw a welder breaking from work on the No. 2 davit on the ship's port side. After he vacated the trackway, I climbed into his workspace and stood between the tracks of the forward arm of the No. 2 davit *with my back to the davit arm* and my attention turned outboard and down, to see what the welder had been welding. Had that davit arm's wire rope parted, I would have been killed in the same manner as the decedent in this case. However, I stood between the trackways because I believed that my safety was assured by years of proven success with this method of davit arm restraint.

10.     After the accident occurred, I completed an Initial Incident Report, which is marked as Vessel Defendants 990 and attached hereto as Exhibit 1. Under the section entitled "Suggestions to Prevent Recurrence," I noted my own impression that day that "[t]he parted wire appears to show heat discoloration at its point of failure, suggesting the possibility of electricity conduction between wire rope and the ship's hull, perhaps during welding."

11.     Completing reports like these, we are required to think of ideas to prevent similar accidents in the future and to write them down. Some ideas will be better than others, and some might not work at all. The purpose is not to cast blame on the shipyard for how they did things in the past. With the benefit of hindsight, I suggested that "[a]lternate means to reduce or eliminate the hazard might include performing maintenance with davit arms fully lowered, welding temporarily fixed retaining bars below each davit arm to lock them stowed, and using non-conducting straps of sufficient strength to hold the davit arms in place." The ship's crew

---

[1] The shipyard periods were longer than the dates I was aboard. When I was not aboard, I was on vacation, and my counterpart was serving as Master.

**Exhibit A**    O.Q.id.

and I are not rigging experts, or davit repair experts, but the wire rope method had worked so well for so long, that I do not believe this accident was foreseeable.

12.     As stated above, I had seen davit arms successfully restrained in the shipyard with a wire rope many times, and over many months, during my career aboard the *Lummus*. When the accident occurred, the other eleven davit arms aboard the *Lummus* were still successfully restrained by this method. Prior to this incident, I had no reason to doubt the effectiveness of wire rope to restrain the davit arms.

13.     Nothing in my 35 years of sailing on ships gave me any reason to anticipate this accident.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 16th, 2022 at Greenland, New Hampshire.

Captain David Hagner

# Exhibit A

CGS-MSC2-FORM-611
May 2016; Rev. 0

# Initial Incident Report

| Personnel Involved in the Incident - Name | Personnel Involved in the Incident - Rating | Drug & Alcohol Testing Performed |
|---|---|---|
| (Withheld) | Shipyard subcontractor | Not Required |

| Type of Incident | Vessel Name | Master / Person in Charge of Vessel | Vessel Location at the time of the Incident | Fleet | Type of Vessel |
|---|---|---|---|---|---|
| Personal Injury | Lummus | David L Hagner | US East Coast | MPF | Ro/Ro |

| Wind Direction | Wind Speed | Weather | Seas and Swell | Date of Occurrence | Time of Occurrence |
|---|---|---|---|---|---|
| Not a Factor | Not a Factor | Clear | Calm | 3-Apr-2019 | 0915 |

| JSA Conducted Prior to Incident | Work Permits in Order |
|---|---|
| Not Required | Not Required |

| Flag State Notified As Required | Class Society Notified As Required |
|---|---|
| Not Required | Not Required |

| Injury Type | Body Injury | Equipment or Environmental Damage | Out of Service Time | Equipment Damage (List Equipment) |
|---|---|---|---|---|
| Crushing | Neck | Not Applicable | Not Applicable | None noted |

| General Characteristics of Hazard | Hazard Location | Vessel Operations |
|---|---|---|
| Personal Injury | Other Deck Area | Other – Explain in Summary |

**Detailed Description of Facts Leading up to the Incident**

(Account is as described by shipyard co-worker and witness Franklin Thomas Jr., who was nearby at the time of the incident.) Lifeboat davits are undergoing overhaul/repair with winch motors and wires removed. Davit arms are held secured in their stowed locations with single-part wire rope loops secured by wire rope clips. Accident victim was sitting on a bucket atop #5 lifeboat davit winch casing. The bucket was supported by wood and he was welding. He was facing outboard with his upper body located between the davit tow tracks. There was a pop and the wire that was supporting the aft davit arm parted, allowing the davit arm to travel down the track and pinning the victim's neck between the davit arm and the flat bar support near the turn of the davit track, where the track's path turns vertically straight downward.

**Initial Corrective Actions Taken**

After several co-workers attempted to manually pull the davit arm free from above, shipyard crane assistance was summoned to free the victim. Emergency responders were unsuccessful in their attempts to resuscitate the victim and he was pronounced dead.

**Suggestions to Prevent Recurrence**

Observations only. The parted wire appears to show heat discoloration at its point of failure, suggesting the possibility of electricity conduction between wire rope and the ship's hull, perhaps during welding. This accident was an unintended release of stored energy; i.e., the gravity deployment of the boat davit arm. Alternate means to reduce or eliminate the hazard might include performing maintenance with davit arms fully lowered, welding temporary fixed retaining bars below each davit arm to lock them stowed, and using non-conducting straps of sufficient strength to hold the davit arms in place.

**General Questions - All**

| Were photos taken? | Yes |
|---|---|
| If yes, attach | |
| Corrective Action Approved | |
| Follow Up Investigation Required | |
| QMS Identification Number | |
| Issue Closed | |

**General Questions – Personal Injury**

| Was the injured person wearing PPE? | Yes |
|---|---|
| List all PPE worn by the injured person at the time of the incident: | Condition |
| Safety harness | |
| safety boots | |
| welding helmet | |
| welding gloves | |

**General Questions – Equipment Damage/Failure**

| Is the equipment part of the ship's Planned Preventive Maintenance Program? | No |
|---|---|
| When was the equipment last tested? | Vessel in shipyard. Davits being worked on/repaired. |

OFFICE USE ONLY

comments:

Vessel Defendants 990    Retention: 3 Years

Exhibit 1

Exhibit A