Juanita Broennimann                    June 16, 2022
Provence, Tiffany N v. United States of America, et al

                                                        Page 1

1   VIRGINIA:

2   IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

3           SOUTH CAROLINA OF CHARLESTON DIVISION

4                      IN ADMIRALTY

5   ********************************************************

6   TIFFANY N. PROVENCE, as the   )
    Personal Representative of    )
7   the Estate of Juan Antonio    )
    Villalobos Hernandez,         ) Case No.
8                                 ) 2:21-cv-965-RMG
             Plaintiff,           )
9                                 )
    -vs-                          )
10                                )
    UNITED STATES OF AMERICA,     )
11  CROWLEY MARITIME CORPORATION,)
    CROWLEY GOVERNMENT SERVICES, )
12  INC.,                         )
    DETYENS SHIPYARDS, INC., and )
13  HIGHTRACK STAFFING, INC.      )
    d/b/a                         )
14  HITRAK STAFFING, INC.         )
             Defendant.           )
15  ********************************************************

16                   DEPOSITION OF

17                 THE UNITED STATES

18        BY AND THROUGH ITS CORPORATE DESIGNEE,

19               JUANITA BROENNIMANN

20             9:00 a.m. to 2:00 p.m.

21                 June 16, 2022

22                   Via ZOOM

23

24  Job No. 38889

25            REPORTED BY:  Dawn Testa

Exhibit C

Page 25

1    Military Sea Lift Command is -- well, what role does the

2    Military Sea Lift Command play in selecting shipyards

3    where its vessels will be repaired; any role, or is that

4    completely left to the operator?

5         A    So, I will answer this, based on the

6    assumption that it is a Government-owned,

7    contracted-operated shipped.

8              We have different methodologies.  And the

9    different methodologies would apply, depending on how we

10   manage the ships.

11             The Lummus was a Government-owned

12   contract-operated vessel.  So I will reply in that

13   context.

14        Q    Sure.

15        A    So the operating company puts together the

16   specifications, the work items that the package of what

17   needs to be done.  It is reviewed by some of our

18   engineering staff at Military Sea Lift Command.  We

19   provide consent for the operating company to go and put

20   it on the list, solicit it.  That package, the bids come

21   into the operating company.  They review it.  They do

22   the price analysis, and they provide a recommendation to

23   Military Sea Lift Command.  And then we would consent to

24   the contract.

25        Q    Okay.  But do I understand correctly that the

Exhibit C

Juanita Broennimann                           June 16, 2022

Provence, Tiffany N v. United States of America, et al

Page 53

1    to the lifeboat systems on the Lummus, those

2    specifications would have been completely and

3    exclusively prepared by Crowley, but would have been

4    expressly approved by the Military Sea Life Command; is

5    that correct?

6         A    When you say "expressly approved," I'm not

7    sure if -- the primary focus of the review is to ensure

8    that we are covering all of the items that we

9    collectively, Crowley, and MSC, know need to be

10   addressed.

11        Q    Okay.  But I think I understood your

12   testimony to be that Crowley would not be permitted to

13   send the specifications out for bid until such time as

14   the Government had expressly approved the specifications

15   by whatever process they have; is that true?

16        A    Yes, that is true.

17        Q    So by extension, if there's a specification

18   for the repairs to the lifeboat davit arms, or lifeboat

19   systems, that would have been prepared by Crowley and

20   approved by the Government before this could have gone

21   out for bid; is that correct?

22        A    Yes.

23        Q    And, from the Government's perspective, is it

24   true that, at all times after this contract is executed

25   in July of 2014, Crowley is acting as an agent on behalf

Exhibit C

Juanita Broennimann                              June 16, 2022
Provence, Tiffany N v. United States of America, et al

                                                    Page 60

1    comply with all of the applicable OSHA regulations

2    during Crowley's operation, maintenance and repair of

3    the Lummus?

4        A    I don't believe that OSHA applies to the ship

5    itself.

6             I believe that Coast Guard requirements,

7    SOLAS, which is Safety of Life At Sea, are applicable.

8             I do not believe OSHA is specifically

9    applicable.  It is applicable when they're in the

10   shipyard, for the shipyard.

11       Q    Yes.  So I tried to phrase my question

12   meaning:  The applicable OSHA regulations.  And I think

13   you are distinguishing, which I understand.

14            I'm talking about when the ship is in the

15   shipyard, like this ship was between November of 2018

16   and June of 2019, is it your understanding that OSHA had

17   shipyard regulations, first of all?

18       A    Shipyard regulations.  I'm not an expert on

19   OSHA, but I know they have some oversight of shipyard

20   safety.

21       Q    Yeah.  I know you're not an expert on OSHA,

22   but you're an expert in this field -- you've been

23   working on for a long time -- presumably, you've come

24   cross OSHA a good bit; is that accurate?

25       A    A fair amount, yes.  I have come across OSHA.

**Exhibit C**

Juanita Broennimann                    June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 61

1    I know it applies to the shipyard.

2        Q      There we go.

3               When someone dies, is it your experience that

4    OSHA becomes involved in an investigation of that depth?

5        A      Yes.

6        Q      During your career with the Military Sea Lift

7    Command, other than this particular case, have you had

8    the unfortunate circumstance of dealing with other

9    deaths in shipyards?

10       A      That was why I paused when I answered it.  I

11   am not certain I think answer that one way or the other.

12   I do not believe so, other than a death from, say a

13   heart attack or something like that, but not an

14   industrial accident.

15       Q      All right.  Be that as it may, my question

16   really is -- I'll limit it down in light of the fine

17   points you made in your testimony.

18              When the ship is in the shipyard, being

19   repaired by Crowley, would you expect them to comply

20   with any applicable OSHA regulations?

21              MR. GILSENAN:  Objection to "yard."

22       A      Crowley is not repairing the ship; the

23   shipyard is contracting to repair the ship.

24       Q      All right.  Ms. Broennimann, let me try to

25   make this clear:  Crowley has responsibility for the

**Exhibit C**

Juanita Broennimann                    June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 62

1   operation, maintenance and repair of the Lummus; is that

2   correct, under the contract with the Military Sea Lift

3   Command?

4        A    Yes.

5        Q    So when I say "repairs," I'm talking about,

6   Crowley is in charge of the repairs for the Lummus; is

7   that accurate?

8        A    Crowley is expected to manage the contract

9   that they enter into with the shipyard, but, by in

10  large, the repairs are being done by the shipyard.

11       Q    Yeah.  I don't mean swinging a hammer and

12  climbing a ladder.  And I think that's, maybe, where

13  we're getting hung up.  Clearly, the shipyard is doing

14  all that kind of work, or people like my client are

15  doing that kind of work, right?

16       A    Correct.

17       Q    But the Government has paid a great deal of

18  money to Crowley to be responsible for the safe,

19  efficient and proper repair of the Lummus; is that

20  correct?

21            MR. GILSENAN:  Objection.

22       A    Yes, in a general way.  I mean, to me,

23  specifics matter.  I'm an engineer.  Words matter.

24       Q    Yes, ma'am.  And I'm trying to use the same

25  words you used earlier in your testimony.

**Exhibit C**

Juanita Broennimann                    June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 147

1     Q    Okay.  And, about how many shipyards on the

2     east and gulf coast contained the Bobo class vessels?

3     A    That are in operation right now?

4     Q    Yes.

5     A    Five.

6     Q    So, how important do you consider Detyens as

7     a resource for repair of these vessels?

8     A    It's an important resource.  Overall, there

9     is not enough commercial ship repair to support both

10    commercial industry, the maritime administration and

11    Military Sea Lift Command.  We're always struggling with

12    what ship is going to be able to get into a yard in

13    order to meet their regulatory requirements for dry

14    docking.  And Detyens is one of the few shipyards that

15    can take more than one ship at a time.

16    Q    So is it fair to say that MSC uses Detyens a

17    lot?

18    A    Yes.

19    Q    And have you ever seen life boat davit arms

20    rigged in this manner before?

21    A    Yes.  That's how I have customarily seen them

22    rigged.

23         I can't say how it's been on every ship that

24    I have seen davit work done on, but if I were to see it,

25    I wouldn't take any particular notice of it, because

**Exhibit C**

Page 148

1    this is what I have always seen.

2        Q      This is the single-wire rope restraint

3    method?

4        A      Yes.

5        Q      And regarding your see something say

6    something standard, when you have been in yards where

7    they would restrain the davit arm in this manner, did

8    you call for a work stoppage and stand down to have it

9    done a different way?

10       A      No.  I am not a rigging expert.  I would

11   defer to the yards expert.  They do it every day.

12              The only time I would call for a stand down

13   on rigging is if I saw something with the rigging gear

14   itself, that it appeared to be failing; say, a strap

15   that was wearing through or a wire that was slipping,

16   obviously, or corroded, something like that.

17       Q      So, in your experience of seeing davit arms

18   rigged this way, you have never objected to that manner

19   of rigging?

20       A      No.

21       Q      Do you know Dallas Verble?

22       A      I do.

23       Q      And how do you know Dallas?

24       A      He's been the Detyens project manager for

25   several ships that I have had at Detyens.

**Exhibit C**

Juanita Broennimann                          June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 149

1      Q      Well, I'll represent to you that that

2   Mr. Verble testified that Detyens has always rigged

3   gravity davit arms in this same manner, with the single

4   wire.  And that's how they've always done it, therefore,

5   they did not perceive a danger.

6           You've been asked a lot of questions

7   regarding QDRs and reports from Captain Oxendine and so

8   forth, regarding supervision by Detyens of various jobs

9   going on, on the shipyard and certain personnel in those

10  reports as you testified about the supervision by

11  Detyens for a particular task might have been

12  inadequate.

13          Do you have any reason to believe that, had

14  Detyens had constant supervision of the davit work, that

15  they would have rigged the davits any differently?

16     A      Based on the fact that they be have been

17  doing it that way for thirty years, I would presume that

18  when they first started doing it, they had supervision.

19  And it became a common practice.

20          No, they would not have changed the way that

21  they rigged it, whether there was supervision or not.

22  That was the standard in that yard.

23     Q      So is it fair to separate supervision issues

24  with certain other jobs from the way in which these arms

25  were rigged?

**Exhibit C**

Juanita Broennimann                                June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 150

1       A     I can easily do so, yes.

2       Q     What is Admiral Mewbourne's background in the

3   Navy?

4       A     Admiral Mewbourne is an aviator.  So he flies

5   airplanes, or flew airplanes, I should say.

6             He was also the commanding of several nuclear

7   carriers prior to coming to MSC.

8             AND then he was at MSC, then Transcom.  I'm

9   sure I have missed some things, put that's the general

10  picture of his career as I understand it.

11      Q     In contrast, is it fair to say that your

12  career has been with the maintenance and lifecycle and

13  management of MSC ships?

14      A     Yes.

15      Q     Okay.  Would you consider Admiral Mewbourne

16  to be a shipyard specialist?

17      A     I would not think so, no.

18      Q     What about Captain Oxendine?  Was he an

19  engineer?

20      A     I can't say one way or the other, but I don't

21  believe he was.

22      Q     Do you consider him to be a shipyard

23  specialist?

24      A     No.

25      Q     Is it fair to say that the MSC port engineers

Exhibit C

Juanita Broennimann                           June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 151

1    are shipyard specialists?

2         A    They are certainly much, much more

3    experienced with what is considered common practice and

4    shipyard policies.  So, yes, some more than others,

5    because of level of experience, but yes.

6         Q    Would that go for the port engineers who work

7    to the contract operators, such as Crowley, as well?

8         A    Yes.

9         Q    Do you have any criticism of Crowley

10   Government Services or Crowley Maritime as a result of

11   this incident?

12        A    No.  The opinion of those of us who work the

13   contract was that the failure was not caused by Crowley,

14   not contributed to by Crowley.  It was a standard

15   practice.  And there was an unusual errant electrical

16   current, from what I understand.  And, you know, there

17   was no adverse reporting.  There was no, essentially, a

18   QDR for Crowley associated with this.

19             It was believed to have been the primary

20   responsibility of the shipyard.

21        Q    Okay.  So Crowley did not receive a reprimand

22   of any kind from MSC?

23        A    No.

24        Q    Did you have any problem, or did the United

25   States have any problem with Crowley's management of the

**Exhibit C**

Juanita Broennimann                     June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 152

1   repair availability of the Lummus?

2        A     Not that I recall, no.

3        Q     Did you then, as a result of this incident

4   with the United States, hesitate to aware a contract to

5   Crowley again?

6        A     No, I would not hesitate.

7        Q     The manner in which the davit arms were

8   rigged, did you consider that to be life threatening?

9        A     It was standard practice.  I would have

10  considered it to be safe.

11       Q     Okay.  So you wouldn't have expected the

12  Crowley port engineer to speak up about the manner in

13  which it was rigged?

14       A     No, I would not.  It would take a rigging

15  expert of which, I mean, the most experienced with

16  rigging was the rigging team from Detyens.

17             And they had determined that it was safe and

18  used it for years.  So there's no reason to think that

19  it was not safe.

20       Q     Does the MSC contract with Crowley for the

21  operation of the Lummus, require Crowley to supply a

22  rigging expert to the shipyard?

23       A     No, specifically, it assigns rigging

24  responsibilities to the shipyard, because they are the

25  subject matter experts.

**Exhibit C**

Juanita Broennimann                              June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 153

1      Q     Okay.  You were testifying earlier about the
2    GTR, the general technical requirements, which are also
3    incorporated into the repair spec, correct?
4      A     Correct.
5      Q     And what is the purpose of the GTR for
6    Crowley?
7      A     Primarily, it's provided so that -- to guide
8    them in the preparation of the specification, itself.
9            From a contractual standpoint, if all of the
10   Government's contracts or all of our operating
11   contractors contracts are overall structured similar.
12   Then it puts us in a better position with a shipyard if
13   they said:  Oh, well this isn't what I thought, because
14   of this other contract.
15           So the more they're standardized, the better,
16   from a contracting standpoint, it is for the Government.
17     Q     Okay.  Let's focus on shipyard guidance.
18           Under the GTR, what is the Government's
19   policy on who determines how do to the work?
20     A     Under the GTR, it's guidance level work
21   items, which means the Government or Crowley would tell
22   the shipyard,via the spec, what it is we're trying to
23   accomplish; but how to do it is left up to the shipyard.
24     Q     So you don't expect Crowley to tell the
25   shipyard how to do the work?

**Exhibit C**

Juanita Broennimann                              June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 154

1       A    No.

2       Q    Or how to perform rigging?

3       A    No.

4       Q    Okay.  You were asked a bit about OSHA

5    earlier, OSHA regulations regarding shipyard work.

6            In your experience with MSC as a vessel owner

7    and operator, do the OSHA regulations apply to the

8    shipyard or to the vessel operator?

9       A    To the shipyard.

10      Q    Do you have any reason to believe they apply

11   to the operator?

12      A    Not that I'm aware of, no.

13      Q    Why do you suppose the customers of Detyens

14   paid Detyens to have their own safety department?

15      A    As a customer of Detyens, I would say that I

16   pay them to have their own safety department, because

17   they know their personnel, they know the conditions in

18   the shipyard, they know the resources available to them.

19   And, also, the people are employed by them.  So they

20   have the right, if you will, to give directions to the

21   employees on how to implement safe practices.

22      Q    Okay.  And does the United States expect its

23   contract operators to supercede the safety department of

24   the shipyard?

25      A    No.  The shipyard is responsible for the

**Exhibit C**

Juanita Broennimann                          June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 155

1    overall care of the ship.  And, to me, that's including

2    the people that are working on it; and, therefore, their

3    safety standards or guidance would have precedence.

4        Q    Does the United States expect the contract

5    operator, such as Crowley, to duplicate these safety

6    departments of the shipyard?

7        A    No.

8        Q    In your thirty-one years of experience with

9    the industry, do you believe that, other than the United

10   States or Crowley, did anything wrong to contribute to

11   this accident and if so, what?

12       A    I don't believe that we contributed to the

13   accident.

14       Q    Okay.  Are you aware in your career of --

15   during ship repair availabilities, has there ever been

16   an instance where a contract operator's SMS superceded

17   the shipyard's?

18       A    Not that I know of, no.

19       Q    And, regarding the contract, the repair

20   specification, in some specifications it might include

21   the shipyard takes full responsibility for the ship upon

22   delivery and retains full responsibility of the ship

23   until redelivery to the Government.  And some repair

24   specifications might not contain that exact language.

25              Whether that language is in the repair

**Exhibit C**

Page 156

1    specifications or not, what is the industry standard?

2         A    The industry standard is that, once they have

3    taken custody, if you will, of the ship, they are

4    responsible for the ship until they turn it back over.

5         Q    To the shipyard?

6         A    Yes, the shipyard.

7         Q    And what is an indicator of taking custody?

8         A    The two indicators that are commonly used for

9    taking custody of the ship is crossing the sill of the

10   dry docking, if the ship is going directly into dry

11   docking or being tied up alongside the pier if they're

12   not going directly to dry dock.

13        Q    So in the industry standard, whether it's in

14   the contract language or not, the standard under which

15   you have operated for your three decades, has been the

16   yard has responsibility when they take custody of the

17   ship?

18        A    Yes.

19        Q    There was some testimony earlier from a

20   shipyard trip report from Captain Oxendine, where

21   Detyen's health and safety officer, Mike Marshall,

22   testified that he was unaware of the davit work.

23             What I want to ask you is:  If Detyens had

24   been rigging davit arms in this same fashion since, for

25   twenty-five plus years, and these arms have been rigged

**Exhibit C**

Juanita Broennimann                    June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 157

1    in this fashion for five months before the failure

2    occurred, do you have believe that if Marshall had been

3    aware of how the davit arms were rigged, it would have

4    changed anything?

5         A    No.  They would have rigged them the same

6    way.  They have been doing that for years.

7         Q    Let me just take a moment to look at my notes

8    Okay.

9              I have nothing further.  Does anyone else

10   have anything?

11             MR. Young:  I do.  Yes.

12   BY MR. YOUNG:

13        Q    Miss Broennimann, I was listening to your

14   testimony here.  It's my understanding that your belief

15   is that this davit arm was completely safe in the manner

16   it was rigged; is that correct?

17        A    I believe that the shipyard rigged it in the

18   way they had determined was a safe manner.

19        Q    Okay.  I think also I heard your testimony to

20   be that you have actually personally experienced or

21   observed that manner of rigging on other ships, or did I

22   misunderstand that?

23        A    Yes, you did.  On other ships, or even on

24   Lummus' previous availabilities.

25        Q    When it comes to Lummus, was it other

**Exhibit C**

Juanita Broennimann                        June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 169

1    the responsibility of the shipyard.

2        Q    Okay.  And could the shipyard, if they wanted

3    the manual, could they have asked for it?

4        A    Yes.

5        Q    Is it fair to say a vessel of this size and

6    complexity has many hundreds of technical manuals for

7    all the different machinery on board?

8        A    Yes.

9        Q    And if you're going in on a five-year dry

10   docking, where you're getting dozens of systems worked

11   on, hundred of pieces of equipment, would you expect --

12   would it be normal to turn over hundreds of technical

13   manuals to the shipyard when the ship is delivered?

14       A    No.  They're available on board the ship,

15   should the shipyard decide that they need to refer to

16   them.

17       Q    And, in your experience, if the shipyard

18   doesn't ask for the manual, you leave it on the shelf?

19       A    Correct.

20       Q    And I want to ask you, did the repair -- item

21   601 for the lifeboat davits, require a complete overhaul

22   of the davits, blasting, clad welding and painting,

23   would you expect that that would require removal and

24   blasting and refurbishment of the stopper bars, as well,

25   that are normally fixed to the davit arms.

Exhibit C

Juanita Broennimann                          June 16, 2022
Provence, Tiffany N v. United States of America, et al

Page 173

1    the track, it would still be right where it was, resting

2    against the bar, in my example, correct?

3         A    Correct.

4         Q    All right.  Extending those hypothetical

5    facts to this case, if the davit arm in this case had

6    been restrained in the manner I just described and the

7    wire rope failed, would you agree with me that the davit

8    arm would not have traveled down the track and killed

9    Mr. Hernandez?

10             MR. GILSENAN:  Objection.

11        A    Provided the stopper bar was strong enough,

12   correct.

13             MR. YOUNG:  Thank you.  I don't have any

14   further questions.

15   BY MR. GILSENAN:

16        Q    What happens if you get an errant electrical

17   current that parts the wire by melting it, while the

18   welded flat bar has been removed to blast and coat that

19   area?

20        A    The davit arm is going to come down.

21        Q    And is there any way to predict if or when an

22   errant electrical current will happen?

23        A    No.  That's the entire meaning of errant.

24   It's unintended.  And the electricity can't be seen, so

25   it's not obvious to a safety observer.

**Exhibit C**