IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | | |
|---|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative of the Estate of Juan Antonia Villalobos Hernandez, | ) ) ) | C/A No.  2:21-cv-00965-RMG |
| | ) | |
| *Plaintiff*, | ) ) | **DEFENDANT HIGHTRAK STAFFING** |
| | ) | **INC. d/b/a HITRAK STAFFING, INC.'S** |
| Vs | ) | **NOTICE OF MOTION AND MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| UNITED STATES OF AMERICA, | ) | |
| CROWLEY MARITIME CORPORATION, | ) | |
| CROWLEY GOVERNMENT SERVICES, | ) | |
| INC., DETYENS SHIPYARDS, INC., and | ) | |
| HIGHTRAK STAFFING, INC. d/b/a | ) | |
| HITRAK STAFFING, INC. | ) | |
| | ) | |
| *Defendants.* | ) | |

Defendant Hightrak Staffing, Inc. d/b/a HiTrak Staffing, Inc. ("HiTrak"), by and through its undersigned counsel, moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, HiTrak respectfully requests that this court recognize that HiTrak, a temporary staffing agency which is owned in part by the owners of Defendant Detyens Shipyards, Inc. and provides temporary workers exclusively to Detyens, is an integrated enterprise with Detyens and therefore should be viewed as a single entity or single employer for the purposes of the Longshore and Harbor Workers Compensation Act (LHWCA). Accordingly, HiTrak respectfully requests that this Court grant this Defendant's motion for summary judgment as the Plaintiff's claims against HiTrak, as a single entity with Detyens, are exclusively limited to the Longshoreman and Harbor Workers Compensation Act ("LHWCA").[1] Additionally, HiTrak

---

[1] This motion follows a separate motion for summary judgment by Detyens Shipyards, Inc. which argued that the Plaintiff's claims are exclusively limited to the LHWCA because the Detyens was the decedent's "borrowed employer" for the purposes of the LHWCA. *See generally* Def.'s Detyens Shipyards, Inc.'s Mot. Summ. J., ECF No. 59, July 21, 2022.

respectfully requests that this Court dismiss the Plaintiff's claims against it, as well as Defendants United States of America, Crowley Maritime Corporation, and Crowley Government Inc.'s cross-claims against it, because HiTrak owed and breached no duty to any of the parties.

## NATURE OF THE CASE

This case is a wrongful death and survival action that arises out of a sudden and tragic accident that occurred on April 3, 2019 at the Detyens Shipyards in North Charleston, South Carolina. *See* Compl., Apr. 1, 2021, ECF No. 1. On the morning of April 3, 2019, Mr. Hernandez, a welder, was sitting on a bucket at the bottom of the trackway of a lifeboat davit on the USNS LUMMUS, which was drydocked at the shipyard for extensive repairs. Compl. ¶ 1; Ex. A, DSI Accident/Incident Report.  At approximately 9:20am, the 3/8-inch wire rope which was used to hold the davit arm in the upright stowed position suddenly severed, releasing the davit arm down the trackway and onto Mr. Hernandez. *Id.* Other Detyens employees immediately responded to the scene and used a crane to lift the davit arm off of Mr. Hernandez. *Id.*; Compl. ¶ 24.  He was moved to the main deck and resuscitation efforts, including the use of chest compressions, a Bag Valve Mask ("BVM"), and an AED defibrillator, ensued. EMS, OSHA, and other emergency responders were called. *Id.* Unfortunately, Mr. Hernandez was pronounced dead at the scene at approximately 9:53am.

## STATEMENT OF THE FACTS

To understand the basis of this motion, one must first understand the structure and background of HiTrak and Detyens.

HiTrak is a temporary staffing agency. According to its general manager, "HiTrak is a staffing service that supplies additional labor and skilled trades to the shipyard," meaning Detyens Shipyard. Ex. B, Stewart Dep. 6:16-18. Its only customer is the shipyard. *Id.* at 6:20-21. HiTrak is

run by its General Manager, Jonathan Stewart, who is an employee of Detyens. *Id*. at 4:20-5:11. In fact, HiTrak only has one full-time employee that works exclusively with HiTrak operations, its skilled recruiter Raymond Quevedo. *Id*. at 5:12-24. HiTrak's other employees are either temporary workers or HiTrak employees who work for Detyens.

Mr. Stewart is also a member of the HiTrak board of directors. The other members include: D. Loy Stewart, Jr., W. Jason Stewart, Leo A. Fary, Jr., M. Larry Reynolds, Peter Browne, and Richard C. Stokes. *See* Ex. C, Answers to Pl.'s Second Set of Interrogs. to Hightrak Staffing Inc. d/b/a HiTrak Staffing, Inc. No. 2. Of note, these board members are also officers and/or shareholders of Detyens. *See* Ex. D, Answers to Pl.'s Second Set of Interrogs. to Detyens Shipyards, Inc. Nos. 1 and 3.  Jonathan Stewart, D. Loy Stewart, Jr., and W. Jason Stewart are brothers and are the sons of now-deceased D. Loy Stewart Sr., the previous owner of Detyens and successor of Detyens founder, Bill Detyens. [2]  In short, Detyens is a close-knit family company.

When Detyens is awarded a ship repair contract, it assesses the quantity and type of temporary workers it needs to fulfill the work under the contract and puts in the request with HiTrak for those temporary workers. HiTrak then provides the requested personnel to Detyens, and screens them, drug tests them, and orients them to the shipyard. Ex. B, Stewart Dep. 9:3-12. When HiTrak cannot itself provide all of the temporary employees Detyens needs, it contracts with other temporary staffing agencies, acting as a gatekeeper, to supplement the temporary employees still needed. *Id*. at 12:9-22.

This practice was followed in the present matter. When Detyens was awarded the repair contract by Crowley Government Services ("Crowley" or "CGS") for the USNS LUMMUS, Detyens looked to HiTrak to provide it with the temporary labor needed, including skilled workers

---

[2] www. https://www.detyens.com/detyens-company-history/

such as welders and unskilled workers to complete the work in the contract. HiTrak then contracted with Southern Skill Trades (hereinafter sometimes referred to as "Southern Skills" or "SST"), a temporary skilled labor staffing agency to provide it with additional skilled workers to provide to Detyens. Among these workers from Southern Skills was the decedent, Mr. Hernandez. Although Mr. Hernandez was an employee of Southern Skills, he is considered a "borrowed servant" or "borrowed employee" for Detyens under the statutory scheme of the LHWCA.[3]

The LUMMUS was drydocked at the Detyens Shipyards on or about November 15, 2018 pursuant to Detyens contract with Crowley and the repair work began immediately. *See* Ex. E, Contract for Repair between Crowley and DSI. Shortly within the LUMMUS' arrival at the shipyard, Detyens' rigging department removed all lifeboats from their davits, and all the wire falls from the davit arm system. As it had done for over twenty years, the Detyens rigging department stowed the davit arms in their upright stowed position using 3/8-inch wire ropes and Crosby clamps. See Ex. F, Thornton Aff. ¶ 7, July 15, 2022; Compl. ¶ 18. Once the davit arms were securely stowed, the repair work ensued.

Mr. Hernandez along with the other workers worked to repair the davit arms with no issues until April 3, 2019. Following the accident, OSHA investigated a generated a report that found that the wire ropes holding davit arm #6 severed as a result of an electrical arc. *See* Ex. G, OSHA Report. To this day, the source of the electrical arc is unknown.

The Plaintiff, Tiffany N. Provence, as the Personal Representative of the Estate of Juan Antonia Villalobos Hernandez, brought claims of vessel negligence under 33 U.S.C. § 905(b), negligence, wrongful death under S.C. Code § 15-51-10, and survival under S.C. Code § 15-5-90

---

[3] This explanation and argument is detailed in Detyens Motion for Summary Judgment filed July 21, 2022. Def.'s Detyens Shipyards, Inc.'s Mot. Summ. J., ECF No. 59, July 21, 2022

against Defendants United States of America, Crowley Maritime Corporation, Crowley
Government Services, Inc., Detyens Shipyards, Inc., and Hightrak Staffing, Inc. d/b/a HiTrak
Staffing, Inc. *See* Compl., Apr. 1, 2021, ECF No. 1. Defendants United States of America, Crowley
Maritime Corporation, Crowley Government Services, Inc. subsequently asserted cross-claims
against Detyens and HiTrak for negligence and contractual indemnity. *See generally* Defs. United
States of America, Crowley Maritime Corporation, and Crowley Government Services, Inc.'s
Answer and Cross-Cl. 8-13, May 19, 2021, ECF No. 12.

## ARGUMENT

I.   **HiTrak and Detyens are a single entity under the LHWCA's exclusivity provision,
     and therefore the Plaintiff's claims against HiTrak are barred under this provision.**

The single entity doctrine, as originally recognized and well-developed in the context of
the National Labor Relations Act in determining the statutory employer, applies when several
nominally separate business entities are considered to be a single employer where they comprise
an integrated enterprise. *Radio & Television Broad. Technicians Local Union v. Broad. Serv. of
Mobile, Inc.*, 380 U.S. 255, 256, 85 S. Ct. 876, 877 (1965). The Supreme Court recognized four
controlling criteria for recognizing multiple entities as a single employer or single entity:
interrelation of operations, common management, centralized control of labor relations and
common ownership. *Id.*

In *Claudio v. United States*, the New York Eastern District Court applied the single entity
doctrine to the LHWCA context, explaining that since the LHWCA is "largely based on" New
York Workers' Compensation Law, and decisions construing New York Workers' Compensation
law are "very persuasive" in interpreting the LHWCA, the single entity doctrine as applied under
the New York Workers' Compensation Law is analogous and appropriate in the context of the
LHWCA where two defendant companies "functioned as a single entity." *Claudio v. United States*,

907 F. Supp. 581, 587, 588 (E.D.N.Y. 1995) (citing *Iacone v. Cardillo*, 208 F.2d 696 (2d Cir. 1953); *Smither & Co., Inc. v. Coles*, 100 U.S. App. D.C. 68, 242 F.2d 220, 222-23 (D.C. Cir.), cert. denied, 354 U.S. 914, 1 L. Ed. 2d 1429, 77 S. Ct. 1299 (1957). See also *Haas v. 653 Leasing Co.*, 425 F. Supp. 1305 (D.C. Pa. 1977) (relying on New York law)). The Court explained:

> "A 'single employer' relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.' The question in the 'single employer' situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*. The 'single employer' standard is relevant to the determination that 'separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise."

907 F. Supp. 581, 588 (internal citations omitted).

In *Claudio*, the court granted summary judgment to Defendant Ken's Marine Service ("KMS") holding that although Ken's Marine and Oil Service, Inc. ("KMOS") and Defendant Ken's Marine Service Inc. ("KMS") did not constitute a "joint venture" as they had claimed, "the facts alleged establish that KMS and KMOS operated as a single entity. The cases which hold that the LHWCA applies to joint ventures, as well as cases applying the New York Workers' Compensation Law, and cases interpreting statutes in other areas of law, teach that the ties between KMS and KMOS establish the existence of a single entity for purposes of prohibiting recovery from KMS under the LHWCA." *Id.* at 586, 589. In its decision, *Claudio* applied the same criteria used by the Supreme Court in the NLRA context. It found that an uncontested affidavit by an individual who served as President and Treasurer of KMS and also as President of KMOS established that the two companies worked in concert as a single entity, with interrelation of operations, common management, centralized control of labor relations and common ownership. *Id.* at 588.

Although the *Claudio* decision and application of the single entity doctrine under the LHWCA has not yet been taken up by any higher court, district courts across multiple federal

circuits have looked to *Claudio* for guidance on the single entity doctrine. See *Padilla-Plaza v. Hormigonera Mayaguezana, Inc.*, No. 05-1129 (ADC), 2010 U.S. Dist. LEXIS 156311, at *23 (D.P.R. June 30, 2010) ("The court finds *Claudio's* reasoning persuasive."); *United States v. Evseroff*, No. 00-CV-06029 (KAM), 2012 U.S. Dist. LEXIS 60344, at *52, 109 A.F.T.R.2d (RIA) 2012-1957 (E.D.N.Y. Apr. 30, 2012); *Price v. Atl. Ro-Ro Carriers, Inc.*, 262 F. Supp. 3d 289, 294 (D. Md. 2017); *Holder v. Fraser Shipyards, Inc.*, 288 F. Supp. 3d 911, 944 (W.D. Wis. 2018); *Davenport v. M/V New Horizon*, No. C 01-0933 SBA, 2002 U.S. Dist. LEXIS 26811, at *10 (N.D. Cal. Dec. 17, 2002).

Most notably, in the Fourth Circuit, the court in *Price v. Atl. Ro-Ro Carriers, Inc.*, granted summary judgment for a third-party defendant marine terminal company, The Rukert Terminals Corporation ("Rukert"), finding that it was a single entity for LHWCA purposes with the plaintiff longshoreman's employer, Beacon Stevedoring Corporation ("Beacon"), a defendant stevedoring company. *Price v. Atl. Ro-Ro Carriers, Inc.*, 262 F. Supp. 3d 289, 295 (D. Md. 2017).

The relevant facts in *Price* are analogous to those in the present matter. Rukert was a privately owned corporation that operated a marine terminal. Beacon was a privately owned corporation that provided stevedoring services exclusively for ships at Rukert's terminal. *Id*. at 291. Among other things, both companies operated out of the same offices, shared the same post office box and fax number, and all management positions at Beacon were on the payroll at Rukert. *Id*. Their labor relations were centrally controlled by Rukert's management. Id. at 295. Most importantly, they were under common management, with overlapping officers and identical Boards of Directors, and common ownership, with private ownership by the same two families. *Id*.

The *Price* court pointed out that, in addition to the four factors enumerated earlier in determining single entity status, "Courts also have found the 'common usage of office facilities and family relationships between persons involved in the purportedly discrete companies' relevant. *Id*. at 294 (citing *N.L.R.B. v. 675 West End Owners Corp.*, 304 Fed. App'x 911, 913 (2nd Cir. 2008).). "Single employer status depends on a totality of the circumstances and is characterized overall by 'an absence of an arm's length relationship found among unintegrated companies.'" *Id*.

In its determination, the court in *Price* noted that although the two companies maintained separate accounting practices and billed clients separately for their work, their financial management was ultimately under the control of the same employees and identical Boards of Directors. *Id*. at 295. Additionally, while the companies maintained separate records, they often exchanged capital and labor between the two corporations. The court found that "Given the totality of their operations, their separate financial practices do not overcome the functional integration." *Id*. Further, it noted: "[the two companies'] labor relations are centrally controlled by [the marine terminal company's] management. The nonunion employees of both companies pay into [the marine terminal company's] retirement system, are reimbursed under [the marine terminal company's] healthcare reimbursement plan, and are covered under [the marine terminal company's] workers' compensation insurance. [The two companies] are under common management, with overlapping officers and identical Boards of Directors, and common ownership, with private ownership by the same two families." *Id*.

As demonstrated below Detyens' and HiTrak are so closely related and intertwined that this Court should view them as a single entity for legal and liability purposes:

    a.  **<u>Interrelation of Operations</u>:  Detyens' and HiTrak's operations are so closely interrelated that HiTrak's only operations are to provide temporary service workers exclusively for its only client, Detyens, for Detyens' shipyard operations.**

Though the companies have different names, in reality, HiTrak essentially operates as a staffing division or department of Detyens as it operates exclusively for Detyens. HiTrak's office is located at Detyens Shipyard and the two companies share the same address. *See* Ex. E, Contract for Repair between Crowley and DSI; Ex. H, HiTrak Staffing Orientation for Detyens Shipyards.

Leo Fary is the Treasurer of both Detyens and HiTrak. Mr. Fary testified that with few exceptions over the last twenty-something years, Detyens relies "exclusively" on HiTrak to provide them with temporary laborers and that this relationship has existed for as long as he has been with both companies. *See* Ex. I, Fary Dep. 12:19-13:7; 14:25-15:13. Notably, the 30(b)(6) representative for HiTrak, its General Manager Jonathan Stewart, is a Detyens employee, owner, and family member. Mr. Stewart testified that his job for HiTrak is to "make sure that we keep our customer happy" and confirmed that their "only customer is the shipyard."  *See* Ex. B, Stewart Dep. 6:16-21. Their operations are so established and intertwined that Mr. Fary explained, with regard to the contract between Detyens and HiTrak, "You know, we've signed that document, but the relationship has been there for 15 years, so we pretty much operate as we have operated without, you know, referencing that document on a daily basis." Ex. I, Fary Dep. 21:16-20**.** HiTrak's contracts with other temporary staffing agencies also make clear that "[o]nce assigned to HiTrak all personnel will be controlled and supervised solely by our customer, Detyens Shipyards, Inc." *See* Ex. J, HiTrak Temporary Worker Services Agreement with SST at Section 8.0.

HiTrak procures, screens, and orients all the temporary labor for Detyens Shipyard and Detyens assigns those workers to departments to begin working once the HiTrak screening and orientation to the shipyard is completed. Mr. Stewart explained that, for example: "We'll get an order for ten welders… and we provide ten welders. And then Detyens assigns them to whatever jobs they need to have done... We screen and drug test and orientate and provide the necessary initial contact with them and then make sure they are trained and are able to do their job." Ex. B, Stewart Dep. 7:1-12. In essence, HiTrak operates as a staffing department or division for Detyens.

As Detyens Project Manager Dallas Verble explained:

A.     When I first come to Detyens, everybody comes in a temporary and I was temporary for the 30, 60, days, whatever, until I become permanent.

Q.     So after you initially started with HiTrak, at some point 30 or 60 days later you became a permanent employee of Detyens?

A.     Yes. Yes, sir.

Q.     And do you have any role at all with HiTrak or do you interact with the folks at HiTrak in your job?

A.     No, sir, I don't remember nothing about HiTrak except my paycheck was just different in the beginning until I become permanent."

Ex. K, Verble Dep. 6:15-7:2. Detyens Senior Safety Officer Wayne Alan Matayabas also testified that when he started in 1997, he originally received his paychecks from HiTrak but then eventually "got rolled over to Detyens." Ex. L, Matayabas Dep. 9:19-10:6.

Additionally, there is considerable overlap in Detyens and HiTrak operations such that employees from one company will work for the other. As noted above, the HiTrak General Manager who runs the operations at HiTrak, Jonathan Stewart, is a Detyens employee, Detyens owner, and member of the family who owns both companies. *See generally* Ex. D, Answers to Pl.'s Second Set of Interrogs. to Detyens Shipyards, Inc. Furthermore, in addition to the temporary labor provided to Detyens from HiTrak, some Detyens permanent and part-time positions are filled

with HiTrak employees. For example, Detyens Environmental Safety Department is comprised of both Detyens and HiTrak employees who are not merely temporary workers. Ex. M, Marshall Dep. 21-23. For example, Ricky Desjardins, the Detyens Safety Officer who responded to the incident, is a HiTrak employee. Ex. N, Desjardins Dep. 10:19-23

It is indisputable that HiTrak's operations are simply a part of the Detyens operations.

**b.** **Common Management: The management between Detyens and HiTrak is so overlapping that they share common employees and officers.**

Detyens and HiTrak share the same executive officers. D. Loy Stewart, Jr. serves as the President and CEO of both companies, M. Larry Reynolds serves as a Vice President for both companies (Vice President for Production for Detyens and Executive Vice President for HiTrak), and Leo Fary serves as the Treasurer for both companies (Treasurer and CFO of Detyens and Treasurer and Secretary of HiTrak). Ex. C, No. 1; Ex. D, No. 1. As noted in the previous section, HiTrak is managed by Detyens employee and owner, Jonathan Stewart.

Several of HiTrak's other managers and directors are also Detyens employees, including HiTrak's Safety Director, Paul Friedman, and HiTrak's Secretary, Vicki Hawkins. Ex. I, 31:5-6 and 20-22; Ex. B, 7:15-25. In fact, HiTrak only has one full-time employee, its skilled recruiter Raymond Quevedo. Ex. B, 5:12-24.

Finally, all of the temporary workers employed by HiTrak are supervised and controlled by the Detyens departments to which they are assigned. *See* Ex. O, HiTrak Temporary Services Agreement with Detyens at Section 8.0.

**c.** **Centralized Control of Labor Relations:**

As noted earlier, all of HiTrak's offices are located on the Detyens Shipyard and HiTrak is managed by Detyens employees. Detyens Environment Health and Safety Officer Thomas Wesley

Mooney testified that there is no real distinction between HiTrak employees and Detyens employees:

> Q.    And then as far as temporary employees or permanent employees, is there any distinction between folks like you that work for Detyens and folks that work for HiTrak?
>
> A.    No, sir.
>
> Q.    They're all the same?
>
> A.    Yes, sir.

Ex. P, Mooney Dep. 26:11-17 Additionally, Detyens and HiTrak employees all clock in at the same clock-in stations at Detyens. *Id.* at 26:5-10. Like in the Price case, their labor relations are centrally controlled by Detyens' management.

>    **d.    <u>Common Ownership</u>: Detyens and HiTrak are owned and controlled by the same individuals, most of whom are direct family members to the original Detyens family.**

Common ownership is the last and perhaps most considerable factor of the single entity analysis. As *Price* pointed out, courts also consider "common usage of office facilities and family relationships between persons involved in the purportedly discrete companies relevant." *Price v. Atl. Ro-Ro Carriers, Inc.*, 262 F. Supp. 3d 289, 294 (D. Md. 2017).

Detyens Shipyards Inc. has been family owned and operated since its inception in April 1962.[4] Detyens was originally owned and operated by Bill Detyens, who then passed the company to his son-in-law, D. Loy Stewart, Sr. in 1990.[5] Loy Stewart Sr. served as a Detyens and a HiTrak board member and owner until shortly before his death in 2020. Ex. D at Nos. 2 and 3; Ex. C at Nos. 2 and 3. Detyens and HiTrak are now owned by Loy Stewart Sr.'s three sons, D. Loy Stewart Jr., Jonathan G. Stewart, and W. Jason Stewart, although Jason Stewart gave up his ownership of

---

[4] https://www.detyens.com/detyens-company-history/
[5] https://www.maritime-executive.com/editorials/former-chairman-and-owner-of-detyens-shipyards-passes-at-72

HiTrak in 2021. Ex. D at No. 3; Ex. C at No. 3. HiTrak is also part-owned by Leo Fary and Larry Reynolds, the Treasurer and Vice President of both companies, who also serve on the HiTrak Board of Directors with the Stewart brothers, Peter Browne, and Richard C. Stokes. Ex. C at Nos. 3 and 2. Based on the significant overlap of these individuals, HiTrak is essentially owned by Detyens. As demonstrated here and in the earlier sections, Detyens and HiTrak share common ownership, common usage of office facilities, and family relationships.

In considering the totality of the circumstances, Detyens and HiTrak operate as a single entity for the purposes of the Longshore and Harbor Workers Compensation Act. Section 905 of the LHWCA provides that compensation under the LHWCA "shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death." 33 U.S.C.S. § 905. As explained in Detyens' recent Motion for Summary Judgment, Detyens is Mr. Hernandez's statutory employer under the LHWCA and therefore the Plaintiff's remedies fall exclusively within the LHWCA. *See generally* Def.'s Detyens Shipyards, Inc.'s Mot. Summ. J., ECF No. 59, July 21, 2022. As Detyens and HiTrak constitute a single entity or employer for the purpose of the LHWCA, the Plaintiff's claims against HiTrak are barred under the LHWCA.

**II.    The Plaintiff's negligence claims against HiTrak fail because HiTrak did not breach any purported duty to Mr. Hernandez.**

"[G]eneral admiralty law, not state law, governs claims resulting from maritime deaths in territorial waters. To be successful… the plaintiffs needed to establish all elements of a negligence cause of action in admiralty. Those elements, 'which are essentially the same as land based negligence under the common law,' are: 1) the existence of a duty of care owed by the defendant to the plaintiff; 2) the breach of that duty of care; 3) a causal connection between the offending

conduct and the resulting injury, which is called 'proximate cause'; and 4) actual loss, injury or damage suffered by the plaintiff." *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001).

In *Aguilar v. Bollinger Shipyards, Inc.*, the United States District Court for the Eastern District of Louisiana held in a very similar case to the present matter that where an I-beam fell and struck the plaintiff while he was working on the shipyard, the defendants were not liable because they acted with reasonable care under the circumstances. *Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 594 (E.D. La. 2011). In *Aguilar*, the plaintiff sued defendants Bollinger Shipyards, Inc. ("the Shipyard") and Blessey Marine Service, Inc. ("Blessey" or "the Vessel owner") for personal injuries when he was working for Carl Senner, Inc. ("Senner") as a service technician on board a vessel owned and operated by Blessey. *Id*. at 584. At all material times, the vessel was located at the Bollinger Shipyard and undergoing repairs. *Id*. Based on uncontested facts established by the testimony of lay witnesses, the court found that Senner was solely responsible for the safety issues attendant to use the I-beam as a lifting point for work on the vessel and that at no point in time did any person who testified believe that the use of the I-beam as a lifting point was unsafe. *Id*. at 590. The court also found that the I-beam could be used in a safe manner as a lifting point without being welded into place and was used in a safe manner without being welded into place. Id. This was evidenced by testimony that the I-beam was used safely 18-19 times prior to the accident. *Id*. at 586. Similarly to the davit arm in this matter, the I-beam could be secured by welding, c-clamped, *or* chained. *Id*. at 587. A member of the Shipyard's safety department testified that at the time he did not know that an I-beam that is not welded down is unsafe, and that the Shipyard relies on the mechanics and shipyard to do their jobs professionally and safely. *Id*. at 588. Finally, no representative of the Shipyard or the Vessel owner knew or should have known that the I-beam was being used in a dangerous manner and would have caused

14

an accident. *Id*. at 590. It was unclear whether the hazard ultimately was posed by the shifting of the I-beam, the fact that the I-beam was not welded, or any other circumstance involving the use of the I-beam. *Id*. at 593.

The court in Aguilar held that any claim for breach of the duty to intervene fails for insufficient proof as the I-beam could and had been successfully secured without welding, and the I-beam was used successfully for nearly 20 lifts. *Id*. The court found that there was no credible proof that the Vessel owner had actual knowledge of any hazardous condition posed by the use of the I-beam as a lifting point or allowed continued work with the prerequisite knowledge that the Senner workers, in the exercise of obviously improvident judgment, intended to continue the work in spite of that condition. *Id*. The court found that the Vessel owner acted with reasonable care at all times. *Id*.

Similarly, with regard to the claims that the Shipyard should have taken steps to ensure the I-beam was welded and for breach of the duty as a multi-employer host to convene a safety meeting with Senner, the court found that these claims fail because "although the accident would not have occurred had the I-beam been welded into place, the I-beam was capable of being safely used without welding by Senner. The combination of [Senner's] failure to ensure that the I-beam was securely lodged into place and the lateral force attendant to the movement of the chain fall caused the accident, not the lack of a welding track per se." *Id*. at 594. The court concluded that the Shipyard's duty did not extend as far as the plaintiffs argue and that the Shipyard acted with reasonable care under the circumstances. *Id*.

Most notably, the Court noted:

The testimony of all involved with the decision to use the I-beam as a lifting point believed that it was absolutely safe. This accident occurred after almost 20 successful lifts using the same I-beam. It appears to the Court that both [the Senner representative and the plaintiff] still cannot believe the accident happened. But the

15

mere fact that it occurred on a vessel undergoing repairs in a shipyard does not render either the vessel owner or the shipyard owner liable under the law, even if the accident could have been avoided had they undertaken the responsibilities to ensure the safety of ship repairmen operations. Instead, both defendants acted reasonably at all times and breached no duty owed to Aguilar.

*Id*. at 594-595.

The facts in *Aguilar* are almost identical to those in the present matter, with the only real distinction being that in *Aguilar*, the third-party service was responsible for the rigging and safety of the I-beam, and in the present matter, Detyens Shipyard was responsible for the rigging and safety of the davit arm. Nonetheless, the findings are equally applicable.

The Plaintiff alleges that HiTrak "failed to exercise reasonable care in arranging, contracting, supervising, preparing, and performing repair work on the Vessel." Compl. ¶ 39. However, there is no evidence on the record to suggest that HiTrak arranged, contracted, supervised, prepared, or performed any work on the LUMMUS. As testimony reveals, HiTrak's individual involvement is limited:

> Q.     I got you. So once you -- so the only role you really play is in selecting the personnel to be provided to Detyens?
>
> A.     We screen and drug test and orientate and provide the necessary initial contact with them and then make sure they are trained and are able to do their job.

Ex. B, Stewart Dep. 9:6-12. Furthermore:

> Q.     Okay. But is it then true that HiTrak actually has no real hand in the execution of the work?
>
> A.     That's correct.
>
> Q.     All right. All of the execution of the work is handled by Detyens, not by HiTrak?
>
> A.     That's correct.

*Id*. at 17:18-24.

Although HiTrak does periodic safety walk-throughs, these walk-throughs are general in nature and not job-specific. *Id.* at 18:3-9; 18:20-16. Ultimately, HiTrak relies on Detyens to provide a safe working environment for the HiTrak personnel being assigned to a particular job. *Id.* at 19:17-21.

There is ample testimony from representatives of Detyens, HiTrak, Crowley, and the United States that the method and manner in which Detyens rigged and secured the davit arms were considered safe and that it had been done in that same manner successfully for over twenty years: "Upon information and belief, just as it did on the USNS LUMMUS, the Detyens Rigging Department had been restraining davit arms using a 3/8 inch wire rope and Crosby clamps in the same way without incident for over twenty years." Ex. F, Thornton Aff. at ¶ 7. "Our best effort was we wired it up with a steel cable like we've always done. That's the way we've done it. We've never had an issue in the past." Ex. K, Verble Dep. 75:8-10. Ricky Desjardins, the HiTrak employee working in the Detyens Safety Department, testified the following:

> Q.    And any prior walk-throughs you had done on the Lummus, you
>       hadn't noticed anything about the manner in which the davit arm
>       was stowed?
>
> A.    No.
>
> Q.    And you hadn't noticed any open or obvious conditions that gave
>       you any concerns about the safety of the environment where Mr.
>       Hernandez was killed?
>
> A.    No.

Ex. N, Desjardins Dep. 25:25-26:9. A representative for Crowley testified the following:

> Q.    And it's also true that between November of 2018 and August 3rd of
>       2019 nobody from Crowley observed any hazardous condition
>       related to the lifeboats or the lifeboat davits on the Lummus. Is that
>       accurate?
>
> A.    Crowley has not -- Crowley repos have not identified a visible in the
>       sense that there were six lifeboats rigged almost the same way. So
>       there was nothing triggering them to see that one isn't the – one is a

> hazard and the others are not. So basically what the – the rigging
> experts of Detyens did was thought to be the correct way to do it.

Q.    But you know today that that was not the correct way, right?

A.    I do not – I cannot answer that one because I have not seen that one
or I have not inspected and then until we -- we know exactly what
was the root cause of that failure -- because there were six davits
were restrained the same way. One failed. Five did not. That means
there could be other reasons, you know, like electrical current going
through some – some source or, you know, they didn't use the same
– same wire. You know, the same method to that. We don't know.
That is why there was nothing visible because all six were, you
know, rigged there and then, you know, that is why it didn't trigger
him to take number – Number 5 for - - for a particular action.

Ex. Q, Varghese Dep. Vol I, 152:9-153:13, Mar. 9, 2022.

The representative for the United States similarly testified that in her experience of seeing

davit arms rigged in the way Detyens rigged the davit arms on the LUMMUS, she has never

objected to this manner of rigging. Ex. R, Broennimann Dep. 148:5-20.

Like the with the shipyard and vessel owner in the *Aguilar* case, there is no evidence on

the record to suggest that HiTrak failed to exercise reasonable care in its limited involvement with

Mr. Hernandez and the work on the LUMMUS. Like in *Aguilar*, all parties thought, at the time,

that the manner of restraint was safe, based on an extensive history of rigging the davit arms in

this manner with no issues. There is no dispute that not a single person voiced concern about the

manner of restraining the davit arms until after the accident. Accordingly, HiTrak had no reason

to believe there was any issue with the manner of restraining the davit arms and no reason to

intervene. Moreover, it is undisputed that the wire rope holding the davit arm did not fail in tension

and that it severed due to an unidentifiable electrical arc. *See* Ex. G, OSHA Report at 6.  Like in

*Aguilar*, testimony of all involved with the decision to restrain the davit arm using a wire rope and

Crosby clamps believed that it was absolutely safe and this accident occurred after almost 20 years

of successfully restraining davit arms in this manner.

Accordingly, this Court should find that HiTrak acted reasonably under the circumstances and did not breach any purported duty owed to Mr. Hernandez.

**III.    Defendants United States of America, Crowley Maritime Corporation, and Crowley Government Services, Inc's cross-claims against HiTrak should be dismissed because HiTrak and Detyens are a single entity and HiTrak owed no independent duty, contractually or otherwise, to Defendants United States of America, Crowley Maritime Corporation, and Crowley Government Services.**

Defendants United States of America, Crowley Maritime Corporation, and Crowley Government Services, Inc. (collectively "Vessel Defendants") asserted cross-claims against Detyens and HiTrak for contractual indemnity and negligence. *See generally* Defs. United States of America, Crowley Maritime Corporation, and Crowley Government Services, Inc.'s Answer and Cross-Cl. 8-13, May 19, 2021, ECF No. 12.

As explained in Section I of this Motion, HiTrak and Detyens are a single entity, or single employer, for the purposes of the Longshore and Harbor Workers Compensation Act. The LHWCA prohibits the Vessel Defendants' cross-claims against Mr. Hernandez's employer:

> In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act [33 USC § 933], *and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.*

33 U.S.C.S. § 905(b) (emphasis added).

As explained in Detyens' Motion for Summary Judgement, caselaw in the Fourth Circuit supports the finding that Detyens is Mr. Hernandez's "borrowed employer" under the LHWCA, and therefore the LHWCA is the Plaintiff's exclusive remedy for her claims. *See generally* Def.'s Detyens Shipyards, Inc.'s Mot. Summ. J., ECF No. 59, July 21, 2022. As Mr. Hernandez's statutory employer, under the provision above, Detyens shall not be liable to any of the Vessel

19

Defendants for damages directly or indirectly through their negligence claims, and regardless of any indemnity agreements through their contractual indemnity claims. Because HiTrak and Detyens are a single entity, or single employer, the Vessel Defendants cross-claims against HiTrak are likewise barred under Section 905(b).

Moreover, as explained in Section II of this Motion, HiTrak was not negligent. Additionally, there is no evidence to suggest that HiTrak owed any duty, contractually or otherwise, to the Vessel Defendants. Accordingly, this Court should find that the Vessel Defendants' cross-claims against HiTrak are barred under the LHWCA and that the Vessel Defendants failed to meet their burden to prove that HiTrak owed any duty to the Vessel Defendants.

**<u>CONCLUSION</u>**

Defendant HiTrak Staffing, Inc. respectfully requests that this Court grant its motion for summary judgment as the Plaintiff's claims and Vessel Defendant's cross-claims against it fail as a matter of law. There is no genuine dispute of material fact that HiTrak and Detyens are a single entity, that HiTrak did not breach any purported duty owed to Mr. Hernandez, and that HiTrak is not liable to the Vessel Defendants.

HOOD LAW FIRM, LLC
172 Meeting Street/Post Office Box 1508
Charleston, SC 29402
Phone: (843) 577-4435/Facsimile: (843) 722-1630

**s/ James B. Hood**
_____
James B. Hood (9130)
james.hood@hoodlaw.com
Kathryn N. Tanner (13616)
kaite.tanner@hoodlaw.com

*Attorneys for Detyens Shipyards, Inc. and Hightrak Staffing, Inc. d/b/a HiTrak Staffing, Inc.*

<u>July 29, 2022</u>
Charleston, South Carolina