IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | |
|---|---|
| TIFFANY N. PROVENCE, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez,<br><br>           **Plaintiff,**<br><br>v.<br><br>UNITED STATES OF AMERICA, CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., DETYENS SHIPYARDS, INC., and HIGHTRAK STAFFING, INC. d/b/a HITRAK STAFFING, INC.<br><br>           **Defendants.** | CASE NO. 2:21-cv-965-RMG<br><br><br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., AND THE UNITED STATES OF AMERICA** |

Plaintiff Tiffany N. Provence, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez ("Plaintiff"), by and through her undersigned counsel, submits this response in opposition to the Motion for Summary Judgment (ECF No. 62, Mot. for Summary Judgment) filed by Defendants Crowley Maritime Corporation ("CMC"), Crowley Government Services, Inc.("CGS"), and The United States of America (the "United States," together with CMC and CGS, the "Vessel Defendants").

## I.  INTRODUCTION

This case addresses the tragic and preventable death of Juan Antonio Villalobos Hernandez ("Juan").  Juan was killed while performing repairs aboard the USNS 1st Lieutenant Jack Lummus ("the Lummus") after a wire rope that was used to secure the ship's lifeboat davits failed, releasing the 3,640-pound davit arm, which rolled down the davit's trackway and crushed Juan.

The core concept of negligence, as set forth by Judge Learned Hand in <u>United States v. Carroll Towing Co.</u>, requires a balancing of the severity and risk of a plaintiff's harm on one hand, against the costs required to prevent such harm on the other.  159 F.2d 169, 173 (2d Cir. 1947).  The Vessel Defendants do not dispute that the severity of harm in this wrongful death case is extremely high—indeed, it could not be higher.  Discovery has revealed that the cost to avoid this harm was extremely low, requiring the Vessel Defendants to simply engage a built-in "stopper bar" designed to hold the weight of the davit arm.  While the Vessel Defendants attempt to minimize the risk of harm in this case, claiming they had no reason to believe the wire rope would fail, this argument ignores the testimony of Plaintiff's expert, the history of safety violations at Detyens' shipyard, and the basic purpose of CGS's own lock-out, tag-out procedures.  There is substantial evidence in the record demonstrating that CGS should have anticipated that the wire rope might fail and should have implemented a secondary method of restraint.  This evidence, taken in the light most favorable to Plaintiff, precludes summary judgment on the issue of reasonableness.

The bulk of the Vessel Defendants' arguments do not address the reasonableness of their conduct directly, but instead, seek to place the primary responsibility for Juan's safety on Defendant Detyens Shipyards, Inc. ("DSI").  The Vessel Defendants argue for a narrow, formalistic reading of their duties under 33 U.S.C. § 905(b), and claim that they bear no responsibility for Juan's death because they were not involved in the repairs and had no knowledge of the danger.  But this argument fails on both the law and the facts.  The Vessel Defendants had contractual duties arising from their contract with the Military Sealift Command (the "MSC") to assess and isolate sources of "stored energy"—including the lifeboat davits—before repairs commenced.  Even if the contractual nature of these duties is set aside, the fact remains that CGS

<u>actually performed</u> the lock-out, tag-out on the Vessel, thereby undertaking a duty to ensure this procedure was performed reasonably.  Moreover, the Vessel Defendants were in a better position to assess the risk posed by reliance on the wire-rope restraints and ensure that a secondary restraint was used, given CGS's superior knowledge of the Lummus's davit system.  Even under the Vessel Defendants' formulation of their § 905(b) duties, they were at least required to warn DSI of the risk posed by the wire rope restraints or intervene when it became clear that DSI was relying on such restraints while repairs were underway.

The Vessel Defendants' actions in this case breached multiple legal duties.  Regardless of the legal framing, however, the central facts remain the same:  the davit arms were restrained in an unreasonably dangerous manner; Juan's life would have been saved if the Vessel Defendants had implemented a secondary restraint—or simply alerted DSI to the issue; and finally, a ready-made secondary restraint was available at no cost to the Vessel Defendants.  Yet, the Vessel Defendants failed to take the minimal steps necessary to prevent this entirely avoidable tragedy.

Therefore, the Court should deny the Vessel Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

Juan was killed in a workplace accident on April 3, 2019, at Detyens Shipyards in North Charleston, South Carolina after being struck by a lifeboat davit arm while performing repairs aboard the Lummus.  Originally from Mexico, Juan was working as a welder in the United States to provide support for his family back home.  At the time of the incident, Juan was directly employed by Southern Skill Trades, Inc. ("Southern Skill"), a temporary employee service company based in Houma, Louisiana.  Southern Skill placed Juan and several other employees on assignment at Detyens Shipyard through a contract with Defendant HiTrak Staffing, Inc.

("HiTrak"). HiTrak, in turn, contracted with DSI for Juan to complete work for DSI. It was DSI who then assigned Juan to work on the Lummus on the date of the incident.

### A.    The Lummus Contracts and Related Safety Requirements

The Lummus is a U.S. Navy cargo ship that is managed and operated by CGS pursuant to a contract with the MSC (the "MSC Contract"). (Ex. 1, MSC Contract.) The MSC Contract served as the master document governing CGS's obligations to the MSC. Section 2.1 of the MSC Contract required CGS to:

> maintain the material condition of all ships under this contract in accordance with the requirements outlined in Section 06.6 of the Technical Manual and all other applicable instructions, rules, and regulations.

(Id. § 2.1). The MSC Contract also mandated that CGS comply with various other policies and procedures. For instance, CGS was required to manage repairs to the vessel pursuant to MSC's "General Technical Requirements" (hereinafter, the "GTRs"). (Ex. 2, GTR Excerpts.) The MSC Contract also required CGS to "develop and maintain a certified safety management system." (Ex. 1, MSC Contract § 3.18.) This "safety management system" (hereinafter, "SMS"), was required to "provide a comprehensive program to reduce occupational injuries, illnesses, material loss or damage, and maintain safe and healthful working conditions for crewmembers and other embarked personnel." (Id. at § 3.18.1.)

On or about November 15, 2020, the Lummus was drydocked in Detyens Shipyard to undergo scheduled repairs pursuant to the MSC Contract. CGS entered into to a separate contract with DSI to have DSI perform those repairs (the "Repair Contract"). (Ex. 3, Repair Contract.) As part of the Repair Contract, CGS provided DSI with certain "Repair Specifications" outlining the work to be done by DSI. (Ex. 4, Repair Specifications.) CGS's drafting of these Repair Specifications was governed by the GTRs, which instructed CGS to:

Avoid "umbrella" phrases. The use of phrases such as "to suit", "as necessary", "as required", "as needed", and "as directed by" should not be depended upon to ensure that work will be performed by the Contractor. These phrases are often the result of a writer not knowing what is needed. The writer cannot expect Contractors to satisfy requirements which are not clear.

(Ex. 2, GTR Excerpts at Vessel Defs. 1163.)

The Repair Specifications, nevertheless, instructed DSI to:

rig, unrig, connect and disconnect stage, un-stage, and remove and replace any interference <u>as required</u> to accomplish each item of the work package.

(Ex. 4, Repair Specifications at Vessel Defs. 960 (emphasis added).)

## B.    The Lifeboat Davit

A lifeboat davit is a crane-like mechanism designed to secure the lifeboat in a raised position and to facilitate the lowering of the lifeboat over the side of a ship when needed. (Ex. 5, Report of Gerry Nielsen at 4.) The mechanism works through the controlled release of gravitational energy. Under normal operations, the davit arm—and by extension the lifeboat—is locked in an upright position by a mechanical, physical restraint known as a "stopper bar." (Ex. 6, Davit Manual, Vessel Defendants 1981.) The lifeboat and davit arm are further restrained by a braided wire rope, known as a "stay," which is attached to an electric winch at one end and the lifeboat at the other end. Notably, while the ship is in operation the "stays" provide a secondary means of restraint in the event the stopper bar fails. (Ex. 7, Fisher Dep. at 75:23–76:1.) Once the stopper bar is removed and the falls are let out from the winch, the force of gravity carries the davit arm down an inclined trackway, positioning the lifeboat over the ship's rail where the lifeboat can be lowered into the water.

The following photograph shows the lifeboats aboard the Lummus in the upright position with the stopper bars engaged.

5



(Ex. 8, Plaintiff 000108.)

### C.    The Rigging and Lock-Out/Tag-Out of the Lummus's Lifeboat Davits

Shortly after the Lummus arrived at Detyens Shipyards on or about November 15, 2018, DSI removed the lifeboats and stays from the davits, but the davit arms themselves were not removed. Instead, they were rigged in their upright position using a temporary wire rope and wire clamps.[1] (Ex. 5, Report of Gerry Nielsen at 19-23.) Significantly, the davit arms were rigged without employing any secondary method of restraint to prevent the davit arms from falling down the trackway—despite the fact that the davits are equipped with a built-in stopper bar to accomplish this exact purpose. (Ex. 9, Nielsen Dep. at 29:3–11 ("My opinions were that there were safer means and there should have been a secondary means, and from what I've seen so far, we've got

---

[1] Notably, though it does not appear to have been the direct cause of Juan's fatal injuries, DSI was fined by OSHA for improperly wrapping the wire ropes around sharp corners of the davit arm and incorrectly applied the wire clamps, reducing the strength of the wire rope. (Ex. 5, Report of Gerry Nielsen at 19-23.)

a stopper bar that, according to the documentation now provided, was intended to be used to hold the davit arm in place during installation with a secondary means."); Ex. 7, Fisher Dep. at 75:23–76:1 (recognizing that during normal operations the stopper bar acted to hold the lifeboat davit in place, and that fall wires served as a backup means of restraint).)

In December of 2020, Crowley assisted in the "safety tag out" of the work items identified by the Repair Specifications, including the lifeboat davits. (Ex. 10, CGS Weekly Status Report at Vessel Defs. 1243–44 ("CREW IS ASSISTING DSI WITH SERVICES, SAFETY TAG OUTS AND IDENTIFICATION OF WORK ITEMS").) This "safety tag out" refers to CGS's "Lock-Out/Tag-Out" procedure (the "LOTO Procedure"), a component of CGS's Safety Management System, which CGS's implemented onboard the Lummus. (Ex. 11, SMS at Vessel Defs. 1708–10 (Safety Management System section outlining "Lock-Out/Tag-Out" procedure); see also Ex. 12, Varghese Dep. Vol. III at 70:5–6 ("Crowley's management system applied lock out/tag out and Crowley executed that.").)

The LOTO Procedure required CGS to identify and isolate all "potential sources of hazardous energy" before repairs were performed on any "equipment or system." (Ex. 11, SMS at Vessel Defs. 1708–10.) The procedure specifically identifies "gravity systems" as a source of "stored" energy which must be evaluated. (Id.) The LOTO procedure further provides that: "Two-level isolation may be possible in some instances and shall be used when possible." (Id. (emphasis added).) Despite this language, CGS failed to simply engage the stopper bar or implement any other secondary means of restraining the 3,640-pound davit arms while conducting their safety tag-outs. Taken in the light most favorable to the Plaintiff, there is evidence in the record that CGS had a duty to lock-out and tag-out its own equipment—the lifeboat davits, that CGS actually did lock-out and tag-out its lifeboat system, that Crowley violated its own LOTO

7

Procedure, violated safe industry standards by failing to use a dual method of restraint, and that Crowley's negligence was a proximate cause of Juan's injury and death.

### D.    The Failure of the Wire Rope

On the morning of April 3, 2019, Juan was preparing to perform work aboard the Lummus on davit number 5, pursuant to Repair Specification 601 (Ex. 4, Repair Specifications at Vessel Defs. 967–70), when the wire rope holding the davit arm in place failed, releasing the davit arm down the trackway and pinning Juan's neck against the ship's equipment. (Ex. 13, Initial Incident Report at Vessel Defs. 990)  Juan survived for some period of time until after the davit arm was removed and attempts to save his life were suspended. (Ex. 14, Report of Dr. Kim Collins at 2 ("Mr. Hernandez would have been conscious and aware of his injuries and would have experienced extreme pain and suffering.").)

Investigations later revealed that the wire rope failed due to an electrical arc, the source of which has never been identified.[2] (Ex. 15, OSHA FOIA at 000019–24.)  It is undisputed, however, that there are numerous forms of secondary restraint which could have been used at the time. CGS's expert, Dr. Kenneth Fisher, has acknowledged that the stopper bars could have been used:

Q: . . . you could always use the stopper bars, couldn't you?

[]

A:  Except, of course, when you had to, you know, do the work in the area where the stopper bars were.

---

[2] Significantly, as it relates to any potential defense of comparative negligence on the part of Juan, OSHA found "no evidence [] of a strike by a welding rod," (Ex. 15, OSHA FOIA at 000023), and although the welding machine at Juan's work-station was not grounded at the time of the incident, Dr. Fisher has testified that "no one can say" that that welding machine caused the arc. (Ex. 7, Fisher Dep. at 272:5–10.)  Moreover, Juan's coworker, Jean Carlos Santiago, has stated that Juan had not even started welding when he was struck by the davit arm. (Ex. 16, Statement of Jean Carlos Santiago at Plaintiff 000002.)  DSI's Safety Manager, Mike Marshall, stated in an email to OSHA that it was his opinion that "the source of the ground was not as result of anything that occurred the morning of the incident." (Ex. 15, OSHA FOIA 000065.)

Q:  Okay, except for the time period that you're actually repairing or, you know, descaling and repainting and so forth around the stopper bars right?

A:  Sure, sure.

(Ex. 7, Fisher Dep. 78:21–79:7.)  Dr. Fisher described the stopper bars as "100 percent effective" in preventing the davit arms from being deployed.  (Id. at 76:15–77:13.)  The below photograph shows davit no. 5 in the aftermath of the accident.  The davit arm is located at the bottom of the trackway, while the disengaged stopper bar is visible mid-way up the trackway.



(Ex. 17, DSI 000152.)

Dr. Fisher further opined that, apart from the stopper bar, there are "multiple other mechanisms that you could use as well."  (Ex. 7, Fisher Dep. at 79:9–10.)  Indeed, after Juan was killed, Detyens began using an analogous method of restraint by "structurally choking" the davit arms so that they cannot move down the trackway, in addition to using wire ropes.  (Ex. 18, Marshall Dep. at 84:11–18; Ex. 19, Final Accident/Incident Report at DSI 000281-85.)  This is consistent with the opinion of Plaintiff's expert, Gerry Nielsen, who opined that a welded bar could have been used to accomplish the same purpose.  (Ex. 5, Report of Gerry Nielsen at 14.)

### III.  ARGUMENT

**A.    The Vessel Defendants Motion for Summary Judgment is premised on an overly narrow understanding of their duties under 33 U.S.C. § 905(b).**

The Vessel Defendants recognize that, as owners and operators of the Lummus, they are considered a "vessel" under the Longshore Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, et. seq. (the "LHWCA").  Section 905(b) of the LHWCA grants shipyard workers, like Juan, a cause of action for injuries "caused by the negligence of a vessel."  33 U.S.C. § 905(b). Recognizing that "Section 905(b) did not specify the acts or omissions of the vessel that would constitute negligence," the Supreme Court outlined three general duties which apply under this section in Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156, 165, 101 S. Ct. 1614, 1621 (1981).

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. [] The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." [] The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98, 114 S. Ct. 2057, 2063 (1994) (quoting Scindia, 451 U.S. at 167, 101 S. Ct. at 1622)).

However, the Scinida opinion recognizes that these are not the only duties that may arise under § 905(b).  While the Court held that a vessel does not owe a general duty to supervise the operations of employees covered by the LWHCA, this holding was explicitly conditioned on the absence of any "contract provision, positive law, or custom to the contrary."  Scindia, 451 U.S. at 172, 101 S. Ct. at 1624; see also Keller v. United States, 38 F.3d 16, 32 (1st Cir. 1994) ("[E]ven absent actual control, participation or knowledge, a post-'turnover' duty may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations for the

purpose of detecting and remedying unsafe conditions.").  Numerous Circuit Courts—including the Fourth Circuit—have held that a vessel may be liable under § 905(b) for "promising, but failing, to remedy a dangerous condition" on the ship.  Bunn v. Oldendorff Carriers GmbH & Co. KG, 723 F.3d 454, 462 (4th Cir. 2013) (citing cases from the Second, Fifth, and Ninth Circuits).

Even if this case were focused solely on the traditional Scindia duties—the turnover duty, the active control duty, and the duty to intervene—the Court has recognized that such duties are not inflexible; instead, they must be informed by "accepted principles of tort law."  Id. at 98, 114 S. Ct. at 2063; see also Bunn, 723 F.3d at 467 ("[W]e do not believe the Supreme Court has built the kind of impenetrable silos of theories cabining shipowner negligence with the rigidity that the dissent believes exist.").  As discussed more fully below, the Vessel Defendants' acts and omissions in this case breached multiple duties owed to the Juan Hernandez.  Regardless of how the duties are framed, however, there is ample evidence in the record to demonstrate a breach, particularly at the summary judgment stage.

**B.    The Vessel Defendants Breached Their Turnover Duty by Failing to Exercise Ordinary Care in Their Implementation of the LOTO Procedure.**

      **i.    CGS owed a duty to exercise ordinary care in implementing the LOTO Procedure.[3]**

---

[3] Plaintiff also notes that, despite the rule that a vessel has "no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop" during shipyard operations, Scindia, 451 U.S. at 172, 101 S. Ct. at 1624, in this case, CGS undertook such duties by actively participating in the supervision and inspection of safety issues while the Lummus was in drydock.  (See Ex. 20, Lyles Dep. at 39:6-14 (DSI employee testifying that he would meet with the Lummus's crew to discuss safety issues when conducting safety inspections, whenever they were available); see also Ex. 21, Vessel Defs. 2904 (comments to SITREP 16 from Capt. David Hagner, stating that he "[t]ook a topside walkabout" and commenting on observed safety issues); Ex. 10, Vessel Defs. 1244 (weekly CGS log noting that "shipyard has been responsive to safety concerns").)  We forego an extensive discussion of CGS's negligent failure to identify safety issues under this theory, as liability would ultimately center around CGS's failure to address DSI's use of a single restraint in rigging the davit arms, which is thoroughly discussed above in context of CGS's implementation of the LOTO Procedure. Nevertheless, Plaintiff highlights yet another source of duty which CGS breached in this case.

The "turnover duty" requires a vessel to exercise "ordinary care <u>under the circumstances</u> to have the ship and its equipment in such condition that an expert and experienced [shipyard] will be able by the exercise of reasonable care to carry on its [] operations with reasonable safety to persons and property." <u>Bunn</u>, 723 F.3d at 461 (quoting <u>Lincoln v. Reksten Mgmt.</u>, 354 F.3d 262, 266 (4th Cir. 2003) (emphasis in original)).[4]  Such "circumstances" must necessarily account for a vessel's voluntary undertakings to assess and remedy dangerous conditions.  <u>See id.</u> at 466 (holding that "the district court did not err in treating the breach of [the vessel's] promise, under the circumstances, as a failure to exercise reasonable care in executing [the vessel's] more general turnover duty").  While a vessel may ordinarily be entitled to rely on the expertise of the shipyard to protect the safety of shipyard workers, that reliance becomes unreasonable when the vessel has voluntarily agreed to perform those duties itself.  <u>Webster v. M/V Moolchand, Sethia Liners, Ltd.</u>, 730 F.2d 1035, 1038 (5th Cir. 1984) (explaining that a vessel owner is "chargeable" under § 905(b) where the "ship's owner had 'actual knowledge of the danger <u>and</u> actual knowledge that he [could] not rely on the stevedore to remedy the situation" (quoting <u>Helaire v. Mobil Oil Co.</u>, 709 F.2d 1031, 1038 (5th Cir. 1983) (emphasis in original))).

---

[4] The turnover duty also carries a corollary duty to:

> warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

<u>Lincoln v. Reksten Mgmt.</u>, 354 F.3d at 266 (quoting <u>Scindia Steam</u>, 451 U.S. at 167, 101 S. Ct. 1614.).  CGS's negligence could also be framed in these terms, insofar as CGS failed to warn that the davits were not properly locked out.  This was undisputedly a hazard affecting the ships equipment which CGS knew or should have known about.  Moreover, the hazard would not have been obvious to DSI.  Nevertheless, Plaintiff focuses her discussion of the CGS's implementation of the LOTO Procedure on the more straightforward prong of the turnover duty.

While the Vessel Defendants make much of the fact that they were generally entitled to rely on DSI to ensure the safety of its operations, CGS could not rely on DSI to implement CGS's LOTO Procedure, particularly because the LOTO Procedure was found in CGS's SMS[5] and required by CGS's contract with the MSC. The LOTO Procedure explicitly tasks the Lummus's Master with ensuring it is properly implemented. (Ex. 11, SMS at Vessel Defendants 1708 ("The Master shall ensure adherence to this procedure.").) Indeed, DSI's own Workplace Safety and Health Manual recognizes that "[t]he release and/or isolation of ships system stored energy shall be the responsibility of the vessel's crew or Port Engineer."[6] (Ex. 22, DSI Workplace Safety and Health Manual at DSI 001427 (emphasis added).) Thus, the project documentation indicates that the lock out and tag out of the ship's equipment was CGS's duty. Moreover, it is undisputed that CGS was actually involved in implementing the LOTO procedure aboard the Lummus. (See Ex. 10, CGS Weekly Status Report at Vessel Defs. 1243–44 ("CREW IS ASSISTING DSI WITH SERVICES, SAFETY TAG OUTS AND IDENTIFICATION OF WORK ITEMS"); Ex. 12, Varghese Dep. Vol. III at 70:5–6 ("Crowley's management system applied lock out/tag out and

---

[5] Despite significant dispute as to whether the SMS "applied" during the time the Lummus was in drydock, the Vessel Defendants do not appear to dispute that they were required to perform and/or oversee the implementation of the LOTO procedure. To the extent there is any dispute on this issue, Plaintiff notes that Dr. Fisher, Crowley's expert in "shipyard project management and contract management principles," has acknowledged that there are "areas where the SMS creates . . . a duty for the chief engineer to participate in some shipyard and oversight of shipyard work." (Ex. 7, Fisher Dep. 223:3–6.) Though Dr. Fisher maintains that the LOTO Procedure section of the SMS still did not apply, this conclusion is belied by language in LOTO Procedure which is explicitly directed toward "contractor personnel," and the parties' use of the SMS's Lock-Out Tag-Out Permit Form to document tag outs during the shipyard repair. (Ex. 23, LOTO Permits at Vessel Defs. 3516, 3589.)

[6] There is no dispute that the davits are part of the ship's equipment. (Ex. 12, Varghese Vol. III at 10:3-5 ("So the lifeboat and the lifeboat davit was ship's equipment; is that correct? A. That is correct.")

Crowley executed that.").)  Thus, it is clear that CGS knowingly took on the task of overseeing and implementing the LOTO Procedure.

Under these circumstances, CGS owed a duty to exercise ordinary care in performing that task.  Bunn, 723 F.3d at 462 ("The general rule is that the defendant is under a duty to perform undertakings made for safety purposes and is liable for physical harm he causes the plaintiff by negligently performing or quitting performance once it has begun." (quoting Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, Dobbs' Law of Torts § 411 (2d ed. 2012))).

> ### ii.    CGS failed to exercise ordinary care in implementing the LOTO Procedure.

Ultimately, the Vessel Defendants breached their turnover duty by failing to ensure that the lifeboat davits were locked out in compliance with the LOTO Procedure.  As noted above, the LOTO Procedure required CGS to identify and isolate all "potential sources of hazardous energy" before repairs were performed on any "equipment or system."  (Ex. 11, SMS at Vessel Defs. 1708–10.)  The Procedure expressly included "gravity systems" as a source of "stored" energy which must be evaluated, (id.), and CGS's expert has testified that "the lifeboat davits are a gravity system."  (Ex. 7, Fisher Dep. at 207:6–8.)  Most importantly, the LOTO Procedure requires that two levels of isolation be used whenever possible.  (Ex. 11, SMS at Vessel Defs. 1708–10 ("Two-level isolation may be possible in some instances and shall be used when possible.") (emphasis added).)

Here, it was entirely possible to employ two levels of isolation—(i) the wire ropes, which constituted a form of "lockout" under the LOTO Procedure according to CGS's expert, (see Ex., 7, Fisher Dep. at 234:1–2 ("That's exactly what the wires or cables did.  They locked it out."), and (ii) the stopper bars.  To the extent there is any dispute about the feasibility of the stopper bars, Plaintiff's expert has explained that they could have been "employed as either a primary or a

secondary means of supporting the davit arm[,]" and CGS's expert has even conceded that "there's no reason you couldn't use [the stopper bars] to restrain the davit arms." (Ex. 7, Fisher Dep. at 78:17–79:12.)[7]  Both CGS and Plaintiff's experts have provided testimony that there were other potential secondary restraints that could have been used. Moreover, DSI's decision in the aftermath of Juan's death to require a second method of isolation by "structurally choking" the davit arms so that they cannot move down the trackway only confirms that a secondary restraint could have been used. (Ex. 18, Marshall Dep. at 84:11–18; Ex. 19, Final Accident/Incident Report at DSI 000281-85.)  Ultimately, there is no escaping the conclusion that this tragedy was a direct result of CGS's disregard for its own procedures and common sense.

Despite their failure to utilize the stopper bars or any other secondary restraint on the davits' gravity system, the Vessel Defendants appear to argue that they did not err in their implementation of the LOTO Procedure. (ECF No. 62, Mot. for Summary Judgment at 6.)  The Vessel Defendants claim that they did use two-levels of isolation on the davit system "as a whole," highlighting the testimony of Paul Varghese, who explained that "[t]he first tag out [is] normally at the [engine] control room, where the main breaker is[,]" and the second tagout "is located at the operating station where the lifeboats are operated, lower[ed] and raise[d]." (Ex. 12, Varghese Dep. Vol. III at 118:13–23.)  Under the Vessel Defendants' view, the davit arms are only a "part" of "the davit system," and thus, not subject to the LOTO Procedure. (Id. at 120:17–23 ("The davit system . . . was tagged out. The davit arm is only a part of that.").)

The problem with this view is that the LOTO Procedure requires an evaluation and isolation of each "potential source[] of hazardous energy."  There is no indication that is only

---

[7] Dr. Fisher did qualify this admission, noting that the stopper bars could not be used while performing work around the stopper bars themselves. (Ex. 7, Fisher Dep. at 79:3–7.)  Plaintiff addresses this objection in a section III.B.iii, infra.

applies at a "system" level.  To the extent the LOTO Procedure even acknowledges a distinction between a "system" and its component "parts," it is clearly intended to apply to both, as it requires isolation of "[a]ll potential hazardous energy sources . . . from the <u>equipment or system</u> that will be serviced."  (Ex. 11, SMS at Vessel Defs. 1708–09.)  There is no question that "the lifeboat davits are a gravity system," within the meaning of LOTO Procedure.  (Ex. 7, Fisher Dep. at 207:6–8.)  CGS's lockout of the davit's _electrical_ system engine room and the operating station did nothing to protect against the _gravitational_ energy stored in the lifeboat davit arms.  The fact that the hazard was posed by a piece of "equipment," rather than the "system," is immaterial.  Indeed, Dr. Fisher's testimony that "the wire ropes constituted a lockout," (_id._ at 259:15–16), indicates that he does not share his client's view that the LOTO Procedure did not apply to the davit arms themselves.

The record contains substantial evidence that: (i) CGS voluntarily undertook a duty to implement the LOTO Procedure, and (ii) by failing to comply with this Procedure, CGS failed to exercise ordinary care in carrying out its duty.  This constitutes a breach of the "turnover duty," under the circumstances, as CGS failed to ensure that the Lummus was turned over in a condition that would allow DSI workers to perform their repairs safely.  The Court should deny the Vessel Defendants' motion on this ground alone.

### iii.    The Vessel Defendants' Failure to Implement the LOTO Procedure Resulted in an Unreasonably Unsafe Condition.

The Vessel Defendants also argue that it was reasonable to rely solely on the wire rope to restrain the davit arms.  In support of this argument, they highlight testimony from DSI Project Manager Dallas Verble that DSI has used this single method of restraint for years without incident, (Ex. 24, Verble Dep. at 130:3–20), and testimony from MSC's Program Manager Juanita Broennimann that she has "customarily seen [the davits] rigged in this manner."  (Ex. 25,

16

Broennimann Depo., at p. 147:19–22.)  They have also submitted a declaration from the Lummus's captain, in which he states that DSI restrained the lifeboat davits on the Lummus using wire ropes and clamps on three prior occasions—in 2006, 2010, and 2013.  In essence, the Vessel Defendants argue that they were not negligent because this how the lifeboat davits have always been restrained.[8]

As an initial matter, this argument ignores CGS's duty to implement two levels of isolation whenever possible under the LOTO Procedure.  Where a vessel has promised to take some action—which CGS undisputedly did in this case—"the promise [is] among the circumstances that define[] the standard of care."  Bunn, 723 F.3d at 466.  Thus, the Court need look no further than the fact that CGS breached its promise to implement the LOTO Procedure.

In any event, though DSI may have used wire-rope restraints when conducting previous repairs, the import of this evidence is highly disputed.  DSI Environmental Safety Manager, William Marshall, testified that while DSI has performed many davit arm repairs in the past, "all davit arms are not the same type that was on the Lummus."  (Ex. 18, Marshall Dep. at 60:18–22.)  Thus, while DSI may have used this wire-rope rigging method in the past, it does not follow that this history is automatically evidence of the method's reliability.  Moreover, industry standards can change.  Plaintiff's expert has testified that

> it is normal, customary, standard when looking at a job especially in the last 10 years talking about drops and stored energy and line of fire, not having secondary retention on something that is suspended above workers is bad business practice at this point in time, where 20 years ago it may have been okay.

(Ex. 9, Nielsen Dep. at 193:24–194:6.)

_____

[8] The Vessel Defendants do not raise this argument specifically in their discussion of the turnover duty.  Nevertheless, to the extent the Vessel Defendants' motion might be read to argue that DSI's prior use of the wire-rope method demonstrates that the Lummus was not turned over in an unreasonable condition—despite CGS's failure to comply with the LOTO Procedure—Plaintiff addresses that argument herein.

Even if the wire-rope method were still an acceptable practice in the industry—which Plaintiff disputes—that still would not end the inquiry. "[R]easonableness," under § 905(b), is a "fluid concept." Keller, 38 F.3d at 25. "[A]n accident that is unprecedented or extraordinary is not necessarily unforeseeable. Nor is proof of adherence to an industry practice or custom dispositive on the issue of negligence." Gill v. Hango Ship-Owners/AB, 682 F.2d 1070, 1074 (4th Cir. 1982). Thus, even if the Vessel Defendants' reliance on the wire-rope as a single method of restraint complied with industry custom, this would still not be dispositive.

As outlined in United States v. Carroll Towing Co., a reasonableness is a function of three variables—the probability a loss will occur, the severity of the potential loss, and the burden on the owner of protecting against said loss. 159 F.2d 169, 173 (2d Cir. 1947) see also Keller, 38 F.3d at 25 ("Generally speaking, the fact-finder should assess the 'reasonableness' of the vessel owner's conduct 'by balancing the usefulness to the [vessel] of the [allegedly] dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses.'" (quoting Johnson v. A/S Ivarans Rederi, 613 F.2d 334, 348 (1st Cir. 1980))). Framed in these terms, the Vessel Defendants' argument is that the probability that the wire rope would fail was so low, that there was no need to engage the stopper bar or any other secondary restraint, in spite of CGS's own policy requiring such measures. They highlight the fact that the wire rope failed due to an electrical arc, claiming this was "something no one had any reason to anticipate." (Mot. for Summary Judgment at 27.)

This argument fails, however, for several reasons. First, it ignores the entire purpose of using a secondary restraint, which is to guard against exigencies that might cause the failure of the primary restraint. This is why the LOTO procedure required "two-level isolation" in the first place. (Ex. 11, SMS at Vessel Defs. 1709.) While the Vessel Defendants seem to believe that because

18

they did not foresee the specific mechanism of the wire-rope's failure, such failure was not foreseeable. CGS's own LOTO Procedure provides the best evidence for why that is not the case. MSC's Program Manager provided further evidence, explaining that "[a] shipyard is an inherently risky situation, because it's an industrial situation." (Ex. 25, Broennimann Dep. at 19:7–8.)

The Fourth Circuit's decision in Woodruff v. United States, 710 F.2d 128 (4th Cir. 1983), is instructive on this point.[9] In Woodruff, the plaintiff was injured after he tripped while "dragging a heavily laden pallet close to the ship's edge" and fell through a four-foot wide gap in the ship's safety netting. Id. at 129. The vessel owner had "designed in their plans . . . a stanchion and rope system to guard against that opening," which the stevedore did not implement. Id. at 130–31. The Court affirmed that a plaintiff's injury must be "reasonably foreseeable" for a vessel owner to be liable, id. at 130, but rejected the district court's finding that the plaintiff's injury was not "reasonably foreseeable" because "the shipowner has some valid basis for relying on the stevedore to take charge of safety precautions." Id. at 130. Noticeably absent from the Court's opinion, however, was any suggestion that the vessel owner must have anticipated the specific events that caused the plaintiff to fall overboard. The same reasoning applies here: CGS designed a LOTO Procedure to protect against the hazards of "stored energy" while repairs are being conducted. This implicitly recognizes that the unintended release of such energy may occur in the course of repair operations, just as the vessel's design of the "stanchion and rope system" in Woodruff

---

[9] Though the Woodruff decision addressed the duty to intervene, Plaintiff is aware of no reason why the court's discussion of foreseeability would be limited to that context. If anything, the incident in this case would be more foreseeable. In Woodruff, the decision to forego the use of a safety net was "was found to be the stevedore's," not the vessel owners—hence, the plaintiff's reliance on the duty to intervene. Id. at 131. Here, in contrast, it was CGS—not DSI—who failed to implement the LOTO Procedure and had more familiarity with the davits themselves. (Ex. 18, Marshall Dep. at 60:10-12 ("I would think that the ship's personnel would know more about how [the lifeboat davit arms] operate than Detyens Shipyards, yes."))

recognized that a longshoreman might fall overboard during the course of stevedoring operations. Neither of these precautions were properly implemented and both plaintiffs suffered the very injuries they were designed to prevent.

Indeed, the Vessel Defendants' argument that the incident was unforeseeable because they were entitled to rely on the shipyard to conduct its operations safely is particularly misplaced with respect to DSI. The United States had internally discussed concerns about the safety practices at Detyens Shipyards prior to the incident and even expressed these concerns to DSI on multiple occasions. (Ex. 26, United States 10-11.) Of course, the United States only learned of these concerns through its contractor, CGS. (Ex. 25, Broennimann Dep. at 20:18–25 (testifying that any concerns the United States had with DSI would have come from CGS because "[t]hey are the ones managing the shipyard").)

The Lummus was undergoing significant repairs for several months before the incident. There were numerous potential sources of electrical current that could have damaged the wire rope at any point during that time. (Ex. 15, OSHA FOIA 000065 (email from DSI Safety Manager stating "I tend to agree that at some point [an] electrical current of unknown source caused electrical ground, when is unknown.").) The very nature of shipyard work, particularly when the shipyard in question has a history of safety issues, calls for the use of redundancies to ensure a safe working environment. CGS's own LOTO Procedure recognized as much. The Court should reject the Vessel Defendants' claim that it was reasonable to ignore their own policy and forego a secondary restraint because it was unlikely that the wire rope would fail. There is, at the very least, a genuine issue of material fact on this issue.

Even if it was unlikely that the wire rope would fail, that does not render CGS's actions reasonable where the harm Juan Hernandez suffered was so severe and the "burden" on CGS to

prevent such harm was so low.  Keller, 38 F.3d at 25.  As outlined above, CGS could have simply engaged the stopper bars that were already installed on the davits.  Alternatively, they could have installed another physical restraint on the davit trackway, which DSI began doing after the incident.  (Ex. 18, Marshall Dep. at 84:11–18.)  The Vessel Defendants' only objection to this has been that DSI would have needed to perform work around the stopper bar or physical restraint at some point, and so the shipyard workers would have necessarily been reliant on a single restraint during that period.  (Ex. 7, Fisher Dep. 78:21–79:7.)  This argument rests on the flawed premise that because the shipyard workers would have necessarily been reliant on a single restraint at some point during their work, it was reasonable to require them to undertake that risk for the entire duration of their work.  Of course, there is no evidence that the work Juan was performing at the time of the incident would have been inhibited by the stopper bar, so this objection is largely irrelevant.

Taken in the light most favorable to Plaintiff, the evidence demonstrates that CGS made a promise to implement the LOTO Procedure.  Despite this undertaking, they failed to comply with the straightforward requirements of their own policy.  By failing to implement a secondary restraint on the davit arms, they turned over the vessel in an unreasonably unsafe condition.  This constituted a breach of the turnover duty.

### C.    The Vessel Defendants Breached the Active Control Duty by Failing to Exercise Ordinary Care in Their Implementation of the LOTO Procedure.

The same core facts also demonstrate a breach of the "active control" duty.  As the Supreme Court has explained:

> [A] vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazard they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

Scindia, 451 U.S. at 167, 101 S. Ct. 1614.

21

The Vessel Defendants argue that "there is no evidence that Crowley actively involved itself in the davit repairs," (Mot. for Summary Judgment at 22), but this ignores CGS's involvement in implementing the LOTO Procedure. There is ample evidence that CGS was involved that aspect of the operations, (Ex. 10, CGS Weekly Status Report at Vessel Defs. 1243–44 ("CREW IS ASSISTING DSI WITH SERVICES, SAFETY TAG OUTS AND IDENTIFICATION OF WORK ITEMS"); Ex. 12, Varghese Dep. Vol. III at 70:5–6 ("Crowley's management system applied lock out/tag out and Crowley executed that.")), and it was that involvement which led to Juan's death.

The Court should deny summary judgment on that basis.

### D. The Vessel Defendants Breached the Duty to Intervene by Allowing DSI to Conduct Repairs After Failing to Implement the LOTO Procedure.

CGS also breached its duty to intervene by allowing DSI to perform repairs without implementing a secondary restraint on the davit arms. When a vessel owner "has knowledge of a dangerous condition[] in areas under the [shipyard's] control, the [vessel] owner may have a duty to intervene 'when the [vessel] owner has knowledge that the [shipyard's] judgment in carrying out his tasks is 'obviously improvident.'" Capers v. Columbia Coastal Transp., Inc., 278 F. Supp. 2d 713, 719 (D.S.C. 2003) (quoting Bonds v. Mortensen & Lange, 717 F.2d 123, 127 (4th Cir. 1983)) (alterations added).

The Vessel Defendants' primary argument addressing the duty to intervene is that CGS lacked "actual knowledge" that "an errant electrical current might weaken" the wire ropes, (Mot. for Summary Judgment at 24.) But, as explained above, Juan's injury was "reasonably foreseeable," and that is all that is required. Plaintiff is not required to demonstrate that CGS foresaw the specific mechanism that caused the wire ropes to fail. It is enough that CGS was aware that the davit arms were not properly locked out. See Woodruff, 710 F.2d at 130 (finding that

22

plaintiff's injury was "reasonably foreseeable" where "the Navy understood that the absence of netting created a serious hazard").

The Vessel Defendants also argue that they had no "actual knowledge" of the contents of the original equipment manufacturer's manual called for the stopper bar to be engaged across the trackway of the lifeboat davit.  (Id. at 24–25.)  Again, the Vessel Defendants overstate Plaintiff's burden.[10]  While the Palfinger Manual certainly demonstrates that the stopper bars should have been engaged, Plaintiff is not required to show that CGS's knowledge of the danger came from that document.  CGS crewmembers were undoubtedly aware of how to operate lifeboat davits, and thus, would have understood that the stopper bars can be used to restraint the davit arms.  More importantly, they would have understood that their own LOTO Procedure required the use of a secondary restraint when feasible.  Put differently, they knew that the LOTO Procedure called for additional safety measures, and they knew that they did not implement them.

Finally, the Vessel Defendants claim that it was not "obviously improvident" for DSI to conduct repairs while the davit arms were not properly locked out.  (Mot. for Summary Judgment at 26–27.)  The Vessel Defendants cite Aguilar v. Bollinger Shipyards, Inc., 833 F. Supp. 2d 582 (E.D. La. 2011), in support of this argument.  That case involved the improvised use of an I-beam as a lifting point to hoist the ship's equipment into place during repairs.  The plaintiff was injured when the I-beam fell and struck him in the back.  The case is distinguishable on two grounds.  First, the court found that the vessel owners did have any responsibility over the safety of the lift.  Id. at 587.  Here, in contrast, CGS was plainly responsible for the implementation of the LOTO

---

[10] Even if this were Plaintiff's burden, the SMS required the Chief Engineer to "maintain and execute the planned maintenance actions and shall update the maintenance requirement descriptions in accordance with technical manuals and OEM recommendations."  (Ex. 11, SMS at Vessel Defs. 1604.)

Procedure.  More significantly, the <u>Aguilar</u> case did not involve the express violation of any safety policies.  Here, in contrast, CGS was necessarily aware of the fact that its LOTO Procedure called for the use of a secondary restraint.  Under these circumstances, allowing DSI to continue repair operations was "obviously improvident."[11]

Therefore, the court should deny summary judgment on the Vessel Defendants' liability under the duty to intervene.

### E.     The Vessel Defendants Were Negligent in Failing to Provide Adequate Repair Specifications.

Beyond their failure to properly implement the LOTO Procedure, the Vessel Defendants are also liable under § 905(b) for failing to exercise reasonable care in the drafting of the Repair Specifications and providing insufficient guidance on how to rig the davit arms.

As outlined above, CGS was required to provide the Repair Specifications to DSI, outlining the work to be performed under the Repair Contract.  CGS's drafting of these Repair Specifications was governed by the MSC's GTRs—specifically, CGS was instructed to "[a]void 'umbrella phrases'" such as "to suit," "as necessary," "as required," "as needed," and "as directed by" because "[t]hese phrases are often the result of a writer not knowing what is needed."  (Ex. 2, GTR Excerpts at Vessel Defs. 1163.)   Nevertheless, when the Repair Specifications included the following instruction to DSI:

> rig, unrig, connect and disconnect stage, un-stage, and remove and replace any interference <u>as required</u> to accomplish each item of the work package.

(Ex. 4, Repair Specifications at Vessel Defs. 960 (emphasis added).)   Moreover, the Repair Specifications outlining the work required on the lifeboat davits did not provide any additional detail on the manner in which the davit arms should be rigged.  (<u>Id.</u> at Vessel Defs. 967–70.)

---

[11] Plaintiffs also refer to the discussion in Section III.B.iii., (<u>supra</u> at 15–20), for additional evidence that the continuation of repair operations was "obviously improvident."

This omission, and the ambiguity created by CGS's use of the phrase "as required," could be found to simply be a breach of CGS's duty arising from its obligations under the GTRs. Alternatively, it could also be framed as a breach of the turnover duty because the absence of such instructions left DSI "unable to carry on its [] operations with reasonable safety." Bunn, 723 F.3d at 461. Finally, it might be viewed as a breach of the "corollary" duty to warn of:

> any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

(quoting Scindia, 451 U.S. at 167, 101 S.Ct. 1614). The hazards posed by rigging the davit arms was certainly related to the ship's equipment and were likely to be encountered by DSI.

The Vessel Defendants argue that their failure to include any more specific instructions was not negligent, highlighting testimony that it is "common" for lifeboat davit repair specifications from shipyard customers to contain no instructions as to how the davit arms should be restrained during repair work. (Mot. for Summary Judgment at 8.) However, the evidence is disputed on this point. DSI's Safety Manager, Mike Marshall, conducted the shipyard's investigation into the incident. (Ex. 18, Marshall Dep. at 27:3-17.) He drafted an initial report which identified "Lack of Written Instructions" and "Hazards Not Identified" as two of the root causes of the incident. (Ex. 27, Original Accident/Incident Report.) Ultimately, these root causes were removed from the final report at the request of Larry Reynolds, DSI's operations vice president, who had final authority to sign the report. (Ex. 18, Marshall Dep. at 35:14-16 ("I don't know that he disagreed, but he didn't think that block was applicable to the incident."); see also Ex. 19, Final Accident/Incident Report at DSI 000281-85.) Notably, however, Mr. Reynolds had no involvement in the investigation itself. (Ex. 18, Marshall Dep. at 37:2-14.) Nevertheless, despite this highly suspicious removal of these root cause findings, Mr. Marshall continues to

believe that they applied.  (Id. at 37:22-38:5 ("Q.  Okay. You still continue to believe even as we

sit here today that there were not sufficient written instructions for how to stow the davit arm; is

that true? . . . A. Yes."); Id. at 40:17-41:4 ("Q. Okay. And then as we're sitting here today, in your

personal opinion do you still believe that the hazard that killed Mr. Hernandez was not properly

identified? . . . THE WITNESS:  I think the lack of written instructions on how to secure and store

-- stow the davit arm wasn't clear.  Q.  I got you.  And that's related to the hazard if I'm

understanding?  A.  Yes.").)

Thus, the reasonableness of CGS's Repair Instructions is a matter of dispute.  There is

evidence in the record that DSI's Safety Manager considered them deficient and they were plainly

noncompliant with the GTRs.  Moreover, despite the Vessel Defendants' claim that the absence of

specific rigging instructions is common in the industry, "proof of adherence to an industry practice

or custom [is not] dispositive on the issue of negligence."  Gill, 682 F.2d at 1074.

Taken in the light most favorable to Plaintiff, the record demonstrates that CGS was

negligent in failing to provide adequate, unambiguous Repair Specifications.

## IV.  CONCLUSION

Because there are genuine issues of material fact regarding the Vessel Defendants' breach of

their duties under § 905(b), the Court should deny Crowley's Motion for Summary Judgment.

s/ Robert L. Wehrman
J. Rutledge Young, III (Fed. Bar No. 7260)
Julie L. Moore (Fed. Bar No. 11138)
Robert L. Wehrman (Fed. Bar No. 13426)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, SC 29401
(843) 720-2044
ryoung@duffyandyoung.com
jmoore@duffyandyoung.com
rwehrman@duffyandyoung.com
*Attorneys for Plaintiff*

August 18, 2022
Charleston, South Carolina