# EXHIBIT 7

Kenneth W Fisher PhD - Confidential         June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 1

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
2          CHARLESTON DIVISION IN ADMIRALTY
3
    TIFFANY N. PROVENCE, AS THE PERSONAL
4   REPRESENTATIVE OF THE ESTATE OF JUAN
    ANTONIO VILLALOBOS HERNANDEZ,
5
                  Plaintiff,
6
    vs.            CASE No. 2:21-cv-965-RMG5
7
    UNITED STATES OF AMERICA, CROWLEY
8   MARITIME CORPORATION, CROWLEY GOVERNMENT
    SERVICES, INC., DETYENS SHIPYARD, INC.
9   AND HIGHTRAK STAFFING, INC. D/B/A HITRAK
    STAFFING, INC.,
10
                  Defendants.
11
12       CONFIDENTIAL TRANSCRIPT SUBJECT TO ORDER
13
    DEPOSITION OF:   KENNETH W. FISHER, PH.D.
14                   (Appearing by VTC)
15  DATE:            June 10, 2022
16  TIME:            10:03 a.m.
17  LOCATION:        Boston, MA
18  TAKEN BY:        Counsel for the Defendants
19  REPORTED BY:     Susan M. Valsecchi, Registered
                     Professional Reporter, CRR
20                   (Appearing by VTC)
    _____
21
22
23
24
25

Kenneth W Fisher PhD - Confidential                    June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 75

1    authorities.
2              So this is not in --
3         Q.    Okay.
4         A.    This commercial marine practice isn't
5    as an alternative.  It's on top of what's required
6    by the contract and by regulations.
7         Q.    Okay.  And let me ask you, Dr. Fisher,
8    when the lifeboats are in their cradles, and, you
9    know, in the davit arms, as if they were normally
10   ready for operation, would there be two methods of
11   restraint on the davit arm?
12        A.    No, there's one, because they slack
13   off, the fall -- and the weight is supported by the
14   stopper bar.  The fall is not in tension, or very
15   minimal tension, if at all, when the vessel is in
16   operation.  Okay?  And then the fall is tightened
17   up and the stopper bars are released if you need to
18   launch the boats.
19        Q.    Okay.  So when the lifeboats are in
20   their operational status, or ready for deployment,
21   the only method of restraint is the stopper bar; is
22   that correct?
23        A.    No, the stopper bar is holding it in
24   position; but if the stopper bar failed, then the
25   fall would be subject to a jerking force, but

Kenneth W Fisher PhD - Confidential                June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 76

1   probably restrain it.

2           Q.    Okay.  In other words, a little bit of

3   slack might come out of the fall, a couple feet,

4   but then the wire ropes would restrain the boat; is

5   that right?

6           A.    I believe that's the expectation.

7           Q.    And in that sense, would you agree with

8   me that, while the boats are in operational

9   condition, there are two methods of restraint?

10          A.    No.

11          Q.    Okay.  What would the falls be

12  considered, in your opinion, if they're not a

13  method of restraint?

14          A.    They're used to lower the lifeboat.

15  These stopper bars, they work.  They work.  They're

16  adequate.  They're a hundred percent.  That's

17  why --

18          Q.    Okay, very good.

19          A.    That's why the launching requirements,

20  say you've got -- you know, they've got all of

21  these procedures that have to be followed to launch

22  a lifeboat.  One of them is to tighten up the fall

23  and then release the stopper bar.  So, you know, it

24  works.

25          Q.    You would agree with me, then, that the

Kenneth W Fisher PhD - Confidential                June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 77

1    stopper bars are 100 percent effective in

2    preventing the davit arms from being deployed?

3         A.   Yes, but I'm also worrying about what

4    is the one hundred percent means effective of

5    making sure there's no errant electrical currents?

6         Q.   Well, Dr. Fisher, you have, during your

7    deposition, used the term 100 percent effective on

8    numerous occasions, and I think I understand you to

9    be saying the stopper bars would be 100 percent

10   effective, and your earlier testimony was that the

11   single method of restraint used by Detyens shipyard

12   was also 100 percent effective; is that correct?

13        A.   Yes.

14        Q.   So there's two different methods that

15   are both 100 percent effective in your opinion,

16   correct?

17        A.   When you're either in repair or you're

18   in operation, you use a different method in

19   different circumstances.

20        Q.   And because both methods are

21   100 percent effective, do I understand your opinion

22   to be that only one of them is necessary to prevent

23   davit arms from rolling down the trackway?

24        A.   Right, in the different situations.

25   When the ship is being repaired, the stopper bars

Kenneth W Fisher PhD - Confidential                June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 78

1    are inappropriate.  When the ship is at sea, the

2    stopper bars are appropriate.  I don't

3    understand -- you know, different methods at

4    different situations.

5         Q.    Let me make sure I heard your testimony

6    there.  Did you just say that when the ship is

7    being repaired, the stopper bars are not

8    appropriate?

9         A.    The stopper bars are not necessary.

10         Q.    Would you clarify that for me.

11         A.    Earlier we spoke about the fact that

12    the stopper bars interfere with the accomplishment

13    of the work.

14         Q.    That was all the testimony you gave

15    about the painting and removing them and so forth?

16         A.    Yes.

17         Q.    But would you agree with me that the

18    stopper bars, there's no reason you couldn't use

19    them to restrain the davit arms in the exact same

20    success ratio or with a hundred percent success;

21    you could always use the stopper bars, couldn't

22    you?

23              MR. GILSENAN:  Objection.

24              THE WITNESS:  Except, of course, when

25         you had to, you know, do the work in the

Kenneth W Fisher PhD - Confidential                June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 79

1          area where the stopper bars were.
2    BY MR. YOUNG:
3          Q.   Okay, except for the time period that
4    you're actually repairing or, you know, descaling
5    and repainting and so forth around the stopper bars
6    right?
7          A.   Sure, sure.
8          Q.   And then let me ask you, Dr. Fisher --
9          A.   I can visualize multiple other
10   mechanisms that you could use as well.  You could
11   keep the --
12         Q.   Sure.
13         A.   -- permanently affixed -- keep the
14   crane attached to the davit arm while the cable is
15   also in place.  There are other methods available
16   as well, but it's a matter of why do you need the
17   redundancy when you've got a hundred percent
18   proven -- you know, proven safe mechanism.
19         Q.   If you had a redundancy in this case
20   involving the stopper bar or something similar to
21   it that mechanically blocked the davit arm, would
22   you agree that Mr. Hernandez would not have been
23   killed?
24              MR. GILSENAN:  Objection.
25              THE WITNESS:  Could you say that again,

Kenneth W Fisher PhD - Confidential            June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 207

1    all?

2            A.    I don't understand the last part of

3    that question.  Does it apply to the lifeboat

4    davits?  When the vessel is in operation, it

5    certainly does.

6            Q.    The lifeboat davits are a gravity

7    system, correct?

8            A.    Yes, they are.

9            Q.    And Crowley has a lockout/tagout

10   procedure that applies to gravity systems in those

11   circumstances that the lockout/tagout procedure

12   applies.  Would you agree with that?

13           A.    When this procedure applies, yes.

14           Q.    And it says here under Exhibit

15   Number 6, "The Master shall ensure adherence to

16   this procedure."

17                 Do you see that, under the

18   Responsibility section?

19           A.    Section 6?

20           Q.    Exhibit, 6 which is this lockout/tagout

21   procedure from Crowley --

22           A.    Which paragraph number?  Oh,

23   Paragraph 3.1?

24           Q.    Yes, sir, Responsibility.

25           A.    Yes, I see that.

Page 223

```
 1   that's in the SMS.  This is a very narrow area

 2   that -- this and the next paragraph alone,

 3   4.74.35 -- are the very narrow areas where the SMS

 4   creates a duty or a -- you know, a duty for the

 5   chief engineer to participate in some shipyard and

 6   oversight of shipyard work.

 7        Q.   Okay.  And that's your opinion.  But if

 8   somebody testified the SMS never applies while the

 9   ship is in the shipyard, that wouldn't be accurate;

10   would it?

11             MR. GILSENAN:  Objection.

12             THE WITNESS:  Pardon me, I just dropped

13        my report.

14             Yes and no.  It does not mean the

15        entire SMS applies.  There is just these two

16        sentences out of the entire SMS, which is,

17        you know, many, many pages.  This is two

18        sentences out of the SMS which may apply

19        while the ship is in the shipyard.

20   BY MR. YOUNG:

21        Q.   Well, I guess I'll try to drill down on

22   that a little bit.

23             You seem to want to qualify this to say

24   Exhibit Number 7 may apply while the ship is in the

25   shipyard --
```

Page 234

1          A.    Bingo.   That's exactly what the wires

2     or cables did.   They locked it out.

3          Q.    So now that you've had a chance to look

4     at Exhibit Number 9, is it your testimony that

5     Detyens complied with this lockout/tags-plus

6     program, as reflected in 5.16, with the wire rope

7     restraint that it chose to use?

8          A.    Yes, chains, wedges, the equivalent of

9     a chain, right, hardware used for isolating --

10         Q.    They didn't use --

11              THE COURT REPORTER:   Hold on.

12              THE WITNESS:   Hardware used for

13         isolating, blocking, or securing equipment

14         or systems.   Right.   Done.

15    BY MR. YOUNG:

16         Q.    Very good.

17              Okay.   So now that you've had a chance

18    to look at Exhibit Number 9, is it your testimony

19    that Detyens complied fully with the lockout/tagout

20    procedure for the restraint of this davit arm?

21         A.    Under their own interpretation of their

22    own rules, or their own procedures, the answer is

23    yes.

24         Q.    Okay.   And then Exhibit Number 9,

25    turning to the second page and looking at Section

Page 259

1    earlier as to who was coordinating all the

2    lockout/tagouts, and it says here, under

3    1915.89(c)(7)(iii), "The employer shall designate

4    the lockout/tags-plus coordinator."

5           Q.   And you recall, Dr. Fisher, we went

6    through some testimony about whether -- employer

7    and what it meant and whether it's a defined term

8    and so forth.  We've already covered that, right?

9           A.   But that also affects what we were

10   talking about in the previous -- one of the

11   previous exhibits, where it says that the ship's

12   crew or the port engineer shall have the

13   responsibility and so forth.  And I was saying

14   that's a joint responsibility.  That means you need

15   permission of both before releasing the energy and

16   so forth.  So this helps build that and say the

17   coordinator has to be an employee of the

18   contractor.

19          Q.   Like we went over earlier, employer is

20   a defined term under Section 1915 and so is

21   employee, correct?

22          A.   Right.  So we're okay here.  So, yes,

23   this applies.

24          Q.   Perfect.

25               Exhibit Number 14 applies, right?

Kenneth W Fisher PhD - Confidential                     June 10, 2022
Provence, Tiffany N v. United States of America, et al

Page 272

1   that ungrounded welding machine that you

2   referenced, you learned that from the OSHA

3   inspector's report, right?

4          A.   Yes.

5          Q.   However, nothing in that report says

6   that that ungrounded welding machine caused any

7   electrical arc or not the one in this --

8          A.   No one -- no one saw the arc, so no one

9   can say it caused an arc.  No one saw the failure

10  occur.

11         Q.   And then shifting gears to the contract

12  between Detyens and Crowley; and this isn't an

13  exhibit you need to read or anything.  This is

14  just based on your review in writing your report.

15              The contract called for Detyens to use

16  the best commercial marine practices in their

17  repair work, right?

18         A.   Right.

19         Q.   And is it your opinion that the way

20  that Detyens restrained the davit arm using the

21  3/8ths-inch wire rope and Crosby clamps was

22  recognized as best commercial marine practices at

23  the time?

24         A.   I don't know who has to recognize it.

25  I would characterize it as being good marine