# EXHIBIT 18

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION
                       IN ADMIRALTY
 3
     TIFFANY N. PROVENCE, AS THE PERSONAL
 4   REPRESENTATIVE OF THE ESTATE OF JUAN
     ANTONIO VILLALOBOS HERNANDEZ,
 5
                    Plaintiff,
 6
          vs.         CASE NO. 2:21-cv-965-RMG
 7
     UNITED STATES OF AMERICA, CROWLEY
 8   MARITIME CORPORATION, CROWLEY GOVERNMENT
     SERVICES, INC., DETYENS SHIPYARDS, INC.,
 9   AND HIGHTRAK STAFFING, INC. D/B/A HITRAK
     STAFFING, INC.,
10
                    Defendants.
11
12   DEPOSITION OF:   WILLIAM MICHAEL MARSHALL
13   DATE:            December 14, 2021
14   TIME:            11:47 a.m.
15   LOCATION:        DETYENS SHIPYARDS, INC.
                      1670 Dry Dock Avenue
16                    Suite 200
                      North Charleston, SC
17
     TAKEN BY:        Counsel for the Plaintiff
18
     REPORTED BY:     MICHAEL DAVID ROBERTS,
19                    Court Reporter
     _____
20
21
22
23
24
25
```

1      Q.   Leo Fary?

2      A.   Uh-huh.

3      Q.   Okay.  But as part of your
4 investigation -- is it accurate to say you
5 conducted an investigation and tried to do a report
6 of what occurred in conjunction with
7 Mr. Hernandez's death?  What was kind of your role
8 in this whole event where Mr. Hernandez was killed?

9      A.   I prepared that report.

10     Q.   All right.  And was it your intention
11 to investigate how the incident occurred?

12     A.   I investigated it, yes.

13     Q.   Okay.  And was it your intention to
14 generate this report that would summarize your
15 factual findings and the things that you uncovered
16 as a result of your investigation?

17     A.   Yes.

18     Q.   All right.  And I think you said this
19 earlier.  This is the type of report that Detyens
20 prepares in the ordinary course of its business; is
21 that right?

22          MR. CLEMENT:  Objection to the form.

23 BY MR. YOUNG:

24     Q.   I'll try maybe a better way.

25          This is a Detyens form and you filled

1      Q.   Did you discuss it with anybody else
2  other than reading it yourself?
3      A.   I don't recall that I did.
4      Q.   And when you talked with Mr. Reynolds
5  about that, did you discuss that with him?
6      A.   I think it was inquired as to why I had
7  checked that block.
8      Q.   Okay.  And you gave him the same
9  explanation that you just shared with us --
10     A.   Yes, sir.
11     Q.   -- generally, right?
12          And he disagreed with you, Mr. Reynolds
13 that is?
14     A.   I don't know that he disagreed, but he
15 didn't think that block was applicable to the
16 incident.
17     Q.   Okay.  So he understood your point or
18 at least you perceived that he understood?
19     A.   I perceived.
20          MR. CLEMENT:  Objection to the form.
21 BY MR. YOUNG:
22     Q.   Was it a face-to-face meeting with him,
23 or was it over the telephone?
24     A.   It would have been face-to-face.
25     Q.   Okay.  And so I would assume that in,

1       A.   I don't know.
2       Q.   Okay.  What role would Mr. Reynolds
3    have played in the investigation of Mr. Hernandez's
4    death, if you know?  What would seem most logical
5    that he would be doing?
6       A.   He doesn't get involved in the
7    investigation.
8       Q.   Okay.  And that's what I want to make
9    sure I understand.
10           He wasn't -- as far as you know, he
11   wasn't involved in the investigation, but he
12   disagreed with your completion of his report and he
13   asked you to change it; is that right?
14      A.   Correct.
15           MR. CLEMENT:  Objection to the form.
16   BY MR. YOUNG:
17      Q.   And you agreed to change it because he
18   asked you or because you changed your mind?  That's
19   what I'm trying to figure out.
20      A.   He disagreed that it needed to be
21   checked.
22      Q.   Okay.  You still continue to believe
23   even as we sit here today that there were not
24   sufficient written instructions for how to stow the
25   davit arm; is that true?

Page 38

1           MR. GILSENAN:  Objection.
2           THE WITNESS:  In my opinion?
3    BY MR. YOUNG:
4        Q.   Yes, sir.
5        A.   Yes.
6        Q.   All right.  And then the next section
7    of the report says hazards not identified, and that
8    is on exhibit 3, and you checked that box as a root
9    cause; is that correct?
10       A.   That's correct.
11       Q.   Now, tell us if you would in the same
12   sort of fashion why you checked that cause -- that
13   box?  Excuse me.
14       A.   Because at that time I didn't know how
15   the davit was stowed -- the davit arm was stowed,
16   so that's a hazard not identified.
17       Q.   I see.
18            And did you subsequently come to learn
19   or did you later find out how the davit arm was
20   actually stowed?
21       A.   On the day of the event.
22       Q.   Okay.  But when you were filling out
23   this report, it was your judgment that the risk of
24   being crushed by this davit arm had not been
25   identified properly; is that right?

Page 40

1    on it?
2                MR. CLEMENT:  Objection to the form.
3                THE WITNESS:  I didn't know how it
4    was -- prior to the -- to the incident, I didn't
5    know how it was stored.
6    BY MR. YOUNG:
7         Q.   Okay.  And then when you met with
8    Mr. Reynolds, he asked you to reconsider that and
9    remove that as a root cause as well?
10        A.   Yes.
11        Q.   All right.  And you decided to remove
12   it so that Mr. Reynolds would sign the form that we
13   marked as exhibit 2, right?
14        A.   There was some discussion.  Exactly
15   what it was I don't recall, but it came to be that
16   we were going to -- that it was removed.
17        Q.   Okay.  And then as we're sitting here
18   today, in your personal opinion do you still
19   believe that the hazard that killed Mr. Hernandez
20   was not properly identified?
21               MR. CLEMENT:  Objection to the form.
22               THE WITNESS:  I think the lack of
23   written instructions on how to secure and store --
24   stow the davit arm wasn't clear.
25   BY MR. YOUNG:

William Michael Marshall                December 14, 2021
Provence, Tiffany N v. United States of America, et al

Page 41

1    Q.    I got you.
2          And that's related to the hazard if I'm
3    understanding?
4    A.    Yes.
5    Q.    I understand.
6          And then you also checked the box
7    inattention to detail.  Now, what's that -- tell us
8    what that refers to in your mind and why you
9    checked that box.
10   A.    Just after the accident -- incident
11   talking to people and where Mr. Hernandez had
12   positioned himself to work.
13   Q.    Right.
14   A.    You know, and, again, afterthought or
15   after the fact is -- it just seemed like a strange
16   place to be in position to work.
17   Q.    Okay.  And so when it says inattention
18   to detail, you're referring to Mr. Hernandez's
19   inattention to detail; is that right?
20   A.    Yes, that.
21   Q.    Because of where he's located in an
22   unsafe position or posture?
23   A.    Yes.
24   Q.    I see.
25         But I think if I'm understanding you,

Page 60

1    more familiar with the lifeboat, davit arms and how
2    they worked than the folks at Detyens Shipyards --
3              MR. GILSENAN:  Objection.
4    BY MR. YOUNG:
5         Q.   -- who were on that particular project?
6              MR. CLEMENT:  Same objection.
7    BY MR. YOUNG:
8         Q.   You can still answer it.  They're doing
9    their jobs.
10        A.   I would think that the ship's personnel
11   would know more about how they operate than Detyens
12   Shipyards, yes.
13        Q.   Okay.  And was there anybody at Detyens
14   Shipyards that was a specialist that you know of in
15   lifeboats or davits or these kinds of systems?
16        A.   Specialist?
17        Q.   Yes, or experienced with it in any way.
18        A.   Again, davit arm repair work is -- is
19   pretty common during these availabilities, not on
20   every availability, and they're not all -- all
21   davit arms are not the same type that was on the
22   Lummus.
23        Q.   Oh, I see.  Okay.  Right.
24             In other words, different systems?
25        A.   Could be, yes.

Page 84

1  that based on your investigation you uncovered
2  about improper grounding of the ship itself?
3       A.   I don't know that I looked at it.
4       Q.   Okay.  Before this incident occurred,
5  is it true there was no written procedure at
6  Detyens for how to safely stow lifeboat davit arms
7  on ships that are being worked on?
8       A.   I have no knowledge of -- of that.
9       Q.   Is there any written procedure today
10 for working on lifeboat davits, davit arms?
11      A.   There's a memorandum on chocking them
12 or structurally securing them; but as far as a
13 procedure, I don't know of any.
14      Q.   Okay.  The memorandum about chocking
15 them, tell me a little bit more about that.
16      A.   I believe I issued it.  It just said
17 that we would either remove the arms in the future
18 or we would structurally chock them.
19      Q.   Okay.  And that was a -- where would
20 that memorandum have been circulated, to all
21 Detyens personnel?
22      A.   In my best recollection, it was sent to
23 anybody -- any of the departments that would be
24 doing electrical -- welding.
25      Q.   Okay.  And that was a result of all