```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  CHARLESTON DIVISION
                       IN ADMIRALTY
 3
    TIFFANY N. PROVENCE, AS THE PERSONAL
 4  REPRESENTATIVE OF THE ESTATE OF JUAN
    ANTONIO VILLALOBOS HERNANDEZ,
 5
                  Plaintiff,
 6
           vs.       CASE NO. 2:21-cv-965-RMG
 7
    UNITED STATES OF AMERICA, CROWLEY
 8  MARITIME CORPORATION, CROWLEY GOVERNMENT
    SERVICES, INC., DETYENS SHIPYARDS, INC.,
 9  AND HIGHTRAK STAFFING, INC. D/B/A HITRAK
    STAFFING, INC.,
10
                  Defendants.
11
    DEPOSITION OF:    WILLIAM MICHAEL MARSHALL
12
    DATE:             December 14, 2021
13
    TIME:             11:47 a.m.
14
    LOCATION:         DETYENS SHIPYARDS, INC.
15                    1670 Dry Dock Avenue
                      Suite 200
16                    North Charleston, SC

17
    TAKEN BY:         Counsel for the Plaintiff
18
    REPORTED BY:      MICHAEL DAVID ROBERTS,
19                    Court Reporter
    _____
20
21
22
23
24
25
```

William Michael Marshall                December 14, 2021
Provence, Tiffany N v. United States of America, et al

Page 12

```
 1    requirements, PPE, fall protection.  Just general
 2    safety stuff.
 3         Q.   Okay.  And would you have attended that
 4    first arrival conference with the Lummus when it
 5    got here in either November or early December of
 6    2018?
 7         A.   I did not.
 8         Q.   Did not.
 9              And who would have been the most senior
10    person in your division that would have attended
11    something like that, if you know?
12         A.   Wayne Matayabas.
13         Q.   All right.  Did you attend any of the
14    project meetings regarding the Lummus any time
15    between November of 2018 and April 3rd of 2019?
16         A.   No, sir.
17         Q.   On the Lummus itself, what role, if
18    any, did you play in inspecting the safety of the
19    job or inspecting the project or anything like
20    that?
21         A.   Again, I don't do walk-throughs on the
22    ships, so I have not inspected the boat.
23         Q.   Okay.  And is it true and accurate to
24    say that you don't have any firsthand knowledge
25    about the events that killed Mr. Hernandez on
```

William Michael Marshall                December 14, 2021
Provence, Tiffany N v. United States of America, et al

Page 13

```
 1    April 3rd, 2019?
 2         A.   I went to the boat on the day of the
 3    event, okay.
 4         Q.   Okay.  Is that the first time you had
 5    stepped on the Lummus as far as you know?
 6         A.   As far as I can recall.
 7         Q.   All right.  Then let me narrow it down
 8    this way.
 9              You weren't an eyewitness to any of the
10    events; is that true, on April 3rd, 2019?
11         A.   Of the -- of the --
12         Q.   Before you actually arrived on the
13    ship.
14         A.   No.
15         Q.   That's a bad question.  It would be
16    impossible.
17              Okay.  Tell us how you were first
18    called to the ship on April 3rd, 2019, what you
19    remember about that?
20         A.   We were having a department meeting in
21    my office talking about how we were going to cover
22    the work, and we got a call on the walkie-talkie.
23    And I think I documented it as 9:30ish.
24         Q.   Feel free -- and let me tell you, we've
25    marked your report at exhibit number 2.  It starts
```

William Michael Marshall                    December 14, 2021
Provence, Tiffany N v. United States of America, et al

Page 92

1              A.    Yes.
2              Q.    Okay.  And it's not necessarily true
3      that a ship's crew would be very familiar with
4      dismantling and overhauling a davit?  I mean, isn't
5      that why it's done in a shipyard?
6              A.    That's part of the specs I assume, yes.
7              Q.    Okay.  And the memorandum for chocking
8      the davit arms that's done now -- the way it's done
9      now, that the davit arms are not just removed
10     altogether, is that what you're referring to in the
11     draft with lack of written instruction?  Your draft
12     report.  I believe it was exhibit 3 under the root
13     cause analysis.
14             A.    When I read the spec, I didn't see --
15     and, of course, I had never done any structural
16     work when I was a trades person.  I was a
17     pipefitter.  I didn't see anything that talked
18     about restraining them and how to do it.  There was
19     no specific in my recollection on how to restrain
20     those arms.
21             Q.    Right.
22                   Have you compared it to other specs
23     that -- where other specs did provide that
24     information?
25             A.    I did not compare them.

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com

Exhibit C

Page 93

1      Q.   Okay.  And, of course, if there's a
2   question on how something should be done, there's
3   probably a process for that in the contract
4   documents?
5      A.   Again, I don't get involved with the
6   contract.
7      Q.   Okay.  So you're not here to testify on
8   what should or should not be in a repair spec
9   that's part of the ship repair contract?
10     A.   No, sir.
11     Q.   In your investigation, did you -- or
12  whether it was through your investigation or just
13  from your knowledge on the Lummus work in the yard,
14  do you have any reason to believe that the ship's
15  crew was involved in the repair of the lifeboat
16  davits?
17     A.   Not to my knowledge, no, sir.
18          MR. GILSENAN:  All right.  I believe
19  that's all I have.  Thank you very much.
20          THE WITNESS:  Yes, sir.
21                    EXAMINATION
22  BY MR. CLEMENT:
23     Q.   Mr. Marshall, I do have a few questions
24  for you.
25          At the time of the incident that is