```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
                   CHARLESTON DIVISION
                      IN ADMIRALTY
                         - - -

TIFFANY N. PROVENCE, as the      :
Personal Representative of the   :
Estate of Juan Antonia           :
Villalobos Hernandez,            :
                                 :
            Plaintiff,           :
                                 : Case No.
            vs.                  : 2:21-cv-965-RMG
                                 :
UNITED STATES OF AMERICA,        :
CROWLEY MARITIME CORPORATION,    :
CROWLEY GOVERNMENT SERVICES,     :
INC., DETYENS SHIPYARDS, INC.,   :
and HIGHTRAK STAFFING, INC,      :
d/b/a Hitrak Staffing, Inc.,     :
                                 :
            Defendants.          :
                                 :
```

_____

               DEPOSITION OF GERALD NIELSEN

_____


DATE TAKEN:   Monday, April 11, 2022

TIME BEGAN:   10:00 a.m.

TIME ENDED:   5:20 p.m.

LOCATION:     REMOTE PARTICIPATION DEPOSITION
              (All parties participated via videoconference)


REPORTED BY:  Mary Posey, Court Reporter
              EveryWord, Inc.
              P.O. Box 1459
              Columbia, South Carolina 29202
              803-212-0012



Exhibit E

Page 152

1 hazards. And because this was specific to a drill
2 ship -- I've got extensive experience working on
3 drill ships -- I could talk very specifically about
4 the different titles onboard and who would be
5 responsible for inspections, maintenance, repair, et
6 cetera.
7  Q  Okay. So beyond -- as I understand, that's
8 the only case you've testified in?
9  A  Earlier in my career as an employee I have
10 provided grand jury testimony but that was not as an
11 expert.
12  Q  Have you had the opportunity to fully
13 discuss the opinions that you formulated with respect
14 to Detyens Shipyard and Hightrak Staffing?
15  A  With the understanding that I've not fully
16 gone through those couple of pieces of documentation
17 that were recently received, yes, you are correct.
18      MR. HOOD: All right. Thank you. I have
19   no other questions at this point. I'm sure Ryan
20   will have some but I'll drop off so you can stop
21   looking at me.
22      MR. YOUNG: Hey, we've been going about an
23   hour and a half. Can we take a quick break?
24      THE WITNESS: Please.
25      MR. GILSENEN: Yes.

Page 153

1      MR. HOOD: Yes. That sounds good.
2          - - -
3      (Recess in the proceedings.)
4          - - -
5              EXAMINATION
6          - - -
7 BY MR. GILSENAN:
8  Q  Mr. Nielsen, Ryan Gilsenan. I represent
9 the Crowley entities and the United States
10 Government.
11      I would like to circle back to the
12 beginning of your deposition today where you
13 mentioned two new documents that you've received
14 since you issued your report. And the first one I'd
15 like to have you look at and have you tell me about
16 is the MSC General Technical Requirements, the GTR.
17  A  Yes.
18  Q  And I believe you said that this
19 strengthened your opinions, words to that effect, and
20 I would like to take a look at that and you can
21 explain to me how.
22  A  Okay. Is that the question? Are you ready
23 for --
24  Q  Yeah.
25  A  Okay. Sorry.

Page 154

1      I have to go back and restate that
2 especially this one, the GTR, I have not reviewed in
3 any level of detail. I skimmed through it quickly
4 looking for items regarding work items, any wording
5 regarding work items since my report does reference
6 them, and I found that in the introduction. I
7 believe, that is the Guide for MSC Work Item
8 Preparation. That would be starting with Page
9 Defendant's 1161. It talks about general, it talks
10 about ambiguity, and it talks about writing, and it
11 talks about regulatory body approvals, and the term
12 that I believe I used at the beginning of the
13 deposition, although I may be wrong -- I don't
14 believe I used the word strength and I believe I used
15 the word support -- I may be mistaken on that -- but
16 I would look at this as how does it support the
17 opinions that I've already come up with. And as
18 we've discussed, I don't -- based on my review so
19 far, I don't believe this generates new opinions, it
20 just gives me, you know, potentially just something
21 to reference in support of the existing things.
22  Q  Okay. Well, let me ask you to look at
23 Vessel Defendants 1164.
24  A  Okay.
25  Q  Let me know when you are there.

Page 155

1  A  I'm there.
2  Q  Okay. Item 3.6, Guidance Level. It says,
3 work items are performance granted, the shipyard
4 determines how to do the work.
5  A  Okay.
6  Q  All right. That seems pretty clear to me
7 that the shipyard determines how to do the work.
8 What's your understanding of that?
9  A  That sentence as you've just read it to me
10 is pretty straightforward. I would like to read
11 what's around it before going too far. I don't want
12 to create or alter an opinion as we talk. That is --
13 it's definitely going to be an important statement.
14 I don't know if there are other sections, you know,
15 similar to -- let's say looking at CFR's where
16 there's a very solid statement, but then when you go
17 to the preceding section, it says except when.
18      So I agree with you that as it is written,
19 that's a strong statement. I would have to make sure
20 that I'm understanding it fully in context.
21  Q  Okay. But as we sit here today, you have
22 nothing to contradict that. Is that a fair
23 statement?
24  A  Nothing comes to mind from anything that
25 I've already looked at.

Page 156

1  Q  Okay. All right.
2     And next I'd like to direct your attention
3  to Vessel Defendants 960. It says, The Repair
4  Specification. Or part of it, I should say.
5  A  Oh. A different document.
6  Q  Yes, sir.
7  A  Okay. I'm in the document. Just bear with
8  me while I get to that page.
9  Q  Sure.
10    MR. GILSENAN: Off the record a minute.
11    - - -
12    (Off the record.)
13    - - -
14 BY MR. GILSENAN:
15 Q  Mr. Nielsen, are you there, at 960?
16 A  Yes, sir.
17 Q  Okay. Do you see the header? This is the
18 USNS Lummus General Requirements, Item Number 1,
19 Definition and General Requirements. That's what
20 this document is.
21 A  The copy that I have does not have a
22 heading on it. It starts with 1.0 Abstract on that
23 specific page.
24 Q  Okay. There was a -- I sent out --
25    MR. GILSENAN: Let's just go back off the

Page 157

1  record.
2     - - -
3     (Off the record.)
4     - - -
5     MR. GILSENAN: Okay. And we'll mark this
6  an exhibit as well, whatever number we would be
7  up to.
8     (USNS Lummus General Requirements,
9     Item No. 1 dated 3/8/18 marked Defendants'
10    Exhibit Number 4 for identification.)
11 BY MR. GILSENAN:
12 Q  Okay. Mr. Nielsen, 3.3 at Vessel
13 Defendants 960 --
14 A  Yes.
15 Q  -- it says, the contractor will provide all
16 labor and materials necessary to accomplish all items
17 in the work package. The contractor will rig, unrig,
18 connect and disconnect, stage, un-stage, and remove
19 and replace any interference as required to
20 accomplish each item of the work package.
21 A  Okay.
22 Q  Have you seen that before in your review of
23 documents?
24 A  I do not recall that specific word-for-word
25 but I did review this document early on.

Page 158

1  Q  Okay. You agree the contractor is Detyens
2  Shipyard?
3  A  Correct.
4  Q  And do you see that the contractor is
5  responsible for rigging?
6  A  Rig, unrig, connect. Yes.
7  Q  Okay. So it's clear on whose
8  responsibility to you the rigging of the davit arms
9  is?
10 A  The only hesitation I have with agreeing
11 fully with you is that it's specific to replace any
12 interference. And again, it's just a matter of
13 making sure that I understand -- make sure that
14 interference isn't defined somewhere else as
15 something that's outside of the scope of what you're
16 working on.
17    You know, the davit arms, I would refer to
18 them as -- I'm sorry.
19    The boats, I wouldn't consider them as
20 interference, they're part of the work item, but if
21 there was a structure in the way that needed to be
22 removed, I would consider that interference.
23    So yes, that's an important statement and I
24 need to make sure that I'm understanding what
25 interference means. If interference includes the

Page 159

1  items in the work pack, then it does state that the
2  contractor will provide as you read it.
3  Q  Well, I read interference as related to
4  removing and replacing that interference, but rigging
5  and unrigging is general and applies to everything
6  that requires rigging.
7  A  I believe -- I believe that is the way that
8  that is intended.
9     You know, again, since I -- I'm looking at
10 a document for the first time in several months. I
11 believe that your reading of that is correct, but I
12 would like to --
13 Q  Have you seen any --
14 A  -- be able to verify it.
15 Q  In your review of the documents, have you
16 seen any documents that state that the vessel owner
17 or operator is responsible for rigging in the
18 shipyard?
19 A  No.
20 Q  You've not.
21    So you'd agree that Detyens was responsible
22 for rigging the lifeboat davit arms.
23 A  Based on this section of the document that
24 we're looking at, yes.
25 Q  Okay. And how about based also on



Gerald Nielsen

Page 160
1  everything else that you've reviewed?  Have you seen
2  anything to tell you that Crowley or the United
3  States was responsible for rigging the davit arms?
4      A    And I'll apologize for the delay, I just --
5  you know, I would rather error on the side of being
6  deliberate and not --
7      Q    Take your time.
8      A    -- yeah -- not give an answer that I've got
9  and then walk back.
10          No.  I was looking at the -- no.  I agree
11 with your statement.  I do not have anything that
12 says that Crowley would be responsible for the
13 rigging, if that's specific to your question.
14     Q    Okay.  Thank you.
15          Let's turn to Vessel Defendants 967 in the
16 same exhibit.
17     A    Okay.
18     Q    Okay.  Section 5.3 says, the contractor and
19 all subcontractors, regardless of tier, must consult
20 the General Technical Requirements (GTR) to determine
21 applicability to this work item.  In performance of
22 this work, the contractor and all subcontractors,
23 regardless of tier, must comply with the requirements
24 of all applicable GTR's.
25          We discussed the GTR in Exhibit 2 about

Page 161
1  five minutes ago.
2      A    Correct.
3      Q    Do you recall?
4      A    Yes, sir.
5      Q    Okay.  And we've also examined that in
6  Section 3.6 of the GTR it says, the shipyard
7  determines how to do the work, correct?
8      A    Correct.
9      Q    All right.  So do you have any difficulty
10 accepting that part of the GTR is incorporated here
11 in Section 5.3?
12     A    It does point back to the GTR based on the
13 excerpts that we've just gone over.  It certainly
14 looks like the GTR ties that point together.
15          Again, I am just trying not to create,
16 alter, you know, change opinions based on new
17 documentation and reference back to things that I
18 have looked at without the opportunity to make sure
19 that I've got all of the information.  But I agree
20 with your statement, that this Section 5.3 ties back
21 to the GTR which I did not have until last Friday.
22     Q    Okay.  And -- very good.
23          So as we sit here today, you have nothing
24 to object to the provision that -- and the GTR -- the
25 shipyard determines how to do the work, and that the

Page 162
1  GTR is incorporated into this repair spec through
2  Section 5.3.
3      A    As of this moment I have nothing to object
4  to.  But the GTR does also have guidance on wording
5  ambiguities.  I will, out of -- you know, just doing
6  it the proper way, I will need to make sure that
7  there are no contradictions or there is not a clause
8  in there that says except when.
9      Q    Okay.
10     A    But, you know --
11     Q    Well, let's talk about ambiguities.
12          Can I refer you to --
13          MR. YOUNG:  Ryan, you've got to let him
14     finish.  I think he wasn't finished with his
15     answer.
16          MR. GILSENAN:  Oh.  Okay.
17 BY MR. GILSENAN:
18     Q    My apologies.
19     A    No, that's Okay.  I was wrapping up.  And
20 as we've already seen today, I sometimes take an
21 extra sentence to wrap up so my apologies.
22     Q    That's all right.
23          Would you turn to Vessel Defendants 1019
24 through 1024.
25          MR. GILSENAN:  We'll mark this as well.  I

Page 163
1  guess this will be 5.
2          (letter from Detyens Shipyards, Inc.
3      to Crowley Government Services dated
4      8/1/18 marked Defendants' Exhibit Number 5
5      for identification.)
6  BY MR. GILSENAN:
7      Q    This is a letter from Detyens Shipyards to
8  Crowley Government Services.
9      A    Okay.  I received that in the same document
10 with the Palfinger reports.
11     Q    Okay.
12     A    I'm sorry.  I'm looking at DSI 1019.
13 You're referring to which one?
14     Q    Vessel Defendants 1019.
15     A    I have Vessel Defendants up to 987.
16     Q    It would have come to you with the e-mail
17 that contained the previous document with the headers
18 on it.  I sent them both out on the same day.
19     A    So Document Number -- I'm sorry.  The
20 number again?
21     Q    1019.
22     A    Yeah.  I have got up to 1013.  I'm getting
23 there.
24          I'm not seeing it.
25     Q    Okay.  What's your e-mail address?



Gerald Nielsen

Page 164

1  A   Gerry@oceanridgemaritime.com.
2  Q   Okay. If you will give me a second, I will
3  send it to you.
4  A   I've got 988 through 1013 which was
5  provided on January 7th.
6  Q   Now, this would have been sent in early
7  March. Just give me a second and I'll send it to
8  you.
9  A   I've got 1014 to 1018, 1025 to 1027, 1239
10 to 1240. I'm hitting all around it. I am not seeing
11 it.
12 Q   All right. Just give me a second here.
13 I'm sending it to you.
14 A   Okay.
15     MR. YOUNG: Hey, Ryan, could you copy me on
16 that?
17     MR. GILSENAN: I did.
18     MR. YOUNG: What is it that you're sending?
19     MR. GILSENAN: This was Exhibit 15 to the
20 Crowley Government Services deposition. It's
21 the Detyens Exception and Qualifications letter.
22     MR. YOUNG: Okay. What's the date on it?
23     MR. GILSENAN: August 1, 2018.
24     It will be Exhibit 5 today.
25     MR. YOUNG: But we don't have the

Page 165

1  transcript from Crowley yet, do we?
2     MR. GILSENAN: Correct. I sent these
3  exhibits to the court reporter and copied
4  everybody like the day after that depo.
5     MR. YOUNG: Okay. I'm still waiting on
6  that transcript.
7     MR. GILSENAN: Me too.
8     THE WITNESS: I have the document in front
9  of me.
10 BY MR. GILSENAN:
11 Q   Okay. I'll give you a minute to read it.
12 A   Okay. Without reading every line item,
13 I've got a good idea of what I'm looking at.
14 Q   Okay. In your career, how many shipyard
15 specifications have you written?
16 A   Dozens.
17 Q   Okay.
18 A   I was going to say 100 but we will keep it
19 at dozens, 50.
20 Q   All right. And how about bid packages?
21 A   My experience has been with work items, not
22 the larger bid packages.
23 Q   Okay. So when you have written a spec,
24 you've written a spec for a particular task as part
25 of an overall shipyard availability?

Page 166

1  A   Typically, yes.
2  Q   Okay. I don't know if you're familiar with
3  the process that we see here where a bid package is
4  put out and then the bidding shipyard comes back with
5  a letter such as this, exceptions and qualifications
6  where they exclude certain issues or certain tasks
7  from the work altogether, and on other tasks they
8  request clarification from the customer.
9  A   Correct.
10 Q   Is that a standard process that you're
11 familiar with?
12 A   It may not be referred to as clarifications
13 and exceptions but, yeah, typically there's a back
14 and forth when there is more information required or,
15 you know, something that is under General Services,
16 not billed separately, yes.
17 Q   Okay. If you turn to the second page,
18 Vessel Defendant 1020.
19 A   Okay.
20 Q   Do you see at the top there it says
21 Clarifications and Exceptions?
22 A   Yes.
23 Q   Okay. And that's what the shipyard has
24 chosen to call this list of items that go on for
25 several pages. Do you agree?

Page 167

1  A   Yes.
2  Q   And I know you've just got this document
3  and, obviously, you haven't had a chance to take in
4  the whole thing, but would it surprise you that the
5  shipyard had no questions about Item 601, Lifeboat
6  Davit Repairs?
7  A   Well, I don't see anything for 601 so...
8  Q   I'll represent to you there's nothing in it
9  about Item 601.
10 A   Yeah. I will agree with you that I don't
11 see anything on 601 either.
12 Q   Okay. And the question is, would that
13 surprise you?
14 A   I don't know if I would use the word
15 surprise. It doesn't surprise me, it doesn't not
16 surprise me. It's something that they -- if they're
17 not asking for clarification, it's an indication that
18 they understand the task or that they don't know what
19 they don't know yet.
20 Q   Right. Well, let's go back to the previous
21 exhibit. This is the ship repair specification.
22 That was Exhibit 4. And let's look at 967, Vessel
23 Defendants 967.
24 A   Okay.
25 Q   It says Item Number -- among other verbiage


Exhibit E
www.EveryWordInc.com

Gerald Nielsen

Page 168
1 at the top of the page, Item Number 601, Lifeboat
2 Davit Repairs and Falls Renewal.
3     Do you see that?
4   A   Yes. I'm on 967.
5   Q   Okay. And then if you will, turn to 968,
6 up at the top of the page. In those first several
7 paragraphs, they talk about removing the lifeboats
8 within 24 hours of the vessel's arrival.
9   A   Correct.
10  Q   And then at 7.2, remove and dispose of the
11 lifeboat falls.
12  A   Correct.
13  Q   And now with the falls removed, the davit
14 arms are going to have to be restrained, correct?
15  A   Yes.
16  Q   Okay. So from this specification it's
17 clear to the shipyard that the davits are going to
18 have to be restrained. Do you agree with that, the
19 arms?
20  A   Restrained or removed.
21  Q   Sure. And as --
22  A   I'm sorry to interrupt but there's -- at
23 this point the other option is to leave them in the
24 outboard or deployed position, and that doesn't work
25 for getting the work done eventually, but I'm

Page 169
1 bringing that up because it may not be a requirement
2 at this point. At this point they are doing work on
3 the -- they are doing inspections, they are working
4 on the wench, the brakes. What I'm looking for is at
5 what point is the inspection done which then lays out
6 all of the work that needs to be done on the davit --
7 the davit arms themselves. And that's in 7.9,
8 inspect and provide a condition report of findings.
9   Q   Well, look up higher at 7.8.1, blast and
10 recoat the entire davit and wire trays per the
11 on-site guidance of the PPG rep.
12  A   Okay.
13  Q   So to do that, you couldn't leave the davit
14 arms deployed the entire time. They'd have to be
15 moved so you could access the entire davit at one
16 point or another.
17  A   Right. That section is specific to the
18 electric motors where it would be typical where they
19 would be removed and put in a shop. I don't believe
20 that that section pertains to the entire structure.
21      MR. HOOD: Could I get the page number real
22 quick?
23      MR. GILSENAN: Yeah. Vessel Defendants
24 969.
25      MR. HOOD: Thank you.

Page 170
1 BY MR. GILSENAN:
2   Q   So Section 7.8.1, Mr. Nielsen, it says
3 blast and recoat the entire davit.
4   A   No. It says blast -- 7.8.1., blast all
5 external painted surfaces, but this is under 7.8
6 which is specific to the electric motors.
7   Q   Go up two lines.
8   A   Okay. I'm sorry. I was looking at 7.8.1
9 when you said blast. I did not see that --
10      So 7.8, present davits for inspection,
11 blast and recoat the entire davit in wire trays for
12 the on-site guidance -- okay.
13      Correct. I see that.
14  Q   Okay. So you can't leave the davit arms in
15 one place for that, you have to have -- if you're
16 going to leave the davit arms on the davit, you're
17 going to have to move them at some point and latch
18 them somewhere so you can, at some point, access the
19 entire davit for blasting and coating.
20  A   Yes.
21  Q   Okay. So this original spec, and we could
22 probably go through it in even further detail, but at
23 least that part establishes that at some point the
24 davit arms, if not removed, are going to have to be
25 rigged.

Page 171
1   A   At some point they will need to be moved
2 and there would be options on how to do that. But
3 yes, they would have. You can't do all of that work
4 in one place.
5   Q   Sure. And they would have to be moved and
6 then secured in some fashion while a different part
7 of the davit is being blasted and coated.
8   A   Correct.
9   Q   Okay. And we've established, and you would
10 agree with me, that based on what you know today, the
11 shipyard is responsible for all rigging.
12  A   Based on the document we were looking at,
13 yes.
14  Q   Yes. That's at Vessel Defendants 960,
15 Section 3.3.
16  A   Yes.
17  Q   All right. So we go back to Exhibit 5,
18 Vessel Defendants 1019 through 1024, the exceptions
19 and qualifications. And I believe what you said was
20 if there's no question phrased about Item 601, then
21 Detyens either knew what to do or believed they did,
22 or they didn't know what they didn't know.
23  A   Correct. Because this document does not
24 preclude questions from coming up later.
25  Q   Sure. This document is dated August 1,



Page 172

1  2018, three months before the ship reached the
2  shipyard. So if there's no question about Item 601
3  and 601 contemplates moving and rigging the davit
4  arms in some respect, is it fair to say that Crowley
5  could rely that Detyens thought they knew what they
6  were doing with respect to rigging these davit arms?
7      A   With no questions in this document, yes, I
8  would agree with that.
9      Q   Okay. It's not up to Crowley, would you
10 agree, to write back to them and say, you know, among
11 the hundreds of items you're doing are you sure
12 you're clear on Item 601?
13     A   I would agree with that. I'm scanning --
14 still scanning the document a little bit. So this is
15 in response to the bid proposal, DSI 5021.
16         I'm assuming that that bid proposal had
17 Item 601 in it and that wasn't part of a separate set
18 of work items, this wasn't parsed out into several
19 packets.
20     Q   Correct.
21     A   Okay.
22     Q   You are correct.
23     A   Okay. Just making sure.
24     Q   Sure. And so you would agree that it's not
25 up to Crowley to write back to Detyens and say, are

Page 173

1  you sure you're clear on 601?
2      A   I agree with that. Yes.
3      Q   Okay. And with this exceptions and
4  clarifications process, you agree that if the
5  shipyard wanted to see a manual for a particular
6  piece of equipment they're working on, among the
7  thousands of manuals related to the ship they could
8  ask for such a manual.
9      A   Yes.
10     Q   Okay. And if they don't ask for such a
11 manual, is it fair to say that the shipyard either
12 already had one or believed that they didn't need it?
13     A   Yes.
14     Q   Okay. In your experience writing dozens of
15 shipyard specs over the years, did you typically
16 provide the manual automatically for every piece of
17 equipment that the shipyard was going to work on?
18     A   Automatically, no. There might be certain
19 circumstances where you provide excerpts or
20 references to based on experience when you want to be
21 sure that something is done in a particular way.
22     Q   Sure.
23     A   You know, you typically would not include a
24 manual, you would reference an important part or
25 section, if necessary.

Page 174

1      Q   Okay. And then, of course, if the shipyard
2  asked you for the manual, you would find it and get
3  it to them.
4      A   Yes.
5      Q   But if they don't ask, you don't just bring
6  your whole library of ships manuals to the project
7  manager's office in the yard.
8      A   No.
9      Q   Okay. Let's go to your report, please.
10     A   Okay.
11     Q   All right. At Page 12 --
12     A   Okay.
13     Q   -- about two-thirds down you write,
14 Palfinger is an international company that provides
15 lifesaving products and inspection services for
16 marine equipment such as lifeboat davits.
17     A   Correct.
18     Q   All right. And the next line, Palfinger
19 conducted an initial survey of all six lifeboats and
20 davits along with representatives from the American
21 Bureau of Shipping, the United States Coast Guard,
22 DSI -- that's the shipyard -- Quality Assurance, and
23 CGS, Crowley Government Services, on or around 4
24 January 2019.
25     A   Correct.

Page 175

1      Q   All right. Is it fair to say that of those
2  parties you've identified that Palfinger would be the
3  lifeboat davit specialist?
4      A   Yes.
5      Q   Okay. And would you expect Palfinger to
6  have greater specific knowledge of the lifeboat
7  davits than even the experienced, albeit generalist,
8  ABS surveyor and Coast Guard inspectors?
9      A   Yes.
10     Q   And the Crowley port engineer?
11     A   Yes, in general. I would expect that
12 Palfinger would be the most knowledgable about the
13 equipment there.
14     Q   Right. And you and I have similar
15 backgrounds and I recall working on say a fuel oil
16 purifier. When the Alfa Laval guy comes, we as
17 licensed engineers in the engine room kind of step
18 back and let him do his work and maybe teach us
19 something.
20     A   Correct.
21     Q   Okay. And is it fair to say that as
22 engineers on ships and port engineers or former
23 engineers on ships, they are responsible for
24 everything from the steering gear to the anchor
25 windlass, to fuel injectors on the main engine to

Page 176
1 lifeboats, generally responsible for all mechanical
2 equipment?
3     A    Correct.
4     Q    But they are not a specialist in one
5 particular equipment which is why we have an OEM
6 representative, correct?
7     A    Correct.
8     Q    All right.  And it would be fair to rely
9 upon the expertise of an OEM representative unless
10 for some reason he gives us an indication of
11 incompetence.
12     A    There's two things there.  One is there is
13 certain equipment such as life saving equipment and
14 fire equipment which regulations require that a
15 third-party inspection be done.  There's other
16 equipment such as your example of the Alfa Laval
17 purifier where it's expensive and heavy and you may
18 not be an expert in something that's spinning at
19 12,000 RPM and you don't want to put it together
20 wrong so you bring on the OEM for specific expertise.
21          In the case of lifesaving appliances and
22 fire equipment, the OEM is brought on to meet the
23 regulatory requirements that there be third-party
24 verification also, not necessarily with the
25 inspection but with the testing and everything else

Page 177
1 that would be ongoing for it to be recertified.
2     Q    Sure.  Understood.  But it's also in this
3 case the Palfinger representative, perhaps plural,
4 issued a 59-page report with detailed notes of the
5 exact work to be done on these davits.  Agree?
6     A    Yes.
7     Q    Okay.  And you would agree that that's a
8 bit more rigorous and intensive than a third-party
9 observation of a static and dynamic test of the
10 lifeboat when the work's done?
11     A    Yes.  Much more detail.
12     Q    Sure.  So they were heavily engaged in this
13 project, correct?
14     A    Yes.
15     Q    Okay.  And when you have an OEM
16 representative present with that level of engagement,
17 is it fair to say that the generalist port engineer,
18 the generalist ABS surveyor, experienced as they may
19 be, have a right to rely on that OEM expertise when
20 they have that level of engagement?
21     A    They should rely upon the OEM expertise.
22 However -- and we discussed this at great length
23 earlier today -- not knowing what the involvement of
24 ABS, US Coast Guard, was at the time, if they had
25 noted a hazard or risk, it is -- based on their

Page 178
1 training, knowledge, experience, it is incumbent upon
2 them to bring it forward regardless of whether or not
3 the OEM has noted it or mentioned it or sees it at
4 all.
5     Q    Fair to say that anybody onboard who sees
6 an unmitigated danger should raise the flag?
7     A    Yes.
8     Q    Okay.  Agreed.
9          Now, here we have a case where nobody
10 perceived it, and you testified for Mr. Hood that the
11 wire rope, for example, did not fail because it was
12 overloaded.
13     A    That's correct.
14     Q    Okay.  It did not fail because the Crosby
15 clips were applied in a certain way or in another
16 way.
17     A    Correct.
18     Q    Okay.  It did not fail because of the turn
19 of the wire rope around the 90-degree edge, correct?
20     A    That is the location where the electric
21 current passed through it and it did fail there.
22     Q    That's the location of where it fell.
23     A    But the expert report points to the
24 electrical current as the cause of failure.
25     Q    Right.  And so when you have -- and the

Page 179
1 other 11 davit arms did not -- whose wire ropes were
2 not subjected to electrical current, did not fail.
3 Do you agree with that?
4     A    I agree that it was the only one that
5 failed.
6     Q    The one that was subjected to an electrical
7 event.
8     A    Correct.
9     Q    Now, when all of these parties that you
10 name on Page 12 were present for the inspection, and
11 when they would have seen how these davit arms were
12 rigged for five months successfully before the one
13 arm failed because of the electrical current, would
14 they have been in a position to observe an electrical
15 current that could cause one of these wire ropes to
16 melt?
17     A    No.
18     Q    Okay.  All right.
19          I would like to go to your first opinion at
20 Page 17.
21          Are you there?
22     A    I am.
23     Q    Okay.  Crowley's contract specifications
24 did not adequately detail proper methods for securing
25 lifeboat davit arms on the USNS Jack Lummus and



Page 180

1 Detyens Shipyard did not utilize safer customary
2 securing methods to secure lifeboat davit arms for
3 shipyard service.  So I'm just going to focus on the
4 Crowley part because Jamie Hood covered the shipyard
5 already.
6     A   Correct.
7     Q   So in view of the general technical
8 requirement provision that the shipyard determines
9 how to do the work and in view of the work
10 specification, Exhibit 4, that says the contractor is
11 responsible for all of the rigging and unrigging, and
12 in view of Detyens' opportunity to present questions
13 or seek clarification in the letter of August 1,
14 2018, Exhibit 5, how was Crowley's contract
15 specification deficient?  And if it was, why did the
16 shipyard not ask any questions or clarification?
17     A   Two parts to that question.  The first one
18 is in a very -- I'm going to try very hard not to
19 provide a supplemental report by thinking with my
20 mouth open, which I just want to avoid doing that,
21 that's not going to serve any of us -- so in light
22 of -- in light of the GTR --
23         So the two parts, Ryan, to your question --
24 and again, with the statement that I'm trying not to
25 create a supplemental report by thinking with my

Page 181

1 mouth open -- the GTR is a new document to me this
2 past Friday, which I've not gone through in
3 sufficient detail.  The other document which was just
4 provided, I do not believe I have seen that before.
5 Based on the information in there, I believe that it
6 would be prudent for me to go back and look at this
7 opinion to see if, in fact, there is support for me
8 saying that Crowley was not in compliance with their
9 requirements.
10         As a statement of fact, which I don't --
11 this opinion is not intended just to be a statement
12 of fact, as that a statement of fact -- there is no
13 detail in the specifications that tells the shipyard
14 how to do that, but what I have to reconcile now is
15 this new information and say, well, is there enough
16 information in there for me to be satisfied with an
17 opinion that, well, they met all of their
18 requirements and there was no requirement, there was
19 no good business practice, there was no need to go
20 any further.
21         So this is -- speaking honestly here, this
22 is new territory for me, being presented with
23 information during a deposition that makes me
24 possibly rethink an opinion, so I don't want to go
25 further with it and, you know, rewrite it while

Page 182

1 talking.
2     Q   I understand.  Thank you for that.
3         And I guess that, you know, we're here
4 today and I have to ask you about what we have so
5 I'll put it in a hypothetical sense and if you find
6 something different afterwards, fine.
7         If the GTR, hypothetically, is clear that
8 the shipyard determines how to do the work, and if
9 the contract document, the specification at Vessel
10 Defendants 960, says the shipyard is responsible for
11 handling rigging, and then, in Exhibit 5, the
12 shipyard gets to ask questions or seek clarification
13 on how to do something but they don't ask about this
14 item, is it fair to say that the contract
15 specification provided by Crowley, as far as Crowley
16 could reasonably know, is adequate?
17     A   As a hypothetical, realizing that there is
18 a little bit more documentation to look into now, I
19 would agree with that hypothetical.  If there was a
20 specification put forward that meets the requirements
21 of the specification as per the agreed upon
22 documentation and there are no questions, I think
23 it's a reasonable statement that there were no
24 questions and, therefore, it was understood.
25     Q   Of the shipyard had to do the work.

Page 183

1     A   Correct.
2     Q   Okay.
3         Opinion 2, I believe, is directed not at
4 Crowley at all.  Would you confirm that?
5     A   I agree with that because any type of
6 oversight inspection work area is covered outside of
7 Opinion 2.
8     Q   Okay.  Let's look at Opinion 3.  That's at
9 Page 24 of your report.
10     A   Yes.
11     Q   Oversight and inspection of work areas on
12 the USNS First Lieutenant Jack Lummus by Crowley
13 Government Services, Inc. and Hightrak Staffing,
14 Inc., leading up to the 3 April 2019 were inadequate
15 and not in compliance with contractual requirements
16 or industry standards.
17         So let's just start with the contractual
18 requirements with respect to Crowley.  I think the
19 testimony you just finished under that hypothetical
20 is that if these documents I've presented to you are
21 accurate, that the shipyard determines how to do the
22 work under the GTR, the shipyard is responsible for
23 rigging and unrigging, at Vessel Defendants 960,
24 Exhibit 4, and the shipyard at Exhibit 5 had an
25 opportunity to ask questions and clarifications and


Exhibit E

Page 184

1  did not do so, then at least with respect to
2  contractual requirements, Crowley has met its
3  obligations.
4      MR. YOUNG: Object to the form of that
5      question, Ryan.
6      THE WITNESS: Again, I'm going to not agree
7      with the way you're wrapping that up because
8      Opinion 1 was very specific to the contract
9      specifications, whereas Opinion 3 is more to the
10     oversight and inspection of work areas. This is
11     not writing specifications and preparing for
12     shipyard, this is while the vessel is in the
13     shipyard with work ongoing, and that's why the
14     bullet points that I have there specific to
15     Crowley is during execution, during the shipyard
16     periods, monitoring repairs, managing the dry
17     dock, and supervision of work being performed at
18     DSI. I've tried to separate the two items so
19     that this one does just focus on work underway.
20 BY MR. GILSENAN:
21  Q   Okay. If you -- I think distilling your
22  report to a sentence, it's that the davit arms should
23  have had two mechanisms of restraint, correct?
24  A   That would be the first part of the
25  sentence because it's -- the davit arm should have

Page 185

1  had a secondary means of retention or had been
2  removed, and if left as is, there were multiple
3  opportunities for the hazard to have been identified
4  and rectified.
5   Q   Okay. And the hazard in question was a
6  stray electrical current. Was the mechanism a
7  failure?
8   A   The hazard was the stored energy, the davit
9  being secured in an area where gravity could work on
10 it if you lost your retention, so the hazard was the
11 stored energy. The risk was that something could
12 happen to release that stored energy. That risk
13 manifested itself in the way of a stray current.
14  Q   Okay. And with respect to that, the risk
15 of the stray current, we don't know where it came
16 from but most probably it was from ungrounded welding
17 at some point prior to this incident.
18  A   That's my understanding, yes.
19  Q   Okay. And you also agree that these davit
20 arms on this ship, all 12 of them, had been
21 successfully restrained for five months.
22  A   From sometime in November to sometime in
23 April. So yes, approximately five months. Correct.
24  Q   Okay. And that this method of constraint
25 would have been visible to the Detyens safety

Page 186

1  department, correct?
2   A   Correct.
3   Q   All right. It would have been visible to
4  an ABS surveyor who happened to look at it?
5   A   If they were closely reviewing or
6  inspecting that equipment. And I don't want to make
7  a blanket statement that an ABS or a Coast Guard or
8  somebody else should have inspected it if they were
9  just either in the area or passing by or in the event
10 of that initial inspection. I have no indication as
11 to how close they were. So I will agree with your
12 statement that if that was their task, to go and
13 review this for safety, they should have noticed it.
14  Q   And even if they were just on deck in way
15 of the lifeboat davits, if they had looked up at the
16 davit arms and seen -- after all, it is called a
17 gravity davit -- what is causing the suspension of
18 the arm, they would have seen the wire rope holding
19 it in place. Fair to say?
20  A   They should have, yes.
21  Q   Sure. And the same goes for any Coast
22 Guard inspector who happened to look up at what was
23 holding the davit arm so high.
24  A   Should have. If they were either there
25 looking for safety issues or if they happened to look

Page 187

1  up. And I can't say that I understand the view from
2  the walkway well enough to know how that would stand
3  out to somebody transiting the area.
4   Q   Okay. And also to the shipyard workers
5  themselves who were working on the davits, they could
6  have, had they looked, seen the wire restraint.
7   A   Yes, they could have. And probably would
8  have been in a better position to see it. But, as
9  discussed earlier, quite often when you get into the
10 lower level trades, their awareness of, okay, is
11 there anything else holding that up, I don't know.
12     You can see a wire rope. I'm not -- I
13 can't take that and say, okay, he would then
14 understand the hazard.
15  Q   Okay. But it would be visible to one who
16 looked there, whether he appreciated the hazard or
17 not.
18  A   Yes.
19  Q   And, of course, the Detyens rigging shop
20 led by a rigging superintendent, would have seen how
21 the davit arms were rigged because they rigged them.
22  A   Correct.
23  Q   All right. And the Palfinger
24 representative who attended the vessel would have
25 seen how the davit arms -- it's his equipment -- were


Exhibit E

Page 188

1 restrained.
2    A  Based on the detail in the report, he would
3 have looked at every area of the davits and davit
4 arms, so yes, it should have been -- it should have
5 been apparent.
6    Q  Okay.  And it's your view that with all of
7 these people and professionals and either an OEM
8 specialist viewing the method of restraint without
9 objection for five months, that Crowley somehow
10 should have taken charge of the rigging and
11 intervened and objected to the method of restraint.
12   A  What I am saying is that amongst all of the
13 people and the groups and the parties that you just
14 mentioned as having the ability or the responsibility
15 to be looking at this equipment, there is also the
16 Crowley crew onboard, especially the deck department,
17 that would be responsible for lifesaving equipment
18 and was tasked with -- I'm sorry.  I'm looking at the
19 report while talking -- they had responsibility for
20 inspecting and accepting different jobs, the lifeboat
21 davits being one of them.
22       So there's -- in the contract there's the
23 requirement for them to inspect and accept but there
24 is also -- my maritime experience that tells me that
25 when you are in a shipyard and you're a crew and you

Page 189

1 were on the vessel, you don't not look at critical
2 equipment that's being worked on.  You're doing it
3 during your rounds.  You should be doing it as part
4 of your daily operation, your oversight of the work
5 being done, you know, to use -- to go specific,
6 supervision of the work being performed, monitoring
7 repairs and alterations.
8       You know, some of it is specific to the
9 port engineer but some of it is more general to the
10 crew.  So in your entire list of persons and parties
11 that should have an eye on this, the Crowley crew is
12 definitely on that list, and as owners of that
13 equipment, as operators of that equipment, there's --
14 there should be special interest paid to it by
15 persons such as the chief mate who's responsible for
16 lifesaving equipment, the operation of lifesaving
17 equipment onboard.
18    Q  Well, you would agree that this lifesaving
19 equipment was out of service and out of commission
20 for many months.  They were not going to rely on the
21 point of a lifeboat that wasn't there to get away
22 from the ship during this period.
23    A  Correct.  Absolutely.
24    Q  Okay.  It would be a different matter if
25 the ship is underway and in trade under a COI having

Page 190

1 to do with fire and boat drills.
2    A  It would be a different matter and it would
3 be much more critical to see what's going on if this
4 was being worked on offshore and being taken out
5 of -- potentially taken out of service for a period
6 of time.  This is in the yard, it's not being used as
7 part of the evacuation.
8       But going back to the responsibilities,
9 manage, shipyard repair, subcontract, execution,
10 sufficient personnel to monitor repairs and
11 alterations, supervision of the work being performed
12 at DSI, my experience is that the ship owner or
13 operator would not take the third engineer or a
14 motorman and say, I need you keeping an eye on the
15 lifeboat repairs.  That would fall under the owner of
16 the equipment that -- the person who's responsible
17 for it in operation, most likely the chief mate.
18    Q  Okay.  So if there is a duty to warn of a
19 hazard, that duty arises when the person who would
20 worn is aware of that, correct?
21    A  That's my understanding, yes.
22    Q  Okay.  You can't warn about something
23 you're not aware of.  Agreed?
24    A  You cannot warn about something you're not
25 aware of.

Page 191

1       My point is that there were ample
2 opportunities to inspect, review, look at, and, you
3 know, some of it is outside of the discussion about
4 the people when you get into the JSA's -- I realize
5 I'm getting back to the shipyard with that
6 statement -- but the opinion is there were mechanisms
7 there and there were persons there that had the
8 opportunity to see that there was only a single means
9 of retention.  At least some of them should have
10 understood that it was rigged not in accordance with
11 the manufacturer's or OSHA regulations, and that
12 there was a hazard --
13    Q  If I could stop you for a minute, I think
14 you testified before that there was no OSHA violation
15 from the manner in which this was rigged.
16       MR. YOUNG:  Object to the form of that
17    question.
18       THE WITNESS:  There was no OSHA standard
19    for the secondary retention.  There is an OSHA
20    standard regarding the use of wire rope and
21    slings and there is the manufacturer's
22    documentation on how to properly use the clips
23    and there is documented rigging standards which
24    also go back to national standards regarding how
25    to use it.  So my statement was there was no



Page 192
1  secondary retention standard; however, the
2  actual clipping, rigging, wrapping of it was not
3  proper.
4  BY MR. GILSENAN:
5  Q   But be that as it may, that was not the
6  mechanism of failure, correct?
7  A   The mechanism of failure was the electric
8  charge going through the wire.
9  Q   Okay.  So I just want to break this down.
10     There was no OSHA violation for having a
11  single point restraint.  Agreed?
12  A   Correct.
13  Q   Okay.  And the manner in which the Crosby
14  clamps were fastened to the wire was not a cause of
15  failure.  Correct?
16  A   Correct.
17  Q   The lack of chafing gear around the
18  90-degree turn that the wire was bent was not a
19  mechanism of failure.  Agreed?
20  A   Yes.
21  Q   So we cannot point to any OSHA violation
22  that was a mechanism of failure.  Agreed?
23  A   I'm looking back at my Opinion Number 2 and
24  I've got to go into the OSHA standard to get the
25  exact wording, where the wire rope is installed

Page 193
1  around a sharp corner bend without protection from
2  electrical currents or damage.
3     But that's -- bear with me one second,
4  please, just so I don't miss...
5  Q   Sure.
6  A   Yeah.  If the sling's in padding it just
7  refers to sharp edges or corners.
8     So yes, the wrapping of the wire since
9  there was the electrical current as per the
10  investigation and report, it was not the sharp turn
11  that caused the failure of the wire.
12  Q   Right.  So if the absence of chafing gear
13  was an OSHA violation, that, however, was not the
14  mechanism of failure.  Agreed?
15  A   Agreed.
16  Q   Okay.  And if the installation of the
17  Crosby clamps in the manner in which they were
18  installed was improper, that also was not the
19  mechanism of failure.  Agreed?
20  A   Correct.
21  Q   Okay.  And using the single wire rope
22  restraint was also not an OSHA violation.
23  A   It's a -- and I'm clear in the report, I do
24  not state that that was an OSHA violation but it is
25  normal, customary, standard when looking at a job,

Page 194
1  especially if you're going through a JSA, especially
2  in the last 10 years talking about drops and stored
3  energy and line of fire, not having secondary
4  retention on something that is suspended above
5  workers is bad business practice at this point in
6  time, where 20 years ago it may have been okay.
7  Q   Okay.  Well, you talk about the industry
8  standard and the custom and all of it.  Do you have
9  any reason to disagree that Detyens has been
10  restraining gravity davit arms in this manner for
11  20-something years?
12  A   That's what the testimony shows, that
13  they've been doing it that way since the 1990's.
14  Q   Okay.  And so that would be the custom and
15  practice in the marine industry at Detyens Shipyard,
16  correct?
17  A   At Detyens Shipyard, yes.
18  Q   Okay.  And so I guess I just -- I can't
19  make it out.  If we have an established custom and
20  practice that has worked well for over two decades
21  and it's not an OSHA violation, and it's been
22  suspending these arms on this vessel for five months,
23  and you have rigging specialists at the shipyard who
24  sign off on this procedure, how is Crowley supposed
25  to know that there's a stray electrical current

Page 195
1  somewhere that could part this thing and intervene?
2  A   The electrical current, as far as I know,
3  there was nothing that would be visible to anybody
4  doing a visual inspection of that.  My opinions have
5  been geared towards the lack of secondary retention
6  or removing the arms to do the work as that would
7  have -- it's doable, it's easier, and it would be
8  safer.
9  Q   Okay.  Would you agree that the mechanism
10  of restraining these davit arms was open and obvious
11  to anyone who cared to look at it?
12  A   I would say that the fact that it was held
13  in place by a wire and clips, somebody could look at
14  that, and, if asked how is that held in place, well,
15  there's a wire and clips, I will not say that the
16  hazard and the risk associated with that mechanical
17  way of holding it is open and obvious to somebody who
18  is not familiar with the fact that that's -- that it
19  is held up there against gravity, that there isn't a
20  secondary retention, that the clips, even though it
21  was not the clips that caused it to part -- that the
22  clips and the binding of three wires and the number
23  of clips were all improper, but yes, if you ask
24  somebody with minimal or no training how is that held
25  up, they would say a wire and clips.


Exhibit E

Gerald Nielsen

Page 196

1  Q   Right.  The presence of a wire and clips
2  was open and obvious as the restraining mechanism.
3  A   Yes.  But the hazard of that arm in the
4  raised position, unless you understand that there
5  isn't secondary retention and you understand that
6  absent that wire this is designed to ride down this
7  track, the risk would not be open and obvious to
8  somebody just transiting through the area.
9  Q   Okay.  And it would have been certainly
10 open and obvious to the shipyard management that
11 there was a single wire holding the davit arms back
12 and not a secondary method of restraint.
13 A   I do not know if that is the case or not
14 because, as we discussed earlier, in the first part
15 of the deposition, the senior safety manager out in
16 the yard had not visited the vessel.  So we know that
17 the lower level contract personnel were doing their
18 walk-arounds but I do not know that the shipyard
19 management is aware of it, as you asked.
20 Q   Okay.  Well, this area of work fell under
21 the hull shop superintendent and he was responsible
22 for this work item.  Do you agree with that?
23 A   Yes.
24 Q   Okay.  Do you believe the hull shop
25 superintendent would have been familiar to know that

Page 197

1  these davit arms were restrained with a single
2  mechanism?
3  A   That would be an assumption that he knew.
4  I would like to think that he occasionally visited
5  the ship and was aware of what was done but I do not
6  know that for a fact.
7  Q   Okay.  It's safe to say the hull shop
8  superintendent probably would have visited the damage
9  since work was going on from time to time?
10 A   I don't know that for a fact.  I would
11 expect that he would.  I do not know that, though.
12 Q   Okay.  And the rigging shop superintendent,
13 he would have known that there was a single mechanism
14 restraining the davit arms, correct?
15 A   Based on the fact that they had been doing
16 it that way, apparently, for more than 20 years, I
17 would expect that he would.
18 Q   And he was in charge of this job.
19 A   As far as I am aware, yes, he was.  But I
20 don't know that he was there to inspect it at any
21 time.
22 Q   Okay.
23 A   The person or persons that did the rigging,
24 obviously, knew.
25 Q   Sure.  So the hull shop superintendent or

Page 198

1  his lieutenants and the rigging shop superintendent
2  and -- or his lieutenants, it would've been open and
3  obvious to them that there was a single means of
4  restraining these davit arms, correct?
5  A   That was the way -- as discussed earlier,
6  that was the way they intentionally put it, that
7  that's the means that they used to secure the davit
8  arm in the stowed position, so yes, they knew about
9  it.
10 Q   That it was open and obvious to them
11 because they were responsible for the work.
12 A   They were responsible for it and they
13 designed it that way and they did it that way, so
14 yes.
15 Q   Okay.  On Page 25 you mentioned that CGS
16 personnel did not attend daily shipyard safety
17 meetings and their interaction with DSI personnel was
18 not regular or formalized but happened by chance
19 only.
20     It's about three-quarters down the page.
21 A   Yeah.  I'm sorry.  I'm going back to the
22 report.
23     Correct.
24 Q   Okay.  Now, whether CGS is there or not, if
25 the safety meetings held by the shipyard did not

Page 199

1  address this hazard, what difference would it have
2  made?
3  A   The daily shipyard safety meetings, having
4  been in many of them in many shipyards, are an
5  opportunity for all parties to bring forward
6  comments, concerns, change management issues.  Had
7  Crowley or any of the other parties been attending
8  the meetings and looking critically at this workspace
9  through the eyes of a JSA, or just general safety,
10 there should have -- there weren't many opportunities
11 for any of these parties to see something, to say
12 something, and bring it up and start the discussion.
13     If none of them ever noticed it and never
14 brought it up -- now, that's one thing, we can't make
15 them bring it up -- but not attending the daily
16 shipyard meetings is not usual from my experience,
17 and I think it's an indication that the Crowley crew
18 was not engaged with the repairs going on even though
19 the contract calls for them to manage execution,
20 monitor repairs and alterations, manage shipyard dry
21 docks, supervision of the work being performed.  Part
22 of that is being engaged in meetings and discussions.
23 Q   Well, is it your view that a safety
24 meeting -- if this danger had even occurred to
25 someone from Crowley, is the safety meeting their


Exhibit E   www.EveryWordInc.com

Page 200

1  only place where they can voice it?
2     A   No.  It should have been brought up -- if
3  noted, it should have been brought up without waiting
4  for a daily safety meeting or a weekly -- in this
5  case, the daily is the ones that I called out.
6     Q   So then is it fair to say that attendance
7  at the safety meeting doesn't make a difference if
8  they could have brought it up at any time?
9     A   I think it's a missed opportunity to hear
10 what others are saying, because we've got no record
11 as to whether or not anybody else did bring it up
12 during any of the meetings.  I have not seen
13 documentation of the topics or the questions
14 discussed.  My point is, you know, at a higher level,
15 the contract says to inspect, verify, oversee, and
16 I'm not seeing indications of Crowley being engaged
17 with the repair work going on.
18        And that opinion is formed based on several
19 different pieces of evidence that I've looked at.
20 The depositions of the safety group where they said
21 they rarely see or would often not see the Crowley
22 folks onboard...
23     Q   Well, just to be clear, you do agree that
24 if Crowley had perceived this danger, and I don't
25 know that they did but had they perceived it, they

Page 201

1  could have voiced it anytime, anywhere.
2     A   It would have been appropriate for them to
3  voice it immediately.  Yes.
4     Q   Okay.  And they don't have to wait or
5  attend a safety meeting to do so.
6     A   No.
7     Q   And the fact is the shipyard was holding
8  these safety meetings and did not make any changes as
9  to how the davit arms were rigged.
10    A   That is correct.
11    Q   Okay.  Your next line regards the Crowley
12 Safety Management System.  Are you aware that
13 Crowley's SMS is dormant while the ship is in dry
14 dock and the shipyard's SMS controls at that point?
15    A   I have not seen a bridging document that
16 goes into the detail of whose system is in place
17 during the shipyard period.
18    Q   I'm just wondering on what you based this,
19 that Crowley should have had their own SMS in place
20 at this time, if you haven't seen the documents.
21    A   The entire -- that entire section of the
22 opinion talks about Crowley having an SMS, the
23 requirements within that SMS, safe practices,
24 compliance with rules, assessing identifying risks,
25 includes instructions and procedures to ensure safe

Page 202

1  operation, and then that along with the industry
2  practice of monitoring work being done by third
3  parties, and the specific contract requirements that
4  Crowley personnel inspect, oversee, review,
5  whatever -- not whatever, while we're -- it is my
6  opinion that they were not engaged with the
7  inspections going on.
8        If it was not their SMS, if it was the
9  shipyard SMS, well, the requirements remain pretty
10 much the same.  The specific wording may be a little
11 bit different in how they enforce it, but assessing
12 identified risks including inspections and procedures
13 to ensure safe operation, Crowley's responsibilities
14 to ensure that they're aware of what's going on
15 around them does not go away with that bridging
16 document.  The bridging document just helps to define
17 whose specific forms we use.  So they use the
18 shipyard JSA form instead of the Crowley JSA form.
19 It doesn't replace the higher level requirements that
20 I list there.
21    Q   Okay.  But you have no reason to dispute
22 that the Crowley SMS was dormant and the shipyard was
23 prevailing while the vessel was in dry dock.
24    A   I'm sure that based on that statement, that
25 that's what the bridging document would reflect, so

Page 203

1  no, I have no reason to dispute that.
2     Q   Okay.  And do you have any evidence that
3  the Crowley personnel were not attending interval
4  inspections of completed work?
5     A   I cannot say that they were absent from the
6  interim inspections or the final inspections.  What I
7  can say is, based on the deposition testimony that
8  I've read, is that they were not engaged, they were
9  not commonly seen, quite often not seen, by the
10 Detyens safety staff when they were doing their
11 rounds.
12    Q   You mean the cursory freelance rounds that
13 you described earlier?
14    A   The freelance rounds that I described
15 earlier.
16    Q   By the shipyard safety personnel.
17    A   Correct.
18    Q   And the ship's 900 feet long so if the
19 safety officer is onboard for 20 or 30 minutes and
20 walks around,it's very possible he would never see
21 the port engineer because the port engineer might be
22 on the flipsil or he might be in the engine room and
23 the safety guy could be at the opposite end of the
24 ship, correct?
25    A   That's correct.

Gerald Nielsen

Page 204

1  Q  All right. And so it doesn't sound
2  altogether conclusive that because these guys in
3  their sporadic and brief visits to the ship don't
4  happen to see a port engineer. That doesn't mean
5  he's not there and he's not engaged. Fair?
6  A  Fair. I'm just, again, not trying to delay
7  an answer, just checking wording in the report.
8     Yes, I would agree with that statement.
9  Q  Okay. You've not talked to the port
10 engineer, have you?
11 A  No, sir.
12 Q  And, in fact, the only transcripts you've
13 reviewed so far are the safety officers from the
14 shipyard and, perhaps, the project manager, Dallas
15 Verble.
16 A  The depositions that I was provided to
17 review were shipyard personnel, I believe,
18 exclusively.
19 Q  Okay. Because you have a lot of language
20 in here that Crowley was not engaged, they were not
21 inspecting the work, they were -- but it doesn't
22 sound like you have anything to base that on.
23    MR. YOUNG: I'm going to object to the form
24    of that, Ryan.
25    THE WITNESS: The documentation that I was

Page 205

1    provided, the deposition testimony, the JSA --
2    and, again, I have one JSA to go by which is not
3    a good sampling for audit purposes.
4       Particularly or quite often, you know, the
5    JSA's are attended by other personnel, shipyard
6    owner, vendor. The JSA that I looked at and
7    the description of the use of the JSA's was
8    that that was not used as an opportunity for
9    more parties to be involved. The only
10   documents that I did receive and review that
11   mentioned Crowley personnel being engaged in an
12   inspection was for the initial review of the
13   lifeboat -- lifeboats and davits that was done
14   by the larger group in early January.
15 BY MR. GILSENAN:
16 Q  Okay. So you've reviewed transcripts of
17 safety officers who made sporadic and brief visits to
18 the vessel, some of whom said they didn't always see
19 the port engineer, and that is the foundation on
20 which you rest your premise that the Crowley
21 personnel were not engaged, not performing
22 inspections, not supervising any work.
23    MR. YOUNG: Object to the form.
24    THE WITNESS: The opinion is not directed
25    solely at the Crowley port engineer. The

Page 206

1    contractual requirements that there be
2    sufficient crew onboard to monitor, to inspect,
3    it's more -- the opinion is more than the port
4    engineer. It is the Crowley crew that is
5    onboard and living onboard the vessel for the
6    purpose of being able to review, monitor,
7    manage -- the different words that are used --
8    the execution, the overhaul of the work being
9    performed. I have no indication in the
10   documentation that I reviewed that there was
11   engagement in the individual tasks.
12 BY MR. GILSENAN:
13 Q  Do you have any evidence that they were not
14 engaged?
15 A  The documentation that we have just
16 discussed, the depositions.
17 Q  Of the safety officers.
18 A  Correct.
19 Q  And you admit their attendance onboard was
20 brief and sporadic.
21 A  Correct.
22 Q  And you're relying on that for the
23 assertion that Crowley did not discharge its
24 contractual obligations to properly crew the vessel
25 and for the crew to perform their duties?

Page 207

1  A  The entire report goes to the fact that
2  there was a hazardous condition that was allowed to
3  exist for months.
4     And I agree with your statement that the
5  part of the hazard that was visible, the fact that it
6  was a single wire, the fact that it was wired or
7  rigged incorrectly, that was not the electric current
8  that caused the wire to part, but there was something
9  there that a trained eye, a chief mate, I would
10 assume the port engineer, the rigging department, the
11 safety people, should have identified, noted it, even
12 if it was on the generic JSA that was then used where
13 they could've said yes, we have stored energy, but
14 it's -- we have a wire on it, it's okay, there's at
15 least acknowledgment of it, then. I've got no
16 documentation, no testimony from either side saying
17 that there were detailed inspections, proper
18 inspections, being done by the people who should know
19 that this is a hazard, it's single retention and it's
20 done wrong.
21 Q  Okay. I want to focus on this narrow
22 question, that there's quite a broad side at Crowley
23 and its port engineer and its crew that the vessel
24 was not properly crewed and the crew were not
25 discharging their duties with reasonable diligence.


Exhibit E

Page 208

1  And you base that -- I just want to make sure I'm
2  clear -- on the deposition testimony of witnesses who
3  you agree made brief and sporadic visits to the
4  vessel.
5      MR. YOUNG: Object to the form of that
6      question, Ryan.
7  BY MR. GILSENAN:
8      Q   Do I have that right?
9      A   The -- in that statement you made a
10 statement that I am saying that it was not properly
11 crewed. I have not made that statement so I want to
12 make sure that --
13     Q   Okay. Let's take that off the table.
14     A   I just want to make sure that's out there.
15     Q   Okay. Good. We're now even further.
16     A   It --
17     Q   If I may, you testified in your report that
18 the crew and the port engineer were inattentive to
19 the work being done, to inspections, supervision of
20 work, and so forth, and if you're basing it on
21 anything else than the testimony of the safety
22 officers who made brief and sporadic freelance visits
23 to the vessel, I would just like to know what you're
24 basing this on.
25     A   Okay. I am basing it on that information

Page 209

1  and the lack of information on -- now, I don't have
2  all of the interrogatories and the RFP's memorized in
3  my mind, but I am confident that in there there are
4  questions about inspections, review, oversight.
5      I have nothing to nullify the information
6  on one side that is indicating that we're not seeing
7  the Crowley people when we go onboard, albeit for the
8  brief walk-about. I've not seen anything -- I've not
9  seen or been presented anything showing that there
10 was inspection, review, oversight, management
11 monitoring, sign-offs, supervision, I've got no
12 indication of that; so I need to push back on your
13 statement because it's partially what I have been
14 able to read and partially the fact that I've not --
15 even though it was requested, I have not received
16 anything to counter it.
17     Q   So it sounds to me when presented with the
18 transcripts of safety officers who were not onboard
19 all day, who are not even onboard everyday, all of
20 them, they go one at a time, you extrapolated that if
21 this safety officer was onboard on this day and
22 didn't see somebody, therefore, the Crowley crew and
23 port engineer are not paying attention to the work
24 going on.
25     A   I don't think that's characterizing it

Page 210

1  properly because, as we've already talked about, the
2  vessel was there, the davit arms were suspended for a
3  period of five months. There is ample opportunity
4  there for the shipyard personnel and the ship
5  operator, the crew onboard that, again, is
6  specifically contractually there to do everything
7  that I've already repeated to the present, manage,
8  monitor, execute, supervise all of that, I've got no
9  indication that they were engaged. I do have an
10 indication that they're not attending daily safety
11 meetings which, to me, is not normal and customary.
12 Those safety meetings are not supposed to be done
13 in -- that's the opportunity for the sharing of
14 knowledge and the transfer of information.
15     Q   I think I'll just leave it with it appears
16 that you really don't have any evidence that they
17 were being inattentive to the work being done.
18     MR. YOUNG: And I'll just state an
19     objection to that unless that was some negative
20     question.
21 BY MR. GILSENAN:
22     Q   Well, if you find some evidence that they
23 were being inattentive other than these deposition
24 transcripts, please let me know and maybe it will be
25 in the supplemental.

Page 211

1      Do you know why the plaintiff has not sued
2  Palfinger?
3      A   I do not have any information about why he
4  has or even if he has. I do not know.
5      Q   Okay. Do you agree that Palfinger should
6  have appreciated the danger of the davit arm rolling
7  down the track if the restraint came undone?
8      A   Yes.
9      Q   Okay. Do you think that they had a duty to
10 warn of that?
11     A   If any person was aware of a direct hazard
12 or imminent danger, they should be warning -- they
13 should be passing the word up the line. They should
14 get that information to the appropriate person. I
15 don't know if the Palfinger person commented on it at
16 all or completely ignored it. There's no -- I've got
17 no indication either way whether he noticed it or
18 didn't notice it.
19     Q   Well, you, to characterize generally,
20 asserted that the Crowley crew was complacent for not
21 pointing out a danger that had been suspended for
22 five months.
23     A   Uh-huh.
24     Q   I'm just asking you, do you think Palfinger
25 should have pointed it out?

Page 212

1  A   If they were aware of it, they should have.
2  I do not know if they did or not and I don't know how
3  often they were on after the initial inspection.  I
4  do not know if during that initial inspection they
5  were moving the davit arms up and down to ensure that
6  they could inspect all sides and areas.  So there
7  were unknowns there.
8       But I do agree with you that that -- to the
9  Palfinger inspector who was climbing all over them,
10 if it was up by the single wire...
11 Q   You muted out there at the last sentence.
12     If it was held up by a single wire, and
13 then you went mute.
14 A   Can you hear me now?
15 Q   Now I've got you back.
16     You said if it was held up by a single
17 wire, and then it cut out.
18 A   Yeah.  I just got a little screen thing
19 across my computer that said the internet connection
20 is unstable so -- can you still hear me?
21 Q   Yes.
22 A   Okay.  If it was noticed and if it was
23 being -- if the Palfinger person knew that it was
24 being left there and that was the intended means,
25 then yes, that is a hazard that should have been

Page 213

1  identified, should have been noted.  Having said
2  that, I don't know if the arms were up or down or
3  being moved around when he was there.
4  Q   Well, I will represent to you the arms had
5  been up since November.
6  A   Okay.  And then the Palfinger inspector,
7  with the report that he did, with the thoroughness of
8  that, it would be hard to imagine or state that he
9  didn't notice that it was a single retention
10 situation held by a wire.
11 Q   So he should have warned.
12 A   He should have.  I don't know if he did or
13 not.  I've got no indication that he did.
14 Q   Okay.  Do you have any indication whether
15 the chief mate did or not?
16 A   I do not.
17 Q   Okay.  And you've testified before, earlier
18 today, that you agree that Palfinger is the
19 specialist on this piece of equipment.
20 A   Of the personnel that were there during the
21 inspection, Palfinger was brought in as the OEM, as
22 the body that is best suited to do the inspection and
23 write a report.  Yes.
24 Q   Okay.  And certainly Palfinger would be
25 more experienced with a major dismantling and

Page 214

1  overhaul of the davit than a ship's crew who tends to
2  deal with them when they're in operation underway.
3  A   That's correct.
4  Q   Okay.  So it sounds to me like of anyone in
5  the position to know the dangers of this suspended
6  load in an overhaul situation, it would be the
7  rigging department at Detyens and Palfinger.  Do you
8  agree?
9       MR. YOUNG:  Object to the form of that
10      question, Ryan.
11      THE WITNESS:  Both of those parties should
12      have the knowledge, the training, the expertise,
13      to identify that hazard.  Other parties involved
14      in the oversight, inspection, supervision, the
15      other terms that we have been using, would also
16      be in a position to -- should be in a position
17      to identify a hazard like that, especially if
18      the documentation and systems had been used in
19      the manner in which they're intended.
20 BY MR. GILSENAN:
21 Q   Sure.  And my question was not who all
22 possible should be able to identify it but who would
23 be in the best position to know.  Now, is it fair to
24 say it would be the rigging department and Palfinger
25 in this overhaul situation of the davits?

Page 215

1  A   I would agree to that.  And I've got to go
2  by your statement, that the arrangement was the same
3  when Palfinger was there as when the incident
4  occurred and I have pictures of it.
5       MR. GILSENAN:  Okay.  All right.
6       Could we take a break?
7       - - -
8       (Recess in the proceedings.)
9       - - -
10      MR. GILSENAN:  I don't have any further
11      questions, Mr. Nielsen.  Thank you.
12      THE WITNESS:  Thank you, sir.
13      - - -
14      EXAMINATION
15      - - -
16 BY MR. HOOD:
17 Q   Mr. Nielsen, I want to -- so we were
18 talking about the scope of what Palfinger was doing
19 and I'm going to share my screen.  I think you
20 probably have this document.  It's Bates stamped
21 DSI 836.  And you should see it there.
22 A   Yes.
23 Q   Okay.  It has an estimated start date of
24 December 10, 2018 after which -- by that point in
25 time, the davits had been removed and they have a