**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY**

| | |
|---|---|
| Tiffany N. Provence, as the Personal Representative for the Estate of Juan Antonio Villalobos Hernandez, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| United States of America, *et al.*, | ) ) |
| Defendants. | ) ) ) |

C/A. No. 2:21-965-RMG

**ORDER AND OPINION**

Before the Court is the United States of America (the "Government")'s motion for summary judgment. (Dkt. No. 62).[1]  For the reasons set forth below, the Court grants the Government's motion.

### I.    Background

The USNS *1st Lieutenant Jack Lummus* (the "Vessel" or the "*Lummus*") is a public vessel of the United States. (Dkt. No. 1 ¶ 5). Pursuant to a government contract awarded on July 15, 2015 by the Military Sealift Command ("MSC"), a division of the Navy, the *Lummus* and five other public vessels are operated by Crowley Government Services, Inc. ("Crowley"). (Dkt. No. 80 at 5-6).

Around September 5, 2018, Crowley contracted with Detyens Shipyards, Inc. ("Detyens") for repairs to the Vessel. (Dkt. No. 62-6) (the "Repair Contract").  The Repair Contract requires

---

[1] While Crowley Maritime Corporation and Crowley Government Services, Inc. joined this motion, by prior order the Court granted both parties summary judgment. (Dkt. No. 80).

Detyens to, *inter alia*, "perform maintenance, repairs and renew the lifeboat falls serving the vessel's six (6) lifeboats." (Dkt. No. 62-7 at 13).[2]  The Repair Contract requires "Contractor [Detyens] [to] comply with the shipboard TAG OUT PROCEDURE" and recommends that "Contractor go with the ship's representative who will be hanging tags as often as possible to expedite the process". (Dkt. No. 73-2 at 1); *see also* (Dkt. No. 71-11 at 6) (Crowley "Vessel Safety Management System Manual" requiring "Contractor personnel [to] comply with" Crowley's "Lock-Out/Tag-Out" procedure). *Contra* (Dkt. No. 71-22 at 3) (Detyens "Workplace Safety and Health Manual" stating the "release and/or isolation of ships systems stored energy shall be the responsibility of the vessel's crew or Port Engineer").

The Lock-Out/Tag-Out procedure identifies "potential sources of hazardous energy." (Dkt. No. 71-11 at 6-7) ("All potential hazardous energy sources shall be isolated from the equipment or system that will be serviced.").  After a potential source of energy is "locked out," it is "tagged out," meaning tags are placed with messages such as "Danger—Do Not Operate" at "[e]ach point of isolation." (*Id.* at 7).    The Lock-Out/Tag-Out procedure defines "electrical" sources as "Energized circuits, electrical shock, and unexpected activation of equipment" and "mechanical" sources as "moving machinery components such as gears, levers, shafts, flywheels, fan blades, springs, elevators, etc." (Dkt. No. 71-11 at 6). The procedure states that "two-level isolation may be possible in some instances and shall be used when possible (i.e., electrical supply may be interrupted at the mains switchboard and at the motor controller, piping systems may contain multiple valves, etc."). (*Id.*).

---

[2] Each lifeboat on the *Lummus* is retained by a davit. Each davit has two steel arms from which lifeboats are suspended using wire rope calls "falls." (Dkt. No. 62 at 5); (Dkt. No. 71 at 5).

On December 7, 2018, an entry from the Vessel's log indicates Crowley "assist[ed] [Detyens] with services, safety tag outs and identification of work items." (Dkt. No 71-10 at 3). The log provides no further detail on any of these items.

Per Plaintiff Tiffany N. Provence, personal representative of the Estate of Juan Antonio Villalobos Hernandez ("Decedent"), "[s]hortly after the *Lummus* arrived at Detyens Shipyards on November 15, 2018, [Detyens] removed the lifeboats and stays from the davits" but left the davit arms. (Dkt. No. 71). Detyens rigged the davits "in the upright position using a temporary wire rope and clamps," (*Id.*), called Crosby clamps, (Dkt. No 62 at 7). "[S]everal months" later, on April 3, 2019, the wire rope holding the davit arm in place failed, releasing the davit arm down the trackway killing Decedent. (Dkt. No. 71 at 8, 20). Investigations revealed that an electrical arc from an unknown source caused the wire to fail. (*Id.* at 8). Weeks after Decedent was crushed, on April 26, 2019, Crowley locked-out/tagged-out the Vessel's lifeboats' motors. (Dkt. No. 71-23 at 2) (noting "method of isolation" as "electrical"). Plaintiff's principal argument is that the Government was negligent because Crowley, its agent, did not require that Detyens use a stopper bar as a secondary restraint on the davit arm. (Dkt. No. 71 at 8-9).

Plaintiff brings this action as the Personal Representative of Decedent. Plaintiff brings three causes of action against the Government: (1) Vessel Negligence under 33 U.S.C. § 905(b); (2) Wrongful Death S.C. Code § 15-51-10; and (3) Survival S.C. Code § 15-5-90. By prior order, the Court ruled that Plaintiff's exclusive remedy was against the Government for vessel negligence. (Dkt. No. 80 at 9).

On July 29, 2022, the Government moved for summary judgment. (Dkt. Nos. 62, 73). Plaintiff opposes. (Dkt. No. 71).

The Government's motion is fully briefed and ripe for disposition.

## II.    Legal Standard

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.    Analysis

Plaintiff brings her claim against the Government pursuant to the Longshore and Harbor Workers' Compensation Act (the "Act"), 33 U.S C. §§ 901–950. Under section 5(b) of the Act, "a shipowner is liable for an injury to a covered person only where the injury is caused by the ship's negligence." *Bonds v. Mortensen & Lange,* 717 F.2d 123, 126 (4th Cir.1983); *see also* 33 U.S.C. § 905(b). Section 905(b) provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall

not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred....

33 U.S.C. § 905(b). The term "'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).

"While Congress created a cause of action against the shipowner in negligence in § 905(b), it left to the courts the task of defining the duties the shipowner owed to the longshoreman." *Lincoln v. Reksten Mgmt.,* 354 F.3d 262, 266 (4th Cir. 2003) (citing *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 165–66 (1981)). In *Scindia*, the Supreme Court outlined the three general duties shipowners owe to longshoremen:

The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel. The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 98 (1994) (internal quotation marks and citations omitted) (construing *Scindia*, 451 U.S. at 167–68); *see also Lincoln,* 354 F.3d at 266.

The Court first analyzes the parties' arguments as to the turnover duty. The turnover duty requires the vessel owner to "exercis[e] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and [to warn] the stevedore of any hazards on the ship or with respect to its equipment

that are known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Scindia*, 451 U.S. at 157. "[T]he turnover duty involves the state of the ship and its equipment upon the commencement of stevedoring operations." *Price v. Atl. Ro-Ro Carriers*, 45 F. Supp. 3d 494, 506 (D. Md. 2014) (citing *Howlett*, 512 U.S. at 98).

Plaintiff argues that the Government—and Crowley, while acting as its agent—violated the turnover duty. (Dkt. No. 71 at 6-21). Plaintiff argues that the Government "promised" to remedy a "dangerous condition" but did not. (*Id.* at 11). Plaintiff argues that the "promise" was Crowley's contract with MSC to implement the Lock-Out/Tag-Out procedure and that Crowley should have thus required Detyens use a stopper bar as a secondary restraint. (Dkt. No. 71 at 13) (arguing that the "safety management system" ("SMS") requires Crowley to implement the Lock-Out/Tag-Out procedure); (Dkt. No. 71-11) (copy of Crowley Lock-Out/Tag-Out Procedure from SMS).[3] Plaintiff argues that a pre-accident, December 7, 2018 report, shows Crowley

---

[3] The SMS is required by Coast Guard regulations implementing the International Safety Management ("ISM") Code. See 33 C.F.R. Part 96 ("Safety Management System means a structured and document system enabling Company and vessel personnel to effectively implement the responsible person's safety and environmental protection policies") and 46 U.S.C. §§ 3201-3205. (Dkt. No. 73 at 10). Numerous courts have held that the SMS requirements imposed by the ISM Code do not affect a vessel operator's negligence liability. *See, e.g., Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 797 (11th Cir. 2015) ("We agree with these district courts that Plaintiff cannot rely on the Code to support his negligence claim against Maersk. Plaintiff points to no authority that recognizes the Code as modifying the duties set out in the Act and recognized in *Scindia*. Congress has directed that compliance with the Code is to be achieved through regulations that are 'consistent' with it, and it has provided penalties for non-compliance. Further, attributing to the ship owner a duty to supervise cargo loading and unloading would run directly contrary to the Supreme Court's interpretation of the Act: namely, that a duty to supervise the stevedore would 'saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate[.]'"); *Calderon v. Offen*, No. 07-61022, 2009 U.S. Dist. LEXIS 97565, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009) ("Congress merely desired to participate with other maritime nations in achieving safety goals [of the ISM Code], but did not intend to change long-

implementing the Lock-Out/Tag-Out procedure during repairs to the Vessel. (Dkt. No. 71-10)

(Crowley report stating it was assisting with "safety tag outs and identification of work items").

Plaintiff also cites a post-accident Crowley Lock-Out/Tag-Out Permit dated April 26, 2019 related

to electrical isolation of the motors on the Vessel's lifeboats as evidence of Crowley's involvement

with Lock-Out/Tag-Out procedures. *See* (Dkt. No. 71-23).

The Court grants the Government's motion as to the turnover duty. Plaintiff admits that

Decedent was killed "several months" after the *Lummus* entered the dry dock at Detyens for

repairs. (Dkt. No 71 at 20). Plaintiff also admits that it was Detyens which "removed the lifeboats

and stays from the davits" and "rigged [the davits] in their upright positions using" Crosby clamps.

(*Id.* at 6). Even reading all facts in a light most favorable to Plaintiff, the accident that led to

Decedent's death was not brought about by the Vessel's "equipment upon the commencement of

stevedoring operations," *Price*, 45 F. Supp. 3d at 506 (citing *Howlett*, 512 U.S. at 98), but by the

work the Government contracted with Detyens to provide, *see Deyerle v. United States*, 149 F.3d

314 (4th Cir. 1998) ("To hold a shipowner liable to repair men for injuries resulting from the very

equipment they have been hired to repair would, in many cases, effectively render the shipowner

an insurer of all repair operations, a result that Congress clearly did not intend by its 1972

Amendments to the [Act], which were designed to eliminate the essentially strict liability regime

of 'seaworthiness' and to establish a negligence regime."). The facts here do not involve a latent

danger implicated by the turnover duty. *See Scindia*, 451 U.S. at 157; *Howlett*, 512 U.S. at 99-100,

105 ("[T]he vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a

---

established rules of law which govern liability and its allocation in general maritime law.");
*Johnson v. Horizon Lines*, LLC, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) (ISM regulations were
"cast in general terms which restate principles already well established by American case law" and
thus should not be construed as additional duties).

narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the

stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the

competent performance of its work. Furthermore, the duty encompasses only those hazards that

'are known to the vessel or should be known to it in the exercise of reasonable care.' Contrary to

Howlett's submission, however, the exercise of reasonable care does not require the shipowner to

supervise the ongoing operations of the loading stevedore (or other stevedores who handle the

cargo before its arrival in port) or to inspect the completed stow."). Accordingly, the

Government's motion is granted on this point.

The Court now addresses the parties' arguments regarding the "active control" duty.

Under the active control duty, a vessel owner is liable if it either "actively involves
itself in the cargo operations and negligently injures a longshoreman" or "fails to
exercise due care to avoid exposing longshoremen to harm from hazards that they
may encounter in areas, or from equipment, under the active control of the vessel
during the stevedoring operation."

*Price v. Mos Shipping Co.*, 740 F. App'x 781, 783 (4th Cir. 2018). The active control duty "applies

to those areas under the vessel's active control, even if the stevedore shares control with the vessel

or if at some earlier time the area was under the stevedore's exclusive control." *Dickerson v. M/V*

*PROLIV VILKITSKOGO*, No. C.A.2:04-23258-PMD, 2007 WL 1499753, at *3 (D.S.C. Jan. 5,

2007) (citing *Davis v. Portline Transportes Mar. Internacional,* 16 F.3d 532, 537 (3d Cir.1994)).

To trigger this duty, "the vessel must have substantially controlled or been in charge of (i) the area

in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific

activities the stevedore undertook." *Davis*, 16 F.3d at 540.

In *Davis,* the Third Circuit listed four elements of a prima facie case for breach of this duty:

(1) that the vessel appreciated, should have appreciated, or with the exercise of
reasonable care would have appreciated, the condition; (2) that the vessel knew, or
should have known, that the condition posed an unreasonable risk of harm to a
longshore worker; (3) that a longshore worker foreseeably might fail to (i) either

discover the condition or apprehend the gravity and probability of harm, or (ii) protect himself or herself against the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition.

*Id.* at 541; *Dickerson*, 2007 WL 1499753, at *3-5 & n.5 (applying *Davis*).

Plaintiff argues that the Government exercised "active control" over davit repairs because Crowley was "involve[d] in implementing the [Lock-Out/Tag-Out] Procedure." (Dkt. No. 71 at 21-22).  As evidence of this involvement, Plaintiff cites two documents.  The first is the December 7, 2018 Crowley log entry which states Crowley was "assisting [with] safety tag outs and identification of work items." (Dkt. No. 71-10 at 3).  The second is an excerpt from the deposition of Crowley's 30(b)(6) representative. (Dkt. No. 71-12 at 70:5-6) ("Crowley's management system applied lock out/tag out and Crowley executed that.").  The deposition testimony reads as follows:

A: [I]tem was 601, caused Detyens to work on the davit, engine part on the davit. And they executed that using their, you know, their expertise on that. It was not Crowley's management system applied there. Crowley's management system applied lock out/tag out and Crowley executed that.

(Dkt. No. 71-12 at 70:1-6).

In *Dickerson*, this court applied the Third Circuit's decision in *Davis*, found that a question of material fact existed as to the active control duty, and denied the vessel's motion for summary judgment. 2007 WL 1499753, at *5 & n.5.  In *Dickerson*, at the request of the vessel's officers, cargo was loaded in a hatch directly blocking a ladder welded to the ship's bulkhead which ordinarily allowed longshoreman to exit the hatch.  To allow the longshoremen to exit the hatch, the vessel put up a portable ladder. *Id.* at *1. The plaintiff longshoreman fell from the portable ladder while exiting the hatch.  The court denied the vessel's motion for summary judgment and found a question of material fact existed as to the active control duty. The court found the vessel

directed how to load the cargo and that the way it was loaded prevented plaintiff from using the ladder welded to the vessel. *Id.* at *5. Further, the plaintiff put forward evidence that "it was the Vessel's responsibility to secure and maintain the portable ladder" and that "the Vessel's crew member set up the portable ladder." *Id.* at *5. The court found the plaintiff had made a prima facie showing under *Davis* because, *inter alia*, the vessel's crew should have "appreciated the danger of using a ladder with no rubber feet in a refrigerated cargo hold." *Id.* at n.5.

The Court grants the Government summary judgment on the active control duty. Reading all facts in a light most favorable to Plaintiff, one could find that the Government exercised some level of control over the lifeboat davits. (Dkt. No. 71-12 at 70:5-6) ("Crowley's management system applied lock out/tag out and Crowley executed that."). Nevertheless, Plaintiff has put forth no evidence from which a reasonable factfinder could infer that the "vessel knew, or should have known" that using only Crosby clamps to secure the davits "posed an unreasonable risk of harm to a longshore worker." *See id.* at *3, 5 n.5. In her motion, Plaintiff argues stopper bars, a form of secondary restrain, "could have been used" while repairing the davits. (Dkt. No. 71 at 8-9, 14-15). Plaintiff fails to cite, however, any evidence showing the Government or Crowley knew or should have known the use of Crosby clamps without a stopper bar posed an unreasonable risk of harm.[4] The Government, on the other hand, cites undisputed testimony that Detyens used Crosby clamps to secure davit arms "for years" without incident. (Dkt. No. 62 at 8-11) (citing declaration of David

---

[4] In her opposition, Plaintiff claims that the Government had "internally discussed concerns about the safety practices at Detyens Shipyards prior to the incident and even expressed these concerns to [Detyens] on multiple occasions." (Dkt. No. 71 at 20). Plaintiff cites (Dkt. No. 71-26 at 2-3) to support this proposition. The exhibit is an April 8, 2019 email from MSC to OSHA stating MSC would provide "OSHA with access to documents and data that reflect the safety concerns MSC has presented to [Detyens] on a number of occasions." Plaintiff, however, provides no further information about any of these "safety concerns," much less that they implicated the Vessel's lifeboat davits.

Hagner, master of the Vessel, stating that the davits had been serviced during each of Capt. Hagner's four prior visits to the shipyard using only Crosby clamps without incident). Accordingly, the Government's motion is granted on this point.

Last, the Court examines the parties' arguments as to the final *Scindia* duty, the duty to intervene. With respect to the duty to intervene, "absent contract provision, positive law, or custom to the contrary," a vessel owner generally "owes no duty to the longshoremen to inspect or supervise the cargo operations," *Scindia*, 451 U.S. at 172, and may rely on the judgement of the stevedore to avoid exposing longshore workers to unreasonable risks of harm, *id.* at 172, 175. However, the vessel owner cannot reasonably assume that the stevedore will remedy a problem, and thus incurs a duty "to intervene and stop unloading operations," when the vessel owner knows that "the stevedore's judgment in carrying out his tasks is 'obviously improvident'" under the circumstances. *Bonds v. Mortensen & Lange*, 717 F.2d 123, 127 (4th Cir. 1983) (quoting *Scindia*, 451 U.S. at 175-76). The vessel owner violates the duty to intervene if he "fails to intervene in the stevedore's operations when he has *actual knowledge*" that both: (1) a hazardous condition exists; and (2) "the stevedore, in the exercise of *obviously improvident judgment* means to work on in the face of it and therefore cannot be relied on to remedy it." *Manson Gulf, LLC v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017) (emphasis added and internal quotation marks omitted). "If the shipowner may reasonably believe, despite its own knowledge of the danger, that the stevedore will act to avoid the dangerous conditions, the owner cannot be said to have been negligent," as "the decision whether a condition imposes an unreasonable risk of harm to longshoremen is a matter of judgment committed to the stevedore in the first instance." *Hodges v. Evisea Mar. Co., S.A.*, 801 F.2d 678, 687 (4th Cir. 1986) (internal quotation marks omitted).

Plaintiff argues that the Government breached the duty to intervene by "allowing [Detyens] to perform repairs without implementing a secondary restraint [the stopper bar] on the davit arms." (Dkt. No. 71 at 22). Plaintiff argues "actual knowledge" that "an errant electrical current might weaken" the wire ropes is not required, but rather only that Decedent's injury be "reasonably foreseeable." (*Id.*). Plaintiff cites *Woodruff v. United States*, 710 F.2d 128 (4th Cir. 1983) in support of this argument.

In *Woodruff*, the Fourth Circuit found, as a matter of law, that the Navy violated the duty to intervene. The plaintiff was a longshoreman employed by a stevedore to apply non-skid coating to the deck of a ship. When elevator platforms used for helicopters were lowered, safety netting would automatically rise to create a barrier around the hole left by the depressed elevator. 710 F.2d at 129.  When the elevator rose, the safety nets would retract, but leave a four-foot wide "void" in the netting along the side of the ship. However, "a set of four manually-placed stanchions c[ould] be set in holes drilled into the deck approximately six inches away from the ship's edge" to fill the "void." *Id.* On the morning plaintiff fell, the manual barrier was not in place.  On appeal, the Fourth Circuit reversed and held that, as a matter of law, the Navy violated the duty to intervene when it did not require the stevedore to put up the manual netting. *Id.* at 130-31. The court noted the Navy knew the manual netting was not being used, "obviously knew that there was a hazard in the area because" the Navy designed the manual netting and, while the decision to not place the manual netting was the stevedore's, it was "obviously imprudent" "as a matter of law" to expose "the longshoreman to the risk of a sheer drop some fifty feet onto the dock below or into water" by "foregoing the available safety device without any offsetting precautions." *Id.*

The Court grants the Government summary judgment on the final *Scindia* duty. As noted above, Plaintiff has put forth no evidence the Government or Crowley knew of any danger related

to only using Crosby clamps to secure the lifeboat davits during repairs. The facts here are far different from *Woodruff*. In *Woodruff*, the Navy specifically designed safety equipment which it knew was not being used by the stevedore despite the "unreasonable risk of harm" and the "reasonably foreseeable consequence of exposure to the open and obvious hazard." *Id.* at 130-31. Here, the Government has put forth undisputed testimony that Detyens had used Crosby clamps for years without incident and that no Crowley employee "knew" that failure to use a stopper bar "presented an unreasonable risk of harm to the longshoremen." *Id.* at 130 (citing *Scindia*, 451 U.S. at 175-76); (Dkt. No. 62 at 10-11) (citing declaration of David Hagner, master of the Vessel, stating that the davits had been serviced during each of Capt. Hagner's four prior visits to the shipyard using only Crosby clamps without incident). Put differently, unlike in *Woodruff*, neither the Government nor Crowley designed a piece of safety equipment which either entity knew the stevedore unreasonably declined to utilize. Accordingly, the Court grants the Government summary judgment on this final point.[5]

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** the Government's motion for summary judgment (Dkt. No. 62).

**AND IT IS SO ORDERED.**

---

[5] In her opposition, Plaintiff also argues that the Government was negligent in "failing to provide adequate repair specifications" to Detyens. (Dkt. No. 71 at 24) (arguing the Government and Crowley did not draft their requested repairs with sufficient detail about how "davit arms should be rigged"). Plaintiff cites no case law explaining, however, how such an alleged failure on the Government or Crowley's part implicates a duty under *Scindia*. Accordingly, the Court rejects the argument. *See Deyerle v. United States*, 149 F.3d 314 (4th Cir. 1998) ("To hold a shipowner liable to repair men for injuries resulting from the very equipment they have been hired to repair would, in many cases, effectively render the shipowner an insurer of all repair operations, a result that Congress clearly did not intend by its 1972 Amendments to the [Act], which were designed to eliminate the essentially strict liability regime of 'seaworthiness' and to establish a negligence regime.")

<u>s/ Richard Mark Gergel</u>
Richard Mark Gergel
United States District Judge

March 14, 2023
Charleston, South Carolina