IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | |
|---|---|
| **TIFFANY N. PROVENCE, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez,**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES OF AMERICA, CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., DETYENS SHIPYARDS, INC., and HIGHTRAK STAFFING, INC. d/b/a HITRAK STAFFING, INC.**<br><br>**Defendants.** | CASE NO. 2:21-cv-965-RMG<br><br><br>**PLAINTIFF'S MOTION TO RECONSIDER ORDER GRANTING CROWLEY MARITIME CORPORATION, CROWLEY GOVERNMENT SERVICES, INC., AND THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGEMENT** |

Plaintiff Tiffany N. Provence, as the Personal Representative of the Estate of Juan Antonio Villalobos Hernandez ("Plaintiff," or when referring specifically to Mr. Hernandez, "Decedent"), by and through her undersigned counsel, hereby moves pursuant to Federal Rule of Civil Procedure 59(e), for reconsideration of the Court's Order and Opinion (Dkt. No. 85, Order), granting the Motion for Summary Judgment (Dkt. No. 62, Mot. for Summary Judgment) filed by Defendants Crowley Maritime Corporation ("CMC"), Crowley Government Services, Inc.("CGS"), and The United States of America (the "Government," together with CMC and CGS, the "Vessel Defendants").

1

## I.  INTRODUCTION

On March 14, 2023, this Court entered its Order granting the Government's Motion for Summary Judgment.[1]  The Court's Order turns on the crucial finding that Plaintiff presented "no evidence from which a reasonable factfinder could infer that the "vessel knew, or should have known" that using only Crosby clamps to secure the davits "posed an unreasonable risk of harm to a longshore worker." (Order at 10 (quoting Dickerson v. M/V PROLIV VILKITSKOGO, No. C.A.2:04-cv-23258-PMD, 2007 WL 1499753, at *3, 5 n. 5 (D.S.C. Jan. 5, 2007).)  In reaching this finding, the Court did not recognize CGS's Lock-Out/Tag-Out Procedure as evidence informing the standard of care.  The Court also did not address the testimony of Plaintiff's expert, Gerald Nielsen, on this point.  Taken in the light most favorable to Plaintiff, such evidence, whether considered independently or together, creates a genuine issue of material fact as to whether CGS—acting as agent of the Government—knew or should have known that the violation of its Lock-Out/Tag-Out Procedure created an unreasonable risk of harm to Decedent.

Plaintiff respectfully requests that the Court reconsider its Order in light of this evidence and deny the Government's Motion for Summary Judgment.

## II.  LEGAL STANDARDS FOR RECONSIDERATION

Reconsideration is adjudicated under the standards of Federal Rules of Civil Procedure 59(e) and 60(b), with any of the following three grounds serving as a proper basis to reconsider a prior order: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998).  In the context of a

---

[1] Plaintiffs refer singularly to the Government, recognizing that CMC and CGS would not be affected by reconsideration of this Order, pursuant to the Court's January 5, 2023, Order and Opinion granting summary judgment on separate grounds.  (Dkt. No. 80.)

motion for reconsideration, "manifest injustice" is defined as "an error by the court that is 'direct, obvious, and observable.'" <u>Register v. Cameron & Barkley Co.</u>, 481 F. Supp. 2d 479, 480 n.1 (D.S.C. 2007).

### III.  ARGUMENT

To prevent manifest injustice and correct a clear error of law, Plaintiff requests that this Court reconsider its Order granting the Government's Motion for Summary Judgment.  The Court's conclusion that Plaintiff has failed to present evidence "from which a reasonable factfinder could infer that the 'vessel knew, or should have known' that using only Crosby clamps to secure the davits 'posed an unreasonable risk of harm to a longshore worker,'" (Order at 10 (quoting <u>Dickerson</u>, 2007 WL 1499753, at *3, 5 n. 5), erroneously disregards evidence which was offered in opposition to the Governments Motion for Summary Judgment.

As recognized by this Court, the active control duty requires a shipowner to "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" <u>Howlett v. Birkdale Shipping Co., S.A.</u>, 512 U.S. 92, 98 (1994).  "To trigger this duty, 'the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook.'" <u>Dickerson</u>, 2007 WL 1499753, at *3 (quoting <u>Davis v. Portline Transportes Mar. Internacional</u>, 16 F.3d 532, 540 (3d Cir. 1994)).  As the Court recognizes, there is a genuine issue of material fact as to the Government's control over the lifeboat davits based on its application and execution of the Lock Out/Tag Out Procedure.  (Order at 10 (citing Dkt. No. 71-12 at 70:5-6) ("Crowley's management system applied lock out/tag out and Crowley executed that.")).  The issue for summary judgement is not whether the active control duty was triggered, but whether that duty was breached.  See <u>Davis</u>, 16 F.3d 532, 540–41 (outlining circumstances that "trigger the active operations duty," and separately outlining elements

3

required to demonstrate "breach of the active operations duty"). This is the context in which Plaintiff must present evidence that the Government "knew, or should have known, that the condition posed an unreasonable risk of harm." Id. at 541.

The Order notes that Plaintiff cited internal discussions revealing that the Government had concerns about the safety practices generally at Detyens Shipyards, (Dkt. No. 71-26), but indicates that because these general concerns did not address the lifeboat davits specifically, this evidence is too vague to preclude summary judgment. (Order at 10 n. 4.) Plaintiff maintains that the Government's concerns are at least relevant on the issue, but does not challenge the Court's conclusion that, standing alone, this evidence would not present a genuine issue of material fact. However, this was not the only evidence that the Government or its agent recognized, or should have recognized, the unreasonable risk presented by the wire-rope method of restraint—i.e., the failure to require a secondary method of restraint pursuant to the Lock-Out/Tag-Out Procedure. Plaintiff's primary argument was that the Lock-Out/Tag-Out Procedure itself demonstrates that the Government should have recognized this risk. (Dkt. No. 71 at 19.) Plaintiff also presented expert testimony that the failure to utilize a secondary method of restraint to address "drops[,] stored energy and line of fire" is a "bad business practice at this point in time." (Id. at 17 (citing Dkt. No. 71-9 at 193:24-194:6).) The Order did not address such evidence in evaluating Plaintiff's "prima facie case for breach of [the active control] duty."[2] (Order at 8.)

### A. The Lock-Out/Tag-Out Procedure provides evidence that the Government knew, or should have known, that the failure to implement a secondary restraint presented an unreasonable risk of harm.

Sections III.B.ii and III.B.iii. of Plaintiff's Response in Opposition to Summary Judgment discuss the Government's failure to exercise ordinary care and the unreasonably unsafe condition created

---

[2] Plaintiff recognizes that the Court discussed the Lock-Out/Tag-Out Procedure at length in other sections of its Order. However, with the exception of footnote 3, discussed infra, those sections do not appear to address how such evidence relates to the Government's knowledge of the unreasonable risk of harm at issue here.

4

as a result of that failure. (Dkt. No. 71 at 14-21.) In those Sections, Plaintiff highlighted the provisions of the Lock-Out/Tag-Out Procedure which arguably should have alerted the Government to the need for a secondary method of restraint, (id. at 14), and stated that "CGS's own Lock-Out/Tag-Out Procedure provides the best evidence for why [the wire-rope's failure was foreseeable]." (Id. at 19.)

The Order does not address this argument directly. However, the Order recognizes that the Lock-Out/Tag-Out Procedure is included in the ship's Safety Management System ("SMS"), which it is required to develop pursuant to Coast Guard regulations under 33 C.F.R. Part 96, implementing the International Safety Management ("ISM") Code. (Order at 3 n. 3.) The Order goes on to state that "[n]umerous courts have held that the SMS requirements imposed by the ISM Code do not affect a vessel operator's negligence liability." (Order at 6 n. 3.)

To the extent this language indicates that the Court cannot consider the Lock-Out/Tag-Out Procedure when evaluating evidence of breach, this statement is a clear error of law. For purposes of reconsideration, Plaintiff does not challenge the Court's ruling that the Lock-Out/Tag-Out Procedure did not create an independent duty under § 905(b).[3] However, it does not follow that SMS components, such as the Lock-Out/Tag-Out Procedure, cannot be considered when evaluating whether a vessel should have been aware of dangerous conditions where the active control duty has been triggered. In other words, Plaintiff's argument is that, <u>after</u> finding the active control duty has been triggered, violation of the Lock-Out/Tag-Out Procedure should properly be considered by the Court as evidence of the vessel operator's negligence—i.e., evidence of a breach of the active control duty.

The case of <u>Vargas v. APL Ltd.</u>, 431 F. Supp. 3d 82, 93 (E.D.N.Y. 2019), addresses this distinction. In <u>Vargas</u>, there was evidence that the vessel's crew provided a longshoreman with a ladder

---

[3] Plaintiff recognizes that she also argued that the Lock-Out/Tag-Out Procedure imposed a duty by "contract provision, positive law, or custom" in her opposition to the Motion for Summary Judgment, and that the Court has ruled against the Plaintiff on that issue.

5

during cargo operations without adhering to the applicable safety protocols. Id. Though the defendants argued that the plaintiffs "[could not] rely on the ship's own safety procedures to establish that the Vessel acted negligently," the court explained that this argument "confus[ed] the elements of duty and breach." Id.

> A vessel's internal safety protocols do not independently create a duty actionable under § 905(b). See, e.g., Horton v. Maersk Line, Ltd., 603 Fed. Appx. 791, 796-797 (11th Cir. 2015) (unpublished) (holding that there is no general duty for the "ship owner to supervise the stevedore," notwithstanding safety manual requiring supervision of cargo loading). But once it has been established that the vessel's duties under Scindia have been triggered, as they have here, [], there is no reason why a vessel's policies cannot be relevant to a determination of whether the crew failed to exercise "reasonable care" under the circumstances, Howlett, 512 U.S. at 98, 114 S. Ct. 2057. In this case, a factfinder could conclude that the Vessel's safety policies are evidence of the requirements of good seamanship generally, and that a failure to adhere to them was therefore unreasonable.

Id.

This is consistent with the cases cited by the Order. In Horton v. Maersk Line, Ltd., for example, the plaintiff argued that the vessel's safety management system imposed a duty to supervise, and that his injuries were caused by the vessel's "failure to supervise." 603 F. App'x at 795. Thus, the question at issue in Horton was "whether the Code imposes such a duty." Id. at 796. The Circuit Court concluded that it does not, id. at 796-97 (agreeing with conclusion of other courts that the Code does not create "additional dues, running from vessels to longshoremen"), but this analysis only addressed the duty element—it cannot be read to hold, or even suggest, that a vessel's safety policies cannot inform the inquiry into whether a particular condition is unreasonably dangerous or whether the vessel should have appreciated that danger. The relevant language in Calderon v. Offen, No. 07-cv-61022-COHN, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009), is similarly constrained. See id. (addressing "[p]laintiff's argument that the ship's charter and safety manual act as a contract provision, positive law or custom under *Scindia* to form a duty to

6

supervise the stevedores" and "conclud[ing] that the general language of the charter, the ISM Code and the [d]efendant's corporate safety manual do not change the general duty standard.").

The final case cited in the Order, Johnson v. Horizon Lines, LLC, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007), held that a violation of 33 C.F.R. § 96.230[4] could not be used to demonstrate that a defendant was negligent per se or preclude any showing of comparative negligence under the Jones Act. This context is even further removed from the issue presented by this case than Horton and Calderon. Whether federal regulations setting forth rules generally applicable to all safety management systems—in necessarily broad terms—can preclude a showing of comparative negligence is a very different question from whether the provisions of a specific safety management system can provide evidence that the vessel owner knew, or should have known, the unreasonable danger that the provision was designed to address.

Although Johnson is distinguishable on these grounds, the guidance it offers weighs against summary judgment in this case. The Johnson court explained that while some "cases suggest that the standards of conduct described in § 96.230 may support a finding by a jury or trial court that a shipowner was negligent, they furnish no authority for holding of negligence per se or the preclusion of comparative fault." Id. at 533 (citing Kyles v. Eastern Car Liners, Inc., 266 Ga. App. 784, 598 S.E.2d 353 (Ga. 2004) and Caraska v. State Department of Transportation, No. 57814–6–I, 2007 WL 2473456 (Wash. Ct. App. Sept 4, 2007)). Plaintiff does not go this far, as Plaintiff is not relying on the Code of Federal Regulations to demonstrate that the Government knew or

---

[4] Section 96.230 is one of the federal regulations that implement the ISM Code and outline the general requirements applicable to all safety management systems. It answers the question "What objectives must a safety management system meet?" and provides necessarily broad answers, such as "[p]rovide for safe practices in vessel operation and a safe work environment onboard the type of vessel the system is developed for" and "Establish and implement safeguards against all identified risks." Id.

7

should have known of the unreasonably dangerous condition. The crucial point is that the cases cited by the Order are distinguishable.

Case law does not support the conclusion that "SMS requirements imposed by the ISM Code do not affect a vessel operator's negligence liability." (Order at 3 n. 3.) It may be the case that SMS requirements do not create duties under § 905(b), but where a vessel owner's duties have been triggered, such requirements can and should be considered when deciding whether a vessel operator was aware that a particular condition was unreasonably dangerous. See Vargas, 431 F. Supp. 3d at 93. The Lock-Out/Tag-Out Procedure, after all, was developed by CGS, and therefore provides the most direct evidence of what risks CGS recognized—or at least, should have recognized—when dealing with hazardous energy sources, such as the gravity-based lifeboat davits.

Through this motion, Plaintiff respectfully requests that the Court reconsider whether a violation of CGS's own SMS procedures, particularly the Lock-Out/Tag-Out Procedure, is evidence of a breach of the active control duty. When such evidence is considered, there is at least a genuine factual dispute as to whether "the Government or Crowley knew or should have known the use of Crosby clamps without a stopper bar posed an unreasonable risk of harm." (Order at 10.)

**B. The testimony of Gerald Nielsen provides evidence that the Government knew, or should have known, that the failure to implement a secondary restraint presented an unreasonable risk of harm.**

Setting aside the Lock-Out/Tag-Out Procedure, the testimony of Plaintiff's expert also presented additional evidence that the Government or Crowley knew or should have known of the danger posed by the single-wire rope method of restraint. Gerald Nielsen is a maritime industry expert with over twenty years of experience in incident and accident reconstruction. (Dkt. No. 71-5 at 7.) When questioned about the use of the single-wire rope method, Nielsen explained:

> I'm clear in my report, I do not state that that was an OSHA violation but it is normal, customary, standard when looking at a job, it is normal, customary, standard when looking at a job especially in the last 10 years talking about drops

8

> and stored energy and line of fire, not having secondary retention on something that is suspended above workers is bad business practice at this point in time, where 20 years ago it may have been okay.

(Dkt. No. 71-9 at 193:23-194:6.)

This testimony offers supporting evidence of the industry standards applicable to gravitational energy hazards, like the lifeboat davit arms, and that the failure to use a dual method of restraint is a breach of the vessel operator's duty to act reasonably. Such standards may also provide evidence for breach of a duty owed under § 905(b). See Gravatt v. City of New York, No. 97 CIV. 0354 (RWS), 1998 WL 171491, at *15 (S.D.N.Y. Apr. 10, 1998) (finding breach the Scindia duties where defendant's safety director testified that practices violated "industry-wide standard of care"). Thus, Nielsen's testimony should also be considered in determining whether the Government or Crowley knew or should have known of the unreasonably dangerous condition. When considered together with the Lock-Out/Tag-Out Procedure, Nielsen's testimony adds additional evidence from which a reasonable fact-finder could conclude that the Government or Crowley knew, or should have known, that the single-wire restraint was unreasonably dangerous.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court reconsider its Opinion and Order of March 14, 2023, and deny the Government's Motion for Summary Judgment.

                <u>s/ Robert L. Wehrman</u>
                J. Rutledge Young, III (Fed. Bar No. 7260)
                Julie L. Moore (Fed. Bar No. 11138)
                Robert L. Wehrman (Fed. Bar No. 13426)
                DUFFY & YOUNG, LLC
                96 Broad Street
                Charleston, SC 29401
                (843) 720-2044
                ryoung@duffyandyoung.com
                jmoore@duffyandyoung.com
                rwehrman@duffyandyoung.com
                *Attorneys for Plaintiff*

April 11, 2022
Charleston, South Carolina